United States District Court
Southern District of Texas
FILED

NOV 2 0 2001

Michael N. Milby
Clerk of Court

25

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ARCHIE KOWALIK and | § | CA NO. B-01-180 |
| MARTHA KOWALIK | § | |
| | § | |
| Plaintiffs | § | |
| | § | |
| | § | |
| v. | § | |
| | § | |
| ACandS, Inc., | § | |
| Defendants. | § | |

_____

| | | |
|---|---|---|
| IN RE: | § | Case No. 01-10578 |
| FEDERAL-MOGUL GLOBAL, INC. | § | Chapter 11 |
| Debtor | § | (Pending in the United States |
| | § | Bankruptcy Court for the |
| | § | District of Delaware) |

PLAINTIFFS' REPLY BRIEF IN SUPPORT OF THEIR
MOTIONS FOR REMAND AND FOR SEVERANCE,
AND RESPONSE TO MOTION TO ABATE

Plaintiffs file this reply brief in support of their motion for remand and would

respectfully show as follows:

I.   RULINGS FROM THE NORTHERN AND SOUTHERN DISTRICTS
     ON THESE ISSUES IN IDENTICAL CASES

Plaintiffs respectfully call to the Court's attention the opinion of Judge Jack in

identical cases removed to the Corpus Christi Division of the Southern District, a copy of

which is attached as exhibit A.  In Arnold v. ACandS, Inc., No. C-01478, Garlock had

also removed Waters & Kraus asbestos cases to federal court on the basis of the Federal

Mogul bankruptcy, and had moved for an emergency transfer to the United States District

1

Court for the District of Delaware.[1] Garlock counsel set its emergency motion for

transfer for hearing on October 30.[2] As in the present case, plaintiffs moved for remand

and/or abstention, sought a severance of the claims against the debtor, and dismissed all

of their claims against the debtor entities with prejudice. Judge Jack issued her ruling on

November 9.

The court first found that the contribution claims by Garlock against the debtors

"arguably" came within "related to" jurisdiction. After noting plaintiffs' dismissal of all

claims against the debtor with prejudice, Judge Jack found the remaining Garlock

contribution claims "at best, tangentially and speculatively 'related to' the bankruptcy."

Nonetheless, under the broad standard for "related to" jurisdiction, such claims sufficed:

> The only possible claim at issue which might be "related to" the Debtor's
> bankruptcy is Garlock's cross-action against "all co-defendants" for
> indemnification and/or contribution. In fact, at the hearing held on October 30,
> 2001, Garlock conceded that, after plaintiffs' dismissal with prejudice of the
> debtor, the only remaining claim relevant to the removal is Garlock's cross-claim
> against the debtor for contribution. Arguably, claims such as the instant claim for
> contribution are not even ripe for adjudication. See, e.g., Pacor, 743 F.2d at 995
> (discussing indemnification claims in the context of "related to" jurisdiction).
> Though this Court declines to find that defendant lacks standing to remove, it
> should be noted that Garlock's contribution claims are, at best, tangentially and
> speculatively "related to" the bankruptcy. Compare, for example, Pacor, 743 F.2d
> at 995) ("indemnity action not "related to" the bankruptcy); Matter of Walker, 51
> F.3d 562 (5th Cir. 1995) with In re Dow Corning, 86 F.3d 482, 486 (6th Cir. 1996);
> In re Harrah's Entertainment, Inc. Securities Litigation, 1996 WL 684463 (E.D.
> La., Nov. 26, 1996). Assuming, arguendo, that Garlock's claim for contribution
> is still viable after plaintiffs' dismissal with prejudice of the debtor, the Court
> finds removal proper based on section 1452(a), and Section 1334, at least for
> those claims brought against the debtor. In the end, it is clear that "related to"
> jurisdiction is treated very broadly under the Pacor test adopted by the Fifth
> Circuit in Wood. As such, the Court finds that the contribution claims are
> arguably "related to" the bankruptcy, as they could conceivably have an effect on
> the estate being administered in bankruptcy.

---

[1] Nine separate cases were removed to the Corpus Christi Division, and all were consolidated before Judge
Jack. Her order in the Arnold case is similar to all the others.

[2] The transcript of this hearing is attached as exhibit C, and is referenced in Part VII below.

Order at 8-9 (footnote omitted).

The court next granted plaintiffs' motion for severance. Concluding that since plaintiffs had given up their claims against the debtor, and since "plaintiffs' state court personal injury action has already proceeded so far in the state court system, severance of all claims against the debtor appears warranted[,]" the court severed the cross-claims by Garlock (and by any other defendant) against the debtors into a separate cause number, and then transferred those claims to the District of Delaware. Order at 10-11 and n. 7.

Judge Jack also rejected straightforwardly Garlock's insistence that transfer to Delaware occur before remand is decided:

> "Though such a course of action would certainly yield the preferred result *for Garlock*, the Court declines to ignore settled principles regarding the limits of the jurisdictional authority of federal courts by simply skipping over an analysis of the propriety of removal in this case and becoming a legal way-station under Section 157(b)(5)....In sum, the Court refuses to entertain a motion to transfer under 28 U.S.C. §157(b)(5) prior to an examination of its jurisdiction."

Order at 11 n. 8 (emphasis the court's).

Finally, the court remanded all remaining claims by plaintiffs against non-bankrupt defendants to state court. Since these claims were "state law personal injury claims having nothing to do with debtor's bankruptcy[,]" remand was held warranted under 28 U.S.C. §1447(c) ("[i]f at anytime before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded.").

Alternatively, Judge Jack stated that even if there were jurisdiction over the claims against non-debtor defendants, equitable remand under §1452(b) would be appropriate: "Equity counsels that other claims should be swiftly remanded and allowed

to continue to proceed in state court." Order at 13. The court found "no reason to retain jurisdiction," but "numerous factors favoring equitable remand." These factors included:

1.  "[A]fter severance, all that remains is an asbestos personal injury case governed by state law and brought by plaintiffs against a group of non-debtor defendants."

2.  "The state court from which this action was removed is certainly better able to respond to questions involving state law;  moreover, that court has already extensively dealt with this case and is well-suited to continue trial on the merits of the state claims."

3.  "Principles of comity likewise support swift remand."

4.  "Garlock's artfully-crafted tale of exponentially increasing litigation caused by duplicative trials of plaintiffs' personal injury claims both in state court and in the Bankruptcy Court is inapplicable and misleading." Garlock conveniently forgets in its response to plaintiffs' motion to remand that not only did Counsel for plaintiffs move in open court to dismiss all claims against the Debtor with prejudice, but plaintiffs additionally asserted *that they would not file any proof of claim in the Debtor's Bankruptcy case*." (emphasis the court's)

5.  "Garlock's claims for contribution are tenuous and remote, at best."

6.  "Finally, and perhaps most importantly, it is prejudicial and inherently unfair to the numerous parties who did not join in removal to interrupt a case already well-rooted in the state court."

4

Order at 13-15 (footnote omitted).  Each of the factors that impelled equitable remand in the cases before Judge Jack is present here as well.

On November 15, Judge Fish of the Northern District also remanded several identical Waters & Kraus asbestos cases removed by Garlock on the basis of the Federal Mogul bankruptcy. In <u>Gill v. ACandS, Inc.</u>, No. 3:01-CV-2110-G, Judge Fish found that "the reasoning of <u>Arnold</u> is unassailable, and this case is indistinguishable from it." Order at 2. The court thus severed and transferred all claims against the debtors, and remanded the remaining claims to state court "pursuant to 28 U.S.C. Sec. 1447(c) and/or sec. 1452(b)." A copy of this order is attached as exhibit G.

Following is a reply to defendant's main contentions.

## II.     THE NOTICE OF REMOVAL WAS DEFECTIVE

Plaintiffs previously pointed out that defendant's notice of removal did not even disclose the identity of the relevant debtor.  Defendant's response denies this, yet Garlock has also filed a "Supplement to Application and Notice of Removal," in which it admits that "it may not be readily evident to the Court" who the debtor is.

As set forth in plaintiffs' motion for remand, the removal notice was required to articulate a plausible basis for bankruptcy jurisdiction.  Inasmuch as Garlock admits that it did not even identify a debtor, the removal notice was defective.

III.    THE IMPERMISSIBILITY, AND UTTER FUTILITY, OF TRANSFER

Defendant has now filed a new "motion to abate" plaintiffs' motion for remand. This motion largely re-urges the argument in the motion to transfer. It certainly provides no new reason for the Court to ignore a serious question of subject matter jurisdiction.

There is nothing mandatory about 28 U.S.C. § 157(b)(5). Nothing in it remotely suggests that this Court should, or can, abdicate the duty of any federal court to determine its jurisdiction. As a case relied upon heavily by Garlock states, "[f]ederal courts must be assured of their subject matter jurisdiction at all times." In re Canion, 196 F.3d 579, 584 (5th Cir. 1999). Indeed, if Garlock's position were the law, why would Congress have provided so clearly, in 28 U.S.C. § 1452, that removal is to the district court where the state case is pending, and that such court may remand to state court? It should hardly be necessary to point out that subject matter jurisdiction and venue are not the same, and that a resolution of the former must precede the latter. E.g., United States v. Thistlethwaite, 110 F.3d 861, 864 (2d Cir. 1997) ("The venue provisions do not confer or deny jurisdiction; they assume that the court in question has subject matter jurisdiction, and they simply limit the locations in which the action may be brought."). As the Eastern District stated in an asbestos case in which defendants insisted that the court not rule on plaintiffs' motion for remand, but let the case be transferred to the MDL court instead, "If this Court lacks subject matter jurisdiction, then it must remand this case to the state court from whence it came….This case no more belongs in federal court than it does at Multi-District Litigation ("MDL"). Faulk v. Owens-Corning Fiberglas Corp., 48 F.Supp.

2d 653, 659 (E.D. Tex. 1999). Or as Judge Jack put it, "the Court declines to ignore settled principles regarding the limits of the jurisdictional authority of federal courts by simply skipping over an analysis of the propriety of removal in this cases and becoming a legal way-station under Section 157(b)(5)." Order, exhibit A, at 11 n. 8.

Garlock's treatment of <u>Baumgart v. Fairchild Aircraft Corp.</u>, 981 F.2d 824 (5th Cir. 1993) is disingenuous at best. The only issue regarding §157(b)(5) in the case was whether the provision "prohibits the district court from dismissing under the doctrine of forum non conveniens a bankruptcy-related wrongful death case that arose in a foreign country. The plaintiffs argued that §157(b)(5) language withdrew any forum non conveniens discretion. The Fifth Circuit affirmed the holding of the district court that forum non conveniens was not precluded.

Garlock quotes the court of appeals statement that "we conclude that §157(b)(5) was intended to confer new power upon the district court in which a bankrupt is pending to qualify the choice of venue made by the plaintiff...." See Garlock's response at 2. But it leaves out the remainder of the sentence: "and was not enacted 'to vest the power of choice in the plaintiff.'" <u>Baumgart</u>, 981 F.2d at 834, quoting <u>United States v. National City Lines</u>, 334 U.S. 573, 597 (1948). The omitted language underscores the true focus of the court's conclusion that, contrary to the plaintiffs' argument, §157(b)(5) could not be read to exclude forum non conveniens discretion.

Garlock likewise mischaracterizes language earlier in the opinion, when the court discusses <u>A.H. Robins Co. v. Piccinin</u>, 788 F.2d 994 (4th Cir. 1986), cert. denied, 479 U.S. 876 (1987). The issue in that case was whether the district court, in the district where the bankruptcy was pending, had authority to order that cases be transferred to it,

or whether the general bankruptcy venue transfer statute, 28 U.S.C. §1412, required that the "various district courts where the cases were pending" had to order such a transfer. Id. at 832. Garlock highlights the Fifth Circuit's description of the <u>Robins</u> holding: "the court wrote that as to ... personal injury tort claims against a debtor...§157(b)(5) is 'supreme.' Id. From this, Garlock argues that the Fifth Circuit "noted the 'supremacy' of this venue determination exclusively in the 'Home' District Court." Garlock's reply regarding transfer motion p. 2.

But again, the Fifth Circuit was describing a holding of the Fourth Circuit, and a much narrower holding at that. In the next paragraph, the court quite clearly states that "the Fourth Circuit was engaged *only* in reconciling §§1412 and 157(b)(5), and found that between the two sections the latter was 'supreme' in that limited context; the court never had before it a question of whether enactment of §157(b)(5) served *sub silentio* to rescind the doctrine of forum non conveniens." Id. at 832 (emphasis the court's). Nor did the court overrule *sub silentio* the fundament that a federal district court must determine its own jurisdiction.

In short, there is nothing in <u>Baumgart</u> that makes §157(b)(5) "supreme" over this Court's authority, and duty, to resolve a challenge to subject matter jurisdiction. Garlock has never cited a single case to the effect that §157(b)(5) excuses, let alone bars, a district court's obligation in this regard because there is none.

Finally, Garlock studiously avoids the obvious reason why transfer would be such a futile act: <u>Pacor, Inc. v. Higgins</u>. As detailed in our motion for remand, this case holds squarely that claims between plaintiffs and nonbankrupt co-defendants in asbestos cases are not within federal bankruptcy jurisdiction: "We therefore conclude that the action

brought by Higgins [the plaintiff] against Pacor [the nonbankrupt co-defendant] is not 'related to' bankruptcy, and that therefore there was no jurisdiction to remove the matter to federal court." 743 F.2d at 996 (footnote omitted.). This rule applies even in the absence of a severance. Hanna v. Philadelphia Asbestos Co., 743 F.2d 996, 1001 (3d Cir. 1984).

Since this holding of the Third Circuit is binding upon the court to which Garlock seeks transfer, the United States District Court for the District of Delaware, the foregone result of any transfer would be a remand of plaintiffs' claims against Garlock, and all other nonbankrupt defendants, to state court. What purpose could possibly be served by transfer, then, other than months of delay? We respectfully submit that delay is exactly what has motivated this entire removal effort.

IV.    "RELATED TO" JURISDICTION

A.    The presence of a debtor in the case makes no difference

Garlock is correct that Gasket Holdings Inc., which is a subsidiary of Federal Mogul Corp., was a defendant in the state court case, and was nonsuited after removal. Although the debtors were not even named in the notice of removal, then, there was technically a debtor in this case at the time of removal. This fact is of no significance, however, because under the rule of Pacor, the presence of a bankrupt entity in the case does not change the outcome: there is still no bankruptcy jurisdiction over the claims by the plaintiffs against the non-bankrupt defendants. Hanna, supra, 743 F.2d at 1001. Moreover, plaintiffs have now dismissed the debtors with prejudice.

B.      Garlock's Cases are Unavailing

Garlock relies primarily on three cases in support of its contention that there is "related to" jurisdiction in these cases.  None of them governs the situation before this Court, or casts any doubt on the rule of <u>Pacor, Inc. v. Higgins</u>.

<u>In re Canion</u>, 196 F.3d 579 (5th Cir. 1999), involved an effort by a judgment creditor of the debtor to collect the judgment from relatives, friends, employees and associates (collectively, the "defendants") of the debtor.[3]  The creditor alleged that these defendants had conspired to interfere with the creditor's ability to collect its judgment against the debtor.  This suit was held to have a direct and foreseeable impact on the bankruptcy estate, because if the plaintiff was successful, the estate would not have the liability represented by the judgment.[4]  Id. at 585-86.

In reaching this decision, the Fifth Circuit cited four cases, each involving a similar, direct relationship between the action at issue and the estate.  See 196 F.3d at 587 n. 28.  The first case was <u>Owens Illinois, Inc. v. Rapid American Corp.</u>, 124 F.3d 619 (4th Cir. 1997).  In  this case, Owens Illinois paid judgments in several asbestos cases, representing both its share of the liabilities and that of  Celotex Corp., another asbestos defendant that had recently declared bankruptcy.  Celotex had previously agreed contractually to indemnify Rapid American Corp., an entity which had briefly owned Celotex. Id. at 622-23.

---

[3] Contrary to defendants' description on p. 22 of its remand response, Canion was the debtor in the case, not the plaintiff/creditor.

[4] The Fifth Circuit rejected the plaintiffs' argument that since recovery against the defendants would simply mean they were legally subrogated to the judgment, the amount of liability faced by the estate would not change.  The court of appeals found that the "unclean hands" doctrine might bar such subrogation. Id. at 586.

After setting out the seminal <u>Pacor</u> test, id. at 626, the Fourth Circuit

distinguished <u>Pacor</u> on the ground that the potential contribution liability was *contractual*

in nature:

> According to Owens, this case is analogous to <u>Pacor</u>, in which the Third
> Circuit held that a third-party action was not "related to" the bankruptcy
> case because the defendant only had a common law right to
> indemnification from the debtor. The court reasoned that a judgment
> against the defendant in the third party action could not determine any
> rights, liabilities, or course of action of the debtor, because neither res
> judicata nor collateral estoppel could be asserted against the debtor.
> Significantly, the Court specifically distinguished its holding from <u>In re
> Brentano's</u> 27 B.R. at 90. In that case, a bankruptcy court found "related
> to" jurisdiction on the ground that the obligation of reimbursement
> between the debtor and the defendant in the third party action was set by
> contract which meant that a successful claim against the defendant would
> automatically result in indemnification liability against the debtor. <u>Pacor</u>,
> 743 F.2d at 995-96

> We do not believe that <u>Pacor</u> suggests that "related to" jurisdiction over
> the Contribution Action. Given that Rapid's proof of claim against the
> Celotex bankruptcy estate rests on an contractual obligation of indemnity,
> we believe that the situation before us is more analogous to the situation in
> <u>In re Brentano's</u> than the situation in <u>Pacor</u>. Furthermore, Owens' claim
> against the Celotex bankruptcy estate serves as an additional link between
> the contribution action and the Celotex bankruptcy case, a link that was
> not present in <u>Pacor</u>.

Id. at 627. The <u>Owens Illinois</u> court cited two of the three other cases cited by the Fifth

Circuit in footnote 28 of the <u>Canion</u> opinion. See 124 F.3d at 626. Both of these cases

likewise involved direct obligations that would unmistakably affect the bankruptcy estate.

See <u>In re Kaonohi Ohana, Ltd</u>. 873 F.2d 1302, 1306-07 (9th Cir. 1989) (bankruptcy

jurisdiction premised on "the direct effect disposition of [plaintiff's] claim for specific

performance would have upon the claim for damages against the estate arising out of

[plaintiff's] breach of contract action."); <u>In re Titan Energy, Inc.</u>, 837 F.2d 325, 329 (8th

Cir. 1988) (outcome of dispute of ownership of insurance policies would directly affect liabilities of estate).

Canion and the cases it relies on are thus fundamentally different from the present case, because they are premised on direct, contractual or otherwise easily identifiable bases of possible liability to the estate. Canion relies on Owens-Illinois, which explicitly distinguishes the Pacor situation.

Garlock next offers In re Jeffers, 2001 WL 96401 (E.D. La., Feb. 2, 2001). Jeffers is likewise easily distinguishable because it involved a direct claim by the plaintiff against the debtor; the debtor had accepted double payment of insurance proceeds from the plaintiff. The plaintiff sued to recover the overpayment, thus presenting a straightforward, liquidated claim against the debtor. Id at *2.

Finally, in its footnote 49 that takes up most of pp. 35 and 36 of the remand response, Garlock makes much of In re Dow Corning Corp., 86 F.3d 482 (6th Cir. 1996). Remarkably, in its entire treatment of the case, defendant never acknowledges that the ultimate result in Dow Corning was *the remand to state court of claims by breast implant plaintiffs against all defendants other than the shareholders of the debtor*. After the Sixth Circuit ruled that "related to" jurisdiction existed in the case, it remanded to the district court for a ruling on mandatory and permissive abstention. 86 F.3d at 497-98. The district court then abstained on both bases. 1996 WL 511646. Finally, the Sixth Circuit granted mandamus. As to mandatory abstention, the district court's analysis was found to be perfunctory and not individualized, and so it was vacated. 113 F.3d at 570. The court reversed the permissive abstention determination as erroneous. Id. at 571.

12

The Sixth Circuit's ultimate resolution, however, was to grant mandamus relief as to claims against the non-debtor co-defendants who were shareholders of the debtor -- Dow Chemical Corp. and Corning, Inc.  The court had, in its earlier opinion set out the reason's for special treatment of these entities:  the "degree of identity" between the shareholders and the debtors, and the existence of shared insurance policies among the three companies.  86 F.3d at 492-494.  Dow Corning is thus distinguishable for the fundamental reason that it is only the claims against *shareholders of the debtor* that were not ultimately remanded to state court.  Needless to say, neither Garlock nor any other non-debtor has such a relationship with any debtor in this case, and indeed Garlock makes no such contention.

### C.     Pacor Controls this Case and Compels Remand

Perhaps because it would obviously govern all proceedings in the District of Delaware, the court to which Garlock seeks transfer, Garlock tries hard to muddle the controlling case of Pacor Inc. v. Higgins.  At p. 32, it suggests two reasons why Pacor is distinguishable:  here there are contribution claims against the debtor, and here the debtor has cross-claim against its codefendants.

First, contrary to Garlock's statement, the non-debtor co-defendant *did* have a contribution claim in Pacor against the debtor.  See 743 F.2d at 986:  plaintiffs "sought damages allegedly caused by Mr. Higgins' work-related exposure to asbestos supplied by Pacor, a distributor of chemical supplies.  In response, Pacor filed a third party complaint impleading the Johns-Manville Corporation, which Pacor claims was the original manufacturer of the asbestos."

13

Second, the notion that bankruptcy jurisdiction might exist here because of cross-claims brought *by the debtor* is absurd. As a threshold matter, Garlock has utterly failed to provide any evidence that such cross-claims even exist in this case. As it is always the removing defendant's burden to establish a basis for federal jurisdiction, <u>Martineau v. ARCO Chem. Corp.</u>, 203 F.3d 904, 910 (5th Cir. 2000), this is a signal failing. Moreover, the debtor did not remove this case. It is obvious that if the debtor thought that *its own* cross-claims mattered in the slightest, the debtor would have attempted to remove this case to federal court. Instead, the debtor has consented to its dismissal with prejudice, and to a waiver of any possible application of the automatic stay. Finally, the debtors have now been dismissed with prejudice.

Finally, defendant never even acknowledges, let alone distinguishes, <u>Nickum v. Brakegate, Ltd.</u>, 128 B.R. 648 (C.D. Ill 1991), appeal dism'd, 942 F.2d 1223 7th Cir. 1991), which also holds that "related to" jurisdiction does not exist in asbestos cases against nondebtor defendants, even where those defendants have contribution claims against bankrupt co-defendants, and accordingly rejects "a nimble attempt to bootstrap state court actions into federal cases by way of the bankruptcy court." Id. at 649. Also ignored is <u>McCratic v. Bristol-Myers Squibb Co.</u>, 183 B.R. 113 (N.D. Tex. 1995), which reaches the identical result in the breast implant context.

Garlock does attempt to distinguish the recent Mississippi case, <u>Johnson v. ACandS, Inc.</u>, No. 1:01CV408GR (S.D. Miss., Oct. 3, 2001), on the ground that the debtors were dismissed in that case before removal, and also on the ground that the state court standing order had effectively severed the cross claims. Neither distinction has merit. First, under the state court standing order in that case, cross-claims continued in

14

existence for 30 days after the plaintiff dismissed the debtor (Sept. 18, 2001), and so they were technically in existence on the date of removal (Oct. 2, 2001).  Second, whether or not the contribution claims against the debtor have been severed makes absolutely no difference under the rule of Pacor.  Hanna v. Philadelphia Asbestos Co., 743 F.2d 996, 1001 (3d Cir. 1984).

Judge Jack's treatment of the issue was the functional equivalent of the result in Pacor.  She found that jurisdiction existed "at least for those claims brought against the debtor[,]" Order, exhibit A, at 9, and then severed those claims.  The remaining claims by plaintiffs against Garlock and the other non-debtor defendants were then remanded for lack of subject matter jurisdiction under 28 U.S.C. §1447(c), Order, exhibit A, at 12, with Judge Jack going on to detail the reasons why equitable remand under §1452(b) would also be appropriate.

Plaintiffs thus respectfully submit that there is no jurisdiction over their claims against the non-debtor defendants, and that those claims must be severed and remanded to state court.

## V.    THE EFFECT OF PLAINTIFFS' DISMISSAL WITH PREJUDICE

In a long section of Garlock's reply brief in support of its transfer motion, Garlock argues that plaintiff's nonsuit, which dismissed claims against the debtor, did not eliminate Garlock's cross-claim.   See Garlock's reply brief on transfer at 12-16. This is an argument about remand, not transfer, so plaintiffs will address it here.  Judge Jack did not decide this issue, but simply assumed for purposes of argument that the cross-claim was still viable.  Order exhibit A, at 8-9.

15

First, under both federal and state law, a dismissal with prejudice constitutes an adjudication on the merits in a defendant's favor, barring any further litigation of the issues. Kaspar Iron Works, Inc. v. Leco Engineering & Mach., Inc., 575 F.2d 530, 534 (5th Cir. 1978) ("It is clear that a stipulation of dismissal with prejudice, or, for that matter, a dismissal with prejudice at any stage of a judicial proceeding, normally constitutes a final judgment on the merits which bars a later suit on the same cause of action."); Lelsz v. Kavanagh, 903 F.Supp 1037, 1040 (N.D. Tex. 1995); Ritchey v. Vasquez, 986 S.W.2d 611, 612 (Tex. 1999); Thomas v. Knight, 52 S.W.3d 292, 295 (Tex. App. – Corpus Christi 2001, pet filed). Plaintiffs' dismissal of all claims against the debtors thus eliminates any right of recovery against them, whether in a tort suit or in a bankruptcy proceeding.

A claim for contribution depends upon the joint and several liability of the party from whom contribution is sought for the same harm. Beech Aircraft Corp. v. Jinkins, 739 S.W.2d 19, 21 (Tex. 1987); see also Singleton v. New York Underwriters Ins. Co., 739 F.2d 198, 200 (5th Cir. 1984); Garza v. Arizona Refining Co, 634 F.Supp. 959, 962 (S.D. Tex. 1986); F.D.I.C. v. Niblo, 821 F.Supp. 441, 457 (N.D. Tex. 1993). Indemnity, on the other hand, is an all-or-nothing proposition: if allowed, it shifts the entire burden of paying the judgment from one tortfeasor to another, and it also depends upon the joint and several liability of the indemnitor and indemnitee. Hardy v. Gulf Oil Corp., 949 F.2d 826, 829-30 (5th Cir. 1992).

Since the dismissals with prejudice mean that plaintiffs cannot recover from the debtors, Garlock cannot recover from them either. If a plaintiff cannot recover against a party, then a defendant cannot recover contribution against that party. C&H Nationwide,

Inc. v. Thompson, 903 S.W.2d 315, 320 (Tex. 1994) (noting "the general rule that a person is not liable to a defendant if he is not also liable to the plaintiff."); Shoemake v. Fogel, Ltd., 826 S.W.2d 933, 935 (Tex. 1992) ("A defendant's claim of contribution is derivative of the plaintiff's right to recover from the joint defendant against whom contribution is sought."); Varela v. American Petrofina Co. of Texas, 658 S.W.2d 561, 562 (Tex. 1983); Hunter v. Ft. Worth Capital Corp., 620 S.W.2d 547, 553 (Tex. 1981) ("Neither contribution nor indemnity are recoverable from a party against whom the injured party has no cause of action."); Eslan Thermoplastics v. Dynamic Systems, Inc., 49 S.W.3d 891, 902 (Tex. App. -- Austin 2001, n.p.h.).

Against this established law, Garlock first offers Tex. Civ. Prac. & Rem. Code §33.016. Yet this statute plainly supports plaintiffs' position, for it provides that contribution may be had from "each person who is not a settling person *and who is liable to the claimant for a percentage of responsibility* but from whom the claimant seeks no relief at the time of submission." §33.016(b) (emphasis added). In other words, while the plaintiff need not *seek* recovery against a contribution defendant, the plaintiff's *right* to recover against the contribution defendant must exist for contribution to be available. The Houston Court of Appeals applied § 33.016(b) in exactly this way:

> A liable defendant is entitled to a right of contribution against any other party who is liable to the injured party for a percentage of responsibility. Tex. Civ. Prac. & Rem. Code § 33.016(b) (Vernon Supp. 1991). The liable defendant is entitled to contribution even though the injured party may seek no relief from the other party.... However, a liable defendant is not entitled to a right of contribution from any party against whom the injured party has no cause of action. Amoco Chem. Corp. v. Malone Serv., 712 S.W.2d 611, 613 (Tex. App. -- Houston [1st Dist.] 1986, no writ); Safway Scaffold Co. v. Safway Steel Prods., Inc., 570 S.W.2d 225, 228-29 (Tex. Civ. App. -- Houston [1st Dist.] 1978, writ ref'd n.r.e.); see also Varela v. American Petrofina Co., 658 S.W.2d 561, 562-63 (Tex.

17

1983) (since employee was precluded under workers' compensation statute from any cause of action against employer, third party had no claim for contribution from employer). Dixie contends that Guillory was precluded from any cause of action against it because he received workers' compensation benefits under the Longshore & Harboer Workers' Compensation Act.... Since Dixie was Guillory's employer, and Guillory received workers' compensation benefits, Guillory's was precluded from pursuing a cause of action against Dixie. Consequently, the Port Aurhority was not entitled to a right of contribution against Dixie, and the trial court erred in entering judgment awarding the Port Authority a five-percent right of contribution against Dixie.

Port of Houston Auth. v. Guillory, 814 S.W.2d 119, 124 (Tex. App. -- Houston [1st Dist.] 1991), aff'd, 845 S.W.2d 812 (Tex. 1993).

Next, Garlock waves away C&H Nationwide, because it did not involve §33.016 and did not involve a nonsuit. As set forth above, §33.016 codifies plaintiffs' position, not Garlock's. And while it is true that a nonsuit was not at issue in C&H Nationwide, that case stands for the much broader proposition, again, that "a person is not liable to a defendant if he is not also liable to the plaintiff." 903 S.W.2d at 320. This straightforward language is never acknowledged in Garlock's brief. A dismissal with prejudice is only one of many ways, of course, in which a person might become "not liable to the plaintiff," and inexorably thus not liable to the defendant either.

Garlock then cites numerous cases to the effect that a "dismissal of the underlying claim does not operate as a dismissal of the cross-claim filed against a defendant by a co-defendant." (reply brief at 14). But while the dismissal of the one might not operate formally or administratively as the dismissal of the other, plaintiffs' inability to recover from the debtors *negates the legal viability* of the contribution claim. Whether or not Gasket Holdings, for example, is still in the list of parties in the case is of no moment; the

point is that it has no longer has even any theoretical, future liability for contribution or indemnity. None of the cases cited by Garlock questions this truism in the slightest.

The Texas cases certainly do not cast any doubt on the rule. <u>Hoodless v. Winter</u>, 80 Tex. 638, 16 S.W. 427 (Tex. 1891), referred to a *counterclaim* as a "cross-claim," and simply held that a plaintiff's nonsuit cannot destroy the defendant's right to affirmative relief on a counterclaim. Id. at 640, 428. <u>Ramon v. Mani</u>, 550 S.W.2d 270, 271 (Tex. 1977), did not involve a cross-claim at all, but rather a reduction in the primary defendant's own liability under the then-governing rule of <u>Palestine Contractors, Inc v. Perkins</u>, 386 S.W.2d 764 (Tex. 1964). See the court of appeals' opinion, 535 S.W. 2d 654, 655 (Tex. App. -- Eastland 1975). <u>State v. Roberson</u>, 409 S.W.2d 872 (Tex. App. -- Tyler 1966), also involved a counterclaim for affirmative relief against the plaintiff. Id. at 875.

None of these cases, in sum, even involves the present situation, let alone questions the familiar rule upon which plaintiffs rely. Moreover, they all predate the straightforward holdings from the Texas Supreme Court quoted above in <u>C&H Nationwide</u>, <u>Shoemake</u>, and <u>Hunter</u>.[5]

---

[5]   The out-of-state cases cited by Garlock, all at least 24 years old, are also inapposite. <u>Fairview Park Excavating Co. v. Al Monzo Const. Co.</u>, 560 F.2d 1122, 1126 (3d Cir. 1977), and <u>Frommeyer v. L&R Const. Co.</u>, 139 F.Supp. 579, 581 (D.N.J. 1956) both involved cross-claims based on the language in construction bonds, not on the third party's liability to the plaintiff. Similarly, in <u>Hecht Co. v. District of Columbia</u>, 139 A.2d 857, 861 (D.C. App. 1958), the cross-claim was "chiefly predicated" on a contractual indemnity agreement. In <u>Aetna Ins. Co. v. Newton</u>, 398 F.2d 729, 732 (3d Cir. 1968) and <u>Picou v. Rimrock Tidelands, Inc.</u>, 29 F.R.D. 188, 189 (E.D. La. 1962), the plaintiffs' claims were dismissed on jurisdictional grounds and not on the merits, and so a claim for contribution or indemnity would still be viable. In <u>Slotkin v. Brookdale Hosp. Center</u>, 377 F.Supp. 275, 281 (S.D.N.Y. 1974), no one argued that the termination of the plaintiffs' claim had vitiated the contribution claim; instead the only contentions wre that the claim was premature and that contribution is not available in fraud actions. Finally, <u>Barker v. Louisiana & Ark. Ry. Co.</u>, 57 F.R.D. 489, 491 (W.D. La. 1972) actually supports plaintiffs' position, for it makes clear that a defendant's liability for contribution is limited to the extent of its liability to the plaintiff.

In any event, none of these cases casts any doubt on the much more recent, definitive statements of Texas law from the Texas Supreme Court.

## VI.  MANDATORY ABSTENTION

In plaintiffs' motion for remand, we detailed how the criteria for mandatory abstention are met in this case.  Garlock devotes half of one page of its remand response, p. 38, to this issue.  Judge Jack did not address mandatory abstention as to plaintiffs' claims against the non-debtor defendants.

Garlock doesn't dispute that plaintiffs fulfill the criteria, but seems to argue that mandatory abstention is unavailable because 28 U.S.C. §157(b)(4) exempts from mandatory abstention, by reference to §157(b)(2)(B), "contingent or unliquidated personal injury tort or wrongful death claims against the estate...."  While plaintiffs' claims against Garlock and the other nonbankrupt defendants are personal injury claims, however, they are not claims against the estate.  Instead they are claims against non-bankrupt entities, and so are not exempt from mandatory abstention.  E.g., Spitzfaden v. Dow Corning Corp., 1995 WL 662663, *2 (E.D. La., Nov. 8, 1995) ("The instant personal injury claims insofar as they relate to the implant co-defendants are not against the estate.  Therefore, §157(b)(4) is inapplicable.");  see also A.H. Robins, supra, 788 F.2d at 1012 ("Section 157(b)(2)(B) excepts from the definition of core proceedings, personal tort claims against the debtor.").

Defendant's only other statement about mandatory abstention is that "Additionally, Logic [sic], judicial economy, and the dictates of 28 U.S.C. §157(b)(5) [implemented by the "Home District Court's obligation to actually make a determination based on the impact upon the bankruptcy case] compel the "Home" District Court consider remand and discretionary abstention in a proceeding which has all parties [sic] interests balanced and protected."  But the very point of mandatory abstention is that it is

20

mandatory; when its requirements have been met, as Garlock does not contest here, Congress has already decided that "logic" and "judicial economy" dictate remand to state court.

In their discussion of mandatory abstention, plaintiffs cited several recent holdings by Texas federal courts granting mandatory abstention in cases involving joint contractual liability among asbestos defendants. See decisions attached as exhibits E, F & G to plaintiffs' motion for remand. Defendant addresses these cases not in regard to mandatory abstention, but in regard to subject matter jurisdiction. See defendant's remand response at 28-30. Defendant states that "not one [such] case cited by plaintiffs was a dismissal on subject matter jurisdiction," but this is incorrect: in Painter, Judge Lynn held straightforwardly that "I conclude that I do not have subject matter jurisdiction." Painter v. Certainteed Corp., No. 3:00-CV-2714-M (N.D. Tex., Dec. 20, 2000), exhibit G to plaintiffs' motion for remand at 33.

In any event, plaintiffs cited these cases in support of their abstention argument. Subject matter jurisdiction exists in these cases because of a *contractual* sharing arrangement, known as the CCR agreement, among bankrupt and non-bankrupt asbestos defendants. E.g., Broyles v. U.S. Gypsum Co., 266 B.R. 778, 781 (E.D. Tex. 2001); Lupercio v. GAF Corp., No. EP –01-CA-228-DB (W.D. Tex. Oct. 19, 2001), exhibit E to plaintiffs' motion for remand at 3 ("Defendants point out that it is likely that [debtors] U.S. Gypsum and Armstrong will be liable, based on their contractual obligations with the CCR, to indemnify defendants should plaintiffs prevail in this case."). The distinction between direct contractual liability for indemnification, and inchoate common law tort liability for contribution or indemnity, is of course the distinction, recognized in

21

plaintiffs' motion for remand, between <u>Pacor</u> and such cases as <u>A.H. Robins</u>, F.2d at 1001.

So while there is subject matter jurisdiction in these cases, they make clear that mandatory abstention is required.   Just since plaintiffs filed their motion for remand, another court has reached the same result.   In <u>Adams v. Armstrong World Ind., Inc.</u>, No. A-01-CA-565-SS (W.D. Tex., Nov. 1, 2001), Judge Sparks held that removal was untimely, but also held that both mandatory and permissive abstention were appropriate. See Order attached as exhibit B at 6-8.


VII.    REMOVAL OF ONLY ONE LAW FIRM'S CASES

At p. 4 of its response to the motion for remand, Garlock "denies that only Waters & Kraus suits were removed..."   No evidence to the contrary is offered, however, and counsel for Garlock has admitted that only the undersigned firm's cases were removed.

In the hearing before Judge Jack, she questioned Garlock counsel on this issue:

THE COURT:      Well, is it possible that you just removed this law firm's
                cases?

MR. CHANEY:     We did.  Yes, that is what we did, Your Honor.

Transcript of hearing in <u>Kennamer v. Able Supply Co.</u> (and related cases), No. C-01-477, Southern District of Texas, Corpus Christi Division, attached as exhibit C, at 89.   Mr. Chaney also stated that the reason Garlock removed only Waters & Kraus cases is that it has "a standing settlement agreement or some type of a global arrangement or some type of understanding" with all other plaintiffs' firms, and therefore doesn't "need the type of consolidation that we're asking for" as to Waters & Kraus cases.  Id. at 86.

22

But does bankruptcy jurisdiction turn on a defendant's settlement preferences? Garlock actually seems to maintain that, because one firm's settlement demands are higher than other firms', bankruptcy jurisdiction must be available if Garlock decides it doesn't want to settle that firm's cases. This is not the law, any more than it is the law that asbestos claims present federal questions unless the plaintiff agrees to settle for a certain figure.

The undersigned firm's cases represent far less than one percent of all asbestos pending claims against Garlock nationwide. As confirmed by Garlock's counsel at the hearing, the removals were not undertaken because there is something about Waters & Kraus cases that make them uniquely amenable to bankruptcy jurisdiction. Instead, they were filed simply to punish Waters & Kraus for treating cases individually, and attempting to maximize results in each one.

## VIII.   GARLOCK'S COMPLAINTS ABOUT ASBESTOS LITIGATION

Beginning on p. 6 of its response to the motion for remand, Garlock embarks on a long excoriation of what it sees as the evils of the present-day asbestos litigation system. Many, many articles from the Wall Street Journal, conservative think tanks and so on are cited (although not attached). All of it would make fine grist for the law reviews, or perhaps testimony before Congress in hearings on how to reform the Bankruptcy Code. All of it is utterly irrelevant to whether bankruptcy jurisdiction exists in the state court asbestos claims removed to this Court. Judge Jack found it "inapplicable and misleading."[6]

---

[6] Order, exhibit A, at 14. This section of Garlock's brief repeats, nearly verbatim, the same passages from Garlock's brief before Judge Jack.

To whatever extent the Court is interested in this screed, it is worth noting that even if some generalized dissatisfaction with the present operation of bankruptcy law in multi-defendant state tort cases sufficed as a basis for jurisdiction, there is absolutely no information about how *Garlock* is faring under the present structure. In fact, we know that Garlock likes the present system just fine, because according to its counsel at the hearing before Judge Jack, it continues to settle cases with other plaintiffs' firms routinely, on a group basis. Although Garlock's brief provides no data about Garlock itself, the current annual report of Garlock's owner, B.F. Goodrich Co., demonstrates the following:

1. As Garlock counsel stated at the hearing, cases are settled in groups with most firms after a certain period of discovery. The annual report calls these "actions in advanced stages." At the end of 2000, Garlock faced 5800 such actions, *down* over 25% from 1999.

2. The total number of claims pending at year–end 2000 (including both Garlock and another B.F. Goodrich subsidiary, Anchor Packing Co.), is 96,300, up less than one-third of one percent from 1999, and *down* five percent from 1998.

3. B.F. Goodrich concludes that although asbestos litigation costs for Garlock and Anchor Packing could be "material" in a given period, "pending and reasonably anticipated future actions against Garlock and Anchor are not likely to have a material adverse effect" on Goodrich's condition.[7]

Little wonder, then, that Garlock's complaints about asbestos litigation say nothing about Garlock's own actual experience. All of Garlock's protestations about the unfairness of the present scheme are fictional. The truth is that the settled operation of

---

[7] The relevant excerpt from this annual report is attached as exhibit D. The report is available in its entirety at www.goodrich.com/annualreport2000.

the bankruptcy laws in multi-defendant state tort cases is of no interest to Garlock, because it settles well over 99% of its asbestos claims.

These settlements point up another irony in Garlock's complaints.   One of Garlock's themes is that the mass of cases pending today are largely claims involving little or no injury, but aggregated by plaintiffs' lawyers to force settlement.  But this case involves only the claims of two injured plaintiffs and their spouses.   Not only are Garlock's assertions about asbestos litigation irrelevant to any legal issue in this case, they are also wholly irrelevant to the plaintiffs in this action.

In any event, out of 96,300 asbestos cases pending against it, Garlock has removed one firm's cases, totaling 88, claiming that "centralization" somehow demands bankruptcy treatment for these cases only.   Is there any better indication of the hollowness, the spuriousness, of Garlock's assertions about the need for "centralization" of asbestos claims, than the fact that they have sought it in only one-tenth of one percent of the cases pending against it?

Finally, even if Garlock's desire for "centralization" were relevant to any jurisdictional determination, and even if it were a sincerely held position, it is one that has been consistently *rejected* by the court charged with overseeing all federal asbestos litigation since 1991.  Judge Charles Weiner of the Eastern District of Pennsylvania, who presides over the MDL proceedings in all federal asbestos cases, routinely dismisses and severs all claims against newly-bankrupt defendants.  See "MDL Actions Dismissed Due to 6 Bankruptcy Filings," 1 Mealey's Asbestos Bankruptcy Report No. 3, p. 15 (order of Sept. 12, 2001);   "Judge Dismisses Six Defendants that have Declared Voluntary Bankruptcy, Tolling Statute of Limitations," 26 Asbestos Products Liab. Litig. MDL

Reporter No. 12, p. 4 (order of June 14, 2001) (reports attached as exhibit E).  In other words, the one federal court already charged with "centralizing" all federal asbestos cases sends claims against each bankrupt defendant off for treatment in each individual bankruptcy proceeding.  This is exactly the course that has been followed by the courts since the first asbestos bankruptcy 20 years ago.

IX.    DISCRETIONARY ABSTENTION OR
       EQUITABLE REMAND FACTORS

Plaintiffs will rest on their previous discussion of these factors.  Judge Jack's thorough treatment of the equitable remand factors is detailed above and fully supports plaintiffs' position.  Plaintiffs add the following matters in reply to certain of Garlock's assertions.[8]

First, defendant argues that "[t]he U.S. Supreme Court has directed federal courts to exercise jurisdiction over cases properly removed to the federal courts."  Garlock's response at 42, citing In re Branded Products, Inc., 154 B.R. 936, 941 (Bankr. W.D. Tex. 1993).  The presumption against abstention, however, does not apply in the bankruptcy context.  Republic Reader's Serv. v. Magazine Serv. Bureau, 81 B.R. 422, 425 (Bankr. S.D. Tex. 1987);  see also In re Best Reception Sys., 220 B.R. 932, 952 n. 32 (Bankr., E.D. Tenn. 1998).  In any event, the actual holding of Branded Products --  that abstention is not applicable in removed cases, 154 B.R. at 939 --  was squarely overruled in In re Southmark Corp., 163 F.3d 925, 929 (5th Cir. 1999).

---

[8] Plaintiffs also attach as exhibit F the deposition of Paul Hanly, chief counsel for Federal Mogul, Gasket Holdings and related entities.  Plaintiffs' motion for remand detailed, through the affidavit of Jeffrey Simon, how Garlock has never once actually sought contribution from Federal Mogul or its subsidiaries. Garlock's response objects to this affidavit on hearsay grounds.  To moot any objection on this basis, plaintiffs' counsel took Mr. Hanly's deposition on November 2.  Plaintiffs now supplement the record in this case with Mr. Hanly's deposition.

Second, a great deal of what is said by Garlock in connection with equitable remand and discretionary abstention is simply a reiteration of defendant's theme that the case must be transferred under §157(b)(5). As noted in Part III above, this Court has no power, let alone obligation to grant transfer. Plaintiffs wish only to add that Garlock's strident contentions about transfer are particularly hollow since the debtor in this case has expressed no concern on this subject at all. The words of the Bankruptcy Court for the Northern District of Alabama are apposite:

> This Court believes that the home court presumption was created to facilitate an economic and efficient administration of the debtor's estate. Stated differently, this presumption exists to help the debtor, not to facilitate forum-shopping for co-defendants.

In re Harnischfeger Ind., Inc., 246 B.R. 421 (Bankr. N.D. Ala. 2000).

These are state court asbestos cases based on familiar state tort theories. They have been handled by the state courts for decades, and have continued to be handled by state courts in the normal course of affairs notwithstanding the many bankruptcy filings that have occurred since Johns-Manville sought bankruptcy protection in 1982. What the Fifth Circuit said in 1983, in denying the application of the automatic stay to non-debtor defendants in asbestos cases, remains equally true today, and is particularly true in the cases removed to this Court:

> We are persuaded that the requisite balancing of the competing interests involved in these cases weighs in favor of allowing the remaining actions to proceed. The realities of the hardship of a stay on the plaintiffs, many of whom allege that they are dying from asbestosis, is substantial and, in some instances permanent. The grim reaper has called while judgment waits. Just as obviously, the bankruptcy proceedings are not likely to conclude in the immediate future. A stay hinged on completion of those proceedings is manifestly "indefinite."

Wedgeworth v. Fibreboard Corp., 706 F.2d 541, 545 (5th Cir. 1983).

CONCLUSION

WHEREFORE, PREMISES, CONSIDERED, plaintiffs respectfully pray that Garlock's motion for transfer be denied, that plaintiffs' motion for remand and motion for severance be granted, and that plaintiffs be granted all other relief to which they are justly entitled.

Respectfully submitted,

Frank Costilla
State Bar No. 04856500
Law Offices of Frank Costilla
5 East Elizabeth Street
Brownsville, Texas 78520
(956) 541-4982

**WATERS & KRAUS, LLP**

Charles S. Siegel
State Bar No. 18341875
Federal I.D. 15736
3219 McKinney Avenue
Suite 3000
Dallas, Texas 75204
(214) 357-6244
(214) 871-2263 facsimile

Henry Simon
Simon, Warner & Doby, LLP
1700 City Center Tower II
301 Commerce Street
Fort Worth, Texas 76102
(817) 810-5250
(817) 810-5255 facsimile

**ATTORNEYS FOR PLAINTIFFS**

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above and foregoing was served via facsimile and/or regular mail on all counsel for Garlock on the _____ day of November, and on all other counsel of record via U.S. Mail.

_____

Charles S. Siegel

Frank Harmon
Crain Caton & James
3300 Two Houston Center
909 Fannin, 33rd Floor
Houston, Texas 77010
Crown, Cork & Seal

John Hill Jr.
Locke Liddell & Sapp LLP
3400 Chase Tower
600 Travis
Houston, Texas 77002-3095
Metropolitan Life Insurance Co.

Lisa A. Powell
Jackson Walker
1100 Louisiana, Suite 4200
Houston, Texas 77002
Able Supply Co.

Peter A. Moir
Quilling Selander Cummiskey & Lowds P.C.
2001 Bryan Street, Suite 1800
Dallas, Texas 75201 75201
Owens- Illinios

Mel Bailey
Bailey Crowe & Kugler LLP
4600 Bank Of America Plaza
901 Main Street
Dallas, Texas 75202-3736
GP, USM

Robert Wilkinson
Dogan & Wilkinson PLLC
734 Delmas Avenue, P.O. Box 1618
Pascagoula, MS 39568-1618
Guard-Line

Lewis C. Miltenberger
Corday Goodrich & Miltenberger
108 W. 8th Street, One Century Plaza, Suite 500
Fort Worth, Texas 76102
Harbison-Walker, A.P. Green, Global, Indresco

Miller Thomas
Fairchild Price Thomas Haley & Willingham
PO Drawer 1719
413 Shelbyville St.
Center, Texas 75935
J.T. Thorpe

Todd Wade
Brown McCarroll & Oaks Harline
1300 Wortham Tower
2727 Allen Parkway
Houston, Texas 77019-2100
Kelly-Moore Paint Co.

James Riley
Coats Rose Yale Ryman & Lee
800 First City Tower
1001 Fannin
Houston, TX 77002-6707
Foster Wheeler

Kenneth Rhodes
Dunn Kacal Adams Pappas & Law
One Riverway, Suite 1200
Houston, Texas 77056
ACandS, Inc

Mary Lou Mauro
Galloway Johnson Tompkns & Burr
3555 Timmons, Suite 1225
Houston, Texas 77027
Combustion Engineering

Gary Elliston
DeHay & Elliston L.L.P.
3500 Bank Of America Plaza
901 Main Street
Dallas, Texas 75202-3736
Center for Claims Resolution

Donald Godwin
Godwin White & Gruber P.C.
901 Main Street
Suite 2500
Dallas, Texas 75202-3714
Brown & Root, Dresser Ind.

Gail Jenkins
Jenkins Grove & Marton
2615 Calder, Suite 500
Beaumont, TX 77720-6008
Kaiser, Fina Oil & Chemical Co.

Frank Poff
Crisp Jordan & Boyd
2301 Moores Lane
Texarkana, TX 75505-6297
Grefco

Ronald Walker
Walker Keeling & Carroll
210 E. Constitution
P.O. Box 108
Victoria, Texas 77902-0108
Alcoa Inc.

D. Ferguson McNeil
Vinson & Elkins
2300 First City Tower
1001 Fannin Street
Houston, Texas 77002-6760
NARCO

Catherine K. Faubion
Thompson Coe Cousins & Irons
200 Crescent Court, Eleventh Floor
Dallas, Texas 75201-1853

James Harris
Harris Lively & Duesler
550 Fannin, Suite 650
PO Box 830
Beaumont, Texas 77704
Flintkote

William C. Arnold
Forman Perry Watkins  Krutz & Tardy PLLC
400 Woodview Office Tower
1349 Empire Central
Dallas, Texas 75247
Uniroyal Holdings, INC

Kyle C. Steele
Foreman Perry Watkins Krutz & Tardy PLLC
1349 Empire Central
Woodview Office
Suite 400
Dallas, Texas 75247
Gasket Holding

Russell Nunnally
Bell  Nunnally & Martin
3232 McKinney Avenue
1400 One McKinney Plaza
Dallas, Texas 75204-2429
Kaiser Aluminum & Chemical Corp.

Teri L. Danish
Rodriguez Colvin & Chaney LLP
1201 East Van Buren
P.O. Box 2155
Brownsville, Texas 78520
Garlock

Melissa Ferrell
Segal  McCambridge Singer & Mahoney
400 West 15th Street
Suite 700
Austin, Tx 78701
(512) 476-7832
GARLOCK

Mitchell Chaney
Rodriguez Colvin & Chaney LLP
P.O. Box 2155
Brownsville, Texas 78522
(956) 541-2710
Garlock

Shelby A. Jordan
Jordan, Hyden, Womble & Culbreth, P.C.
500 N. Shoreline Dr., Suite 900
Corpus Christi, Texas  78471
Garlock
(361) 888-5555

Laurel A. Siegert
Whittenburg Whittenburg & Schachter PC
2300 Plaza of the Americas
600 North Pearl, LB 133
Dallas, Texas 75201
214-999-5747
Garlock

James R. Old, Jr.
Germer Bernsen & Gertz LLP
805 Park Street
Beaumont, Texas 77701
Garlock
409-838-4050

Ed Peticolas
Peticolas, Shapleigh, Brandeis, and Kerns
701 North Saint Vrain
El Paso, Texas 79902
Garlock
(915-534-7207

United States District Court
Southern District of Texas
ENTERED

NOV 0 9 2001

Michael N. Milby, Clerk of Court

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| BILLY ARNOLD AND SYBIL ARNOLD; | § | |
| RICHARD BOYLE AND BARBARA BOYLE; | § | |
| ROBERT McCULLOUCH AND ANNETE | § | |
| McCULLOUGH, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. C-01-478 |
| | § | |
| AC&S, INC., et al., | § | |
| | § | |
| Defendants. | § | |

### ORDER

On this day came on to be considered Defendant Garlock Inc.'s ("Garlock") Application and Notice of Removal[1] and Emergency Motion to Transfer Civil Action Pursuant to 28 U.S.C. § 157(b)(5) for Venue Determination as well as Plaintiffs' Motion to Remand for Lack of Subject Matter Jurisdiction, for Mandatory Abstention, or for Discretionary Abstention or Equitable Remand and Plaintiffs' Motion to Sever all Claims against Bankrupt Defendants in the above-styled action. For reasons stated herein, the Court ORDERS that all claims against the Debtor[2] in this action be SEVERED and

---

[1]As an initial matter, Garlock has moved to supplement its Application and Notice of Removal with "inadvertently omitted pleadings." The Court grants Garlock's motion without expressing an opinion on the *reasons* for Garlock's incomplete removal of the instant case.

[2]Garlock removed nine cases at the same time to this Court based on alleged "related to" jurisdiction. The bankruptcy referred to throughout this Order (and in the other eight cases) is Case Number 01-10578, pending in the United States Bankruptcy Court

1



TRANSFERRED to the District Court in Delaware pursuant to 28 U.S.C. § 157(b)(5). The Court also ORDERS that all remaining claims be REMANDED pursuant to 28 U.S.C. § 1447(c) and/or §1452(b) to the 94th Judicial District Court of Nueces County, Texas, where they were originally filed and assigned Cause Number 00-5582-C.

## I.   JURISDICTION

Garlock contends that this Court has original jurisdiction of the Removed Case pursuant to 28 U.S.C. §§ 1334(a)-(b) and that this case is removable pursuant to 28 U.S.C. § 1452(a).[3]

## II.   FACTS AND PROCEEDINGS

Billy Arnold and Sybil Arnold, Richard Boyle and Barbara Boyle, Robert McCullough and Annette McCullough (collectively,

--------

for the District of Delaware. Initially, Garlock failed to explain which entities were involved in that bankruptcy (styled "In Re Federal-Mogul Global, Inc."). Thus, in many of the nine cases, Federal-Mogul was not a party and it appeared to this Court that the bankruptcy had nothing to do with the removed case. At the hearing held on October 30, 2001, Garlock explained, and Plaintiff concurred, that the following entities were also a part of that bankruptcy, as subsidiaries and/or affiliates to Federal-Mogul: Gasket Holding, Inc., Flexitallic, Inc., T&N PLC, and T&N Ltd. In this Order, these entities are collectively referred to as the "Debtor," and at least one of them was sued by the Plaintiff in this action at one time or another. In this case, the relevant parties in bankruptcy are Gasket Holding, Inc. (sued individually and as successor in interest to Flexitallic Gasket Co.); T&N PLC, f/k/a Turner & Newell PLC; T&N PLC (successor in interest to Keasbey & Mattison); Turner & Newell Industries, Inc., d/b/a United Gasket Corp.; and Turner & Newell, Ltd., d/b/a United Fabricated.

[3]   As a threshold matter, the other named defendants do not need to consent to removal in the bankruptcy context. See Creasy v. Coleman Furniture Corp., 763 F.2d 656 (4th Cir. 1985); Sommers v. Abshire, 186 B.R. 407, 409 (E.D. Tex. 1995; Plowman v. Bedford Financial Corp., 218 B.R. 607, 616 (N.D. Ala. 1998).

"Plaintiffs") brought an asbestos personal injury suit in the 94th Judicial District Court of Nueces County, Texas, against numerous Defendants, including Garlock, on October 12, 2000. On December 22, 2000, Garlock filed a Cross-Action against "all Co-Defendants" for indemnification and/or contribution. The Debtor filed for Chapter 11 bankruptcy within 90 days of Garlock's filing of the Notice and Application for Removal. Garlock removed the state court action to this Court on October 19, 2001, asserting the existence of federal question jurisdiction. Garlock alleges this Court has original jurisdiction of the removed case pursuant to 28 U.S.C. §§ 1334(a) & (b) and that removal is proper pursuant to 28 U.S.C. § 1452(a). Plaintiffs filed, among other things, (1) a Motion to Remand for Lack of Subject Matter Jurisdiction, for Mandatory Abstention, or for Discretionary Abstention or Equitable Remand; and (2) a Motion to Sever all Claims against Bankrupt Defendants on October 30, 2001. This case is one of nine asbestos personal injury cases removed by Garlock to this Court.[4] At a hearing held to consider both Garlock's Emergency Motion to Transfer and Plaintiffs' Motion to Remand, counsel for Plaintiffs represented that it had either dismissed or attempted to dismiss the Debtor and all entities related to the Debtor (all involved in the bankruptcy) from the nine lawsuits. However, some of those dismissals occurred

_____

[4]Those cases are as follows: (1) C-01-477; (2) C-01-478; (3) C-01-479; (4) C-01-480; (5) C-01-481; (6) C-01-482; (7) C-01-483; (8) C-01-484; and (9) C-01-485.

3

after removal, and so the Debtor remained a party in some of the nine cases.  Plaintiffs' counsel agreed to dismiss all claims against the Debtor or its subsidiaries (also in bankruptcy) with prejudice in all nine cases.[5] Defendants filed a Response to Plaintiffs' Motion to Remand on November 1, 2001.  The Court now conducts an examination of its jurisdiction over the instant action.

## III. DISCUSSION

### A.   REMOVAL BASED ON FEDERAL QUESTION JURISDICTION GENERALLY

It is well-settled that the removing party bears the burden of showing that removal was proper.  Willy v. Coastal Corp., 855 F.2d 1160, 1164 (5th Cir. 1988).  This burden extends to demonstrating the jurisdictional basis for removal.  Carpenter v. Wichita Falls Indep. Sch. Dist., 44 F.3d 362, 365 (5th Cir. 1995); Delgado v. Shell Oil Co., 890 F.Supp. 1324, 1341 (S.D. Tex. 1995); Albonetti v. GAF Corp. - Chem. Group, 520 F.Supp. 825, 827 (S.D. Tex. 1981). The removal statutes are to be strictly construed against removal; doubts as to removability are resolved in favor of remanding the case to state court.  Shamrock Oil & Gas Corp. v. Sheets, 313 U.S. 100, 61 S.Ct. 868 (1941);  Leffall v. Dallas Indep. Sch. Dist., 28 F.3d 521, 524 (5th Cir. 1994); Butler v. Polk, 592 F.2d 1293, 1296

---

[5]As is indicated, *infra*, the Court grants Plaintiffs' Motion to Dismiss.

4

(5th Cir. 1979); <u>Walters v. Grow Group, Inc.</u>, 907 F.Supp. 1030, 1032 (S.D. Tex. 1995).

In general, an action is removable to a federal court only if it might have been brought there originally.  <u>See</u> 28 U.S.C. § 1441(a); <u>Avitts v. Amoco Production Co.</u>, 53 F.3d 690, 693 (5th Cir. 1995).  The venue for removed actions is the district and division in which the state court action is pending.  28 U.S.C. § 1441(a); <u>Polizzi v. Cowles Magazines, Inc.</u>, 345 U.S. 663, 73 S. Ct. 900, 902 (1953); <u>Bacik v. Peek</u>, 888 F. Supp. 1405, 1413 (N.D. Ohio 1993). District courts have original, federal question jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331.  "Federal courts have jurisdiction to hear, originally or by removal, only those cases in which a well-pleaded complaint establishes either that federal law creates the cause of action, or that the plaintiffs' right to relief necessarily depends on resolution of a substantial question of federal law."  <u>Franchise Tax Bd. v. Construction Laborers Vacation Trust</u>, 463 U.S. 1, 27-28, 103 S. Ct. 2841, 2855-2856 (1983).  Further, allegations which raise substantial questions of federal common law by implicating important foreign policy concerns confer federal question jurisdiction.  <u>Torres v. Southern Peru Copper Corp.</u>, 113 F.3d 543 & n.8 (5th Cir. 1997).

The presence of federal question jurisdiction is governed by the well pleaded complaint rule.  <u>Gully v. First Nat. Bank</u>, 299

U.S. 109, 112-113, 57 S. Ct. 96, 97-98 (1936); Powers v. South Central United Food & Commercial Workers Unions, 719 F.2d 760, 764 (5th Cir. 1983). The well pleaded complaint rule establishes that a "plaintiff's properly pleaded complaint governs the jurisdictional determination, and if on its face, such a complaint contains no issue of federal law, then there is no federal question jurisdiction." Aaron v. Nat'l Union Fire Ins. Co. of Pittsburgh, 876 F.2d 1157, 1160-61 (5th Cir. 1989)(citing Franchise Tax Bd. v. Laborers Vacation Trust, 463 U.S. 1, 10, 103 S. Ct. 2841, 2846 (1983)). "Absent extraordinary circumstances, the well-pleaded complaint rule governs." Carpenter v. Wichita Falls Indep. Sch. Dist., 44 F.3d 362, 367 (5th Cir. 1995).

**B.   REMOVAL AND FEDERAL QUESTION JURISDICTION UNDER 28 U.S.C. §§ 1452 AND 1334**

Section 1452(a) provides that a party may remove a claim or cause of action *to the district court where the civil action is pending* when that district court has jurisdiction over the claim under Section 1334. See 28 U.S.C. § 1452(a). The majority of courts find that Bankruptcy Rule 9027, which provides for a 90 day time limit to remove matters, governs the removal procedure. See, e.g., In re TrafficWatch, 138 B.R. 841 (Bankr. E.D. Texas 1992); In re Donington, Karcher, Ronan & Rainone, P.A., 194 B.R. 750, 756 (D.N.J. 1996). Defendant has asserted that, pursuant to Rule 9027 of the Rules of Bankruptcy Procedure, the Application and Notice of Removal were filed properly within 90 days after the order for

6

relief in the Debtor's bankruptcy case. Plaintiffs do not disagree with this contention.

Section 1334(b) provides that the district courts have jurisdiction over all civil proceedings arising under Title 11, or arising in or related to cases under Title 11. <u>See</u> 28 U.S.C. § 1334(b). Garlock claims that the state court action is "related to" the Debtor's Title 11 case, and thus this Court has removal jurisdiction. Though the "related to" cases are not limitless, a claim is "related to" a case under Title 11 within the meaning of 28 U.S.C. § 1334(b) if the outcome of the proceeding could conceivably have any effect on the estate being administered in bankruptcy. <u>See, e.g.</u>, <u>Celotex Corp. v. Edwards</u>, 514 U.S. 300, 308 n.6 (1995)(surveying cases); <u>In re Bass</u>, 171 F.3d 1016 (5th Cir. 1999)(quoting <u>In re Walker v. Cadle Co.</u>, 51 F.3d 562, 569 (5th Cir. 1995) ( a claim or cause of action is "related to" the bankruptcy if the "outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankruptcy estate."); <u>In re Wood</u>, 825 F.2d 90, 93 (5th Cir. 1987); <u>Pacor, Inc. v. Higgins</u>, 743 F.2d 984 (3rd Cir. 1984)(an action is related to bankruptcy if its outcome might alter the rights, options, liabilities, or freedom of action of the debtor in either a positive or negative way), *impliedly overruled on other grounds by* <u>Things Remembered, Inc. v. Petrarca</u>, 516 U.S. 124, 116

7

S.Ct. 494, 133 L.Ed.2d 461 (1995). Normally, the question would be whether the monetary recovery sought by Plaintiffs and by Cross-Plaintiffs in the state court action would have an effect on the Debtor's estate being administered in bankruptcy. The only possible claim at issue which might be "related to" the Debtor's bankruptcy is Garlock's cross-action against "all Co-Defendants" for indemnification and/or contribution. In fact, at the hearing held on October 30, 2001, Garlock conceded that, after Plaintiffs' dismissal with prejudice of the Debtor, the only remaining claim relevant to the removal is Garlock's cross-claim against the Debtor for contribution. Arguably, claims such as the instant claim for contribution are not even ripe for adjudication. See, e.g., Pacor, 743 F.2d at 995 (discussing indemnification claims in the context of "related to" jurisdiction). Though this Court declines to find that Defendant lacks standing to remove, it should be noted that Garlock's contribution claims are, at best, tangentially and speculatively "related to" the bankruptcy. Compare, for example, Pacor, 743 F.2d at 995)("indemnity action not "related to" the bankruptcy); Matter of Walker, 51 F.3d 562 (5th Cir. 1995) with In Re Dow Corning, 86 F.3d 482, 486 (6th Cir. 1996); In re Harrah's Entertainment, Inc. Securities Litigation, 1996 WL 684463 (E.D. La., Nov. 26, 1996). Assuming, *arguendo*, that Garlock's claim for contribution is still viable after Plaintiffs' dismissal with

8

prejudice of the Debtor,[6] the Court finds removal proper based on Section 1452(a) and Section 1334, at least for those claims brought against the Debtor. In the end, it is clear that "related to" jurisdiction is treated very broadly under the Pacor test adopted by the Fifth Circuit in Wood. As such, the Court finds that the contribution claims are arguably "related to" the bankruptcy, as they could conceivably have an effect on the estate being administered in bankruptcy.

**C.    SEVERANCE OF CLAIMS AGAINST THE DEBTOR AND TRANSFER PURSUANT TO 28 U.S.C. § 157(b)(5)**

Rule 21 of the Federal Rules of Civil Procedure provides that "[a]ny claim against a party may be severed and proceeded with separately." FED.R.CIV.P. 21. "Severance under Rule 21 creates two separate actions or suits where previously there was but one. Where a single claim is severed out of a suit, it proceeds as a discrete, independent action, and a court may render a final, appealable judgment in either one of the resulting two actions notwithstanding the continued existence of unresolved claims in the other." United States v. O'Neil, 709 F.2d 361, 368 (5th Cir. 1983). The Court has broad discretion to sever claims. See Brunet v. United Gas Pipeline Co., 15 F.3d 500, 505 (5th Cir. 1994).

_____

[6]Texas law provides that "[e]ach liable defendant is entitled to contribution from each person who is not a settling person and who is liable to the claimant for a percentage of responsibility but from whom the claimant seeks no relief at the time of submission." Tex. Civ. Prac. & Rem. Code Ann. §33.016(b).

9

Because Plaintiffs no longer have claims against the Debtor in this case and because Plaintiffs' state court personal injury action has already proceeded so far in the state court system, severance of all claims against the Debtor appears warranted. Accordingly, the Court SEVERS out all claims against the Debtor (the "severed claims")[7] from the above-styled cause number. These severed claims shall retain the same cause number, however, as this Court determines all *other* claims are to be remanded for equitable reasons. See *infra* Section III.D.

In addition to removing this case, Garlock moved to transfer the case for venue determinations pursuant to 28 U.S.C. § 157(b)(5) to the District Court in which Debtor's bankruptcy is pending in Delaware. Title 28 U.S.C. § 157(b)(5) provides that

> [t]he district court shall order that personal injury tort and wrongful death claims shall be tried in the district court in which the bankruptcy case is pending, or in the district court in the district in which the claim arose, *as determined by the district court in which the bankruptcy is pending.*

28 U.S.C. § 157(b)(5) (emphasis added); Baumgart v. Fairchild Aircraft Corp., 981 F.2d 824, 829 (5th Cir. 1993). One purpose of Section 157(b)(5) is "to centralize the administration of the estate and to eliminate the multiplicity of forums for the adjudication of parts of a bankruptcy case." A.H. Robins Co. v.

---

[7]It is likely that Garlock's Co-Defendants also have claims against the Debtor. The Court reiterates that *all* claims against the Debtor are severed, whether asserted by Garlock or by other Defendants.

Piccinin, 788 F.2d 994, 1011 (4th Cir.1986), *cert. denied*, 479 U.S. 876, 107 S.Ct. 251, 93 L.Ed.2d 177 (1986).  The Fifth Circuit has noted that (1) the language of § 157(b)(5) delineates venue between the *bankruptcy courts* and the *district courts* ("non-core proceedings such as personal injury tort and wrongful death claims shall not be adjudicated in bankruptcy court, but in the Article III district court"); and (2) the district court in which the bankruptcy is pending shall have power to order tried in its own venue personal injury tort and wrongful death claims filed elsewhere, or to order such cases tried in the districts where the claims arose.  Baumgart v. Fairchild Aircraft Corp., 981 F.2d 824, 833 (5th Cir. 1993).[8]  The Court FINDS that transfer of the *severed* claims against the Debtor for venue determinations is warranted

---

[8]Garlock would have this Court simply transfer the entire action pursuant to 28 U.S.C. § 157(b)(5) while declining to first determine whether the Court has jurisdiction over the case at all. Though such a course of action would certainly yield the preferred result *for Garlock*, the Court declines to ignore settled principles regarding the limits of the jurisdictional authority of federal courts by simply skipping over an analysis of the propriety of removal in this case and becoming a legal way-station under Section 157(b)(5).   28 U.S.C. § 1447(c) provides that "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case *shall* be remanded."  28 U.S.C. § 1447(c) (emphasis added).   A district court should constantly examine the controversies before it in order to determine the presence of subject matter jurisdiction and, if such jurisdiction is found lacking, the district court *must* remand to state court if appropriate, or otherwise dismiss.  See Coleman v. Alcolac, Inc., 888 F. Supp. 1388, 1394 (S.D. Tex. 1995).   In sum, the Court refuses to entertain a motion to transfer under 28 U.S.C. § 157(b)(5) *prior to* an examination of its jurisdiction.

11

under 28 U.S.C. § 157(b)(5). Accordingly, the severed claims[9] are TRANSFERRED to the District Court in Delaware for a determination of venue.

### D.   AS A RESULT OF THE SEVERANCE AND TRANSFER UNDER SECTION 157(b)(5) OF CLAIMS AGAINST THE DEBTOR, ALL OTHER CLAIMS SHOULD BE REMANDED

As this Court has severed out all claims against the Debtor and transferred them to the federal District Court in Delaware, the main claims remaining before this court are state law personal injury claims having nothing to do with Debtor's bankruptcy. As such, remand of all such claims is proper under 28 U.S.C. § 1447(c) ("[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case _shall_ be remanded.") Moreover, even if the Court were to determine that it still had "related to" jurisdiction over the remaining claims by Plaintiff against _non-Debtor defendants_,[10] the Court would find equitable remand warranted under 28 U.S.C. §1452(b). Garlock

---

[9]Again, the Court reiterates that the "severed claims" include _all_ claims against the Debtor whether asserted by Garlock or by other Defendants.

[10]Garlock notes that some Courts have held Section 157(b)(5) allows for the transfer of personal injury and wrongful death claims pending against non-debtor defendants who have been sued with a debtor under claims of joint and several liability. _See, e.g._, In re Dow Corning Corp., 86 F.3d 496 (6th Cir. 1996); A.H. Robins Co. v. Piccinin, 788 F.2d 994, 1009 (4th Cir.1986), _cert. denied_, 479 U.S. 876, 107 S.Ct. 251, 93 L.Ed.2d 177 (1986). However, in this case, Plaintiff has claims against non-debtor defendants _and no claims against the debtor_. Such important issues were not adequately addressed by Garlock in its filings.

specifically removed pursuant to 28 U.S.C. § 1452(a). Removals

accomplished pursuant to 28 U.S.C. § 1452(a) are subject to motions

to remand pursuant to 28 U.S.C. § 1452(b).    Section 1452(b)

provides that the "court to which... claim[s] or cause[s] of action

[are] removed may remand...on any equitable ground."    Such

equitable grounds include:

> (1) forum non conveniens; (2) a holding that, if the
> civil action has been bifurcated by removal, the entire
> action should be tried in the same court; (3) a holding
> that a state court is better able to respond to questions
> involving state law; (4) expertise of the particular
> court; (5) duplicative and uneconomic effort of judicial
> resources in two forums; (6) prejudice to the
> involuntarily removed parties; (7) comity considerations;
> and (8) a lessened possibility of an inconsistent result.

Seale v. Owens & O-M Mgmt Group, Inc., 134 B.R. 181, 184 (Bankr.

E.D. La. 1991)(quoting Browning v. Navarro, 743 F.2d 1069, 1076

n.21)(5th Cir. 1984)).   Having severed out all claims against the

Debtor, this Court finds no reason to retain jurisdiction over the

remaining claims and parties.   Venue determinations regarding any

claims (if there are any such claims truly remaining) against the

Debtor by its former Co-Defendants may be dealt with in the

District Court in Delaware.   Equity counsels that other claims

should be swiftly remanded and allowed to continue to proceed in

state court.

An analysis of the facts of this case indicate numerous

factors favoring equitable remand are present.   First, after

severance, all that remains is an asbestos personal injury case

13

governed by state law and brought by Plaintiffs against a group of
non-debtor Defendants. The state court from which this action was
removed is certainly better able to respond to questions involving
state law; moreover, that court has already extensively dealt with
this case and is well-suited to continue trial on the merits of the
state claims. Principles of comity likewise support swift remand.
Additionally, Garlock's artfully-crafted tale of exponentially
increasing litigation caused by duplicative trials of Plaintiffs'
personal injury claims both in state court and in the Bankruptcy
Court is inapplicable and misleading. Garlock conveniently forgets
in its Response to Plaintiffs' Motion to Remand that not only did
Counsel for Plaintiffs move in open court to dismiss all claims
against the Debtor with prejudice, but Plaintiffs additionally
asserted that *they would not file any proofs of claim in the
Debtor's Bankruptcy case.* This Court acknowledges Plaintiffs'
assertions, and hereby GRANTS Plaintiffs' Oral Motion to Dismiss
all Claims against the Debtor with Prejudice. Moreover, Garlock's
claims for contribution are tenuous and remote, at best.[11] Finally,

---

[11]Even if Garlock is entitled to continue with its claim
against the Debtor, it is unclear whether Garlock's claim is
anything more than mere boilerplate language inserted in its
Answer. Garlock has never attempted to do any discovery of the
Debtor in this case, nor has Garlock ever attempted to get
contribution from Debtor in the myriad of prior cases in which
Garlock has "asserted" cross-claims for contribution against
Debtor. Though Garlock devotes much of its Response to Plaintiffs'
Motion to Remand explaining to this Court why lack of historical
collection and/or prosecution of its contribution claims should not
have any effect on this Court's analysis, Garlock utterly fails to

14

and perhaps most importantly, it is prejudicial and inherently unfair to the numerous parties who did not join in removal to interrupt a case already well-rooted in the state court. In fact, even when given the opportunity to speak at the hearing, not one of the involuntarily-removed defendants stood in support of Garlock's removal. An evaluation of the relevant factors convinces the Court that remand of the remaining claims, after severance of those claims against the Debtor, is the proper course of action.

### E.   MANDATORY AND PERMISSIVE ABSTENTION

Section 1334 provides for two types of abstention: discretionary abstention under 28 U.S.C. § 1334(c)(1) and mandatory abstention under 28 U.S.C. § 1334(c)(2). Section 1334(c)(1) provides that:

> Nothing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11.

Section 1334(c)(2) states:

> Upon timely motion of a party in a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which an action could not have been commenced in a court of the United States absent jurisdiction under this section, the district court shall abstain from hearing

---

explain the lack of prosecution and development of *this* contribution claim. Finally, even if Garlock is entitled to contribution, such a claim is arguably not ripe unless and until Plaintiffs succeed in their claim against Garlock in the state court action.

15

such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction.

Any abstention issues (whether mandatory or permissive) as they pertain to the contribution claims may, however, be decided by the District Court in Delaware.

## IV. CONCLUSION

For the foregoing reasons, the Court ORDERS that all claims against the Debtor in this action be SEVERED and TRANSFERRED to the District Court in Delaware pursuant to 28 U.S.C. § 157(b)(5). The Court also ORDERS that all remaining claims and causes of action be REMANDED pursuant to 28 U.S.C. § 1447(c) and/or §1452(b) to the 94th Judicial District Court of Nueces County, Texas, where the case was originally filed and assigned Cause Number 00-5582-C.

SIGNED and ENTERED on this the _____ 7th _____ of November, 2001.

JANIS GRAHAM JACK
UNITED STATES DISTRICT JUDGE

16

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

FILED

NOV - 1 2001

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
                    DEPUTY CLERK

| | | |
|---|---|---|
| JANIE W. ADAMS, et al., | § | |
| | § | |
| **Plaintiffs** | § | |
| | § | |
| -vs- | § | **Case No. A-01-CA-565-SS** |
| | § | |
| ARMSTRONG WORLD INDUSTRIES, | § | |
| INC., et al., | § | |
| | § | |
| **Defendants.** | § | |

## ORDER

BE IT REMEMBERED on the _1st_ day of November 2001 the Court reviewed the file in the above-styled cause, and specifically the Plaintiffs' Motion to Remand or, in the Alternative, to Abstain [#7] and supplemental brief in support thereof [#11], Defendants' opposition thereto [#9], and Plaintiffs' reply [#15]; and Defendants' Motion to Stay this Case Pending MDL Transfer [#10] and Plaintiffs' response thereto and cross-motion for immediate determination of Plaintiffs' Motion for Remand [#16] Having considered the motions and responses, the case file as a whole and the applicable law, the Court enters the following opinion and order.

### Factual and Procedural Background

Janie W. Adams, George Gray Midgett, and James E. Parris ("Plaintiffs"), all North Carolina residents, are surviving family members of employees who allegedly died as a result of exposure to asbestos-containing products designed, manufactured and sold by Defendants. Plaintiffs sued Defendants Armstrong World Industries, Inc. ("Armstrong"), Amchem Products, Inc ("Amchem"),

18



NO? _ 2-01   4 40PM   U- CT COURT AUSTIN

and United States Gypsum Company ("U.S Gypsum") in the Travis County court   All three defendants were members of the Center for Claims Resolution ("CCR"), a nonprofit claims handling facility established in 1988 by former asbestos producers to handle asbestos personal injury suits against them   *See Notice of Removal* [#1], at 2.  On approximately October 6, 2000, Plaintiffs entered into a settlement agreement with CCR for the collective amount of $400,000, and Defendants agreed to forward the payments within ninety days of the settlement date (approximately January 4, 2001) in return for release from Plaintiffs' claims. *See Plaintiffs' Motion to Remand* [#7], Ex. 4 ("Summary Judgment Motion"), at 2; *Defendants' Opposition* [#9], Ex. 2 ("Jordan Declaration"), at 3.

On December 6, 2000, Armstrong filed a voluntary bankruptcy petition under Chapter 11 in a Delaware federal court. *Defendants' Opposition*, at 4.  At that time, it terminated its membership in CCR and stopped funding the settlement CCR negotiated with the Plaintiffs. *Id.*  On March 13, 2001, Plaintiffs filed a Fifth Amended Petition in the case pending in Travis County court, adding a breach of contract claim for failure to pay the CCR settlement and joining other CCR member companies who were not defendants in the original lawsuit. *See Plaintiffs' Motion to Remand* [#7], Ex. 3 ("Petition"), at 6-7   On June 25, 2001, U.S. Gypsum filed a voluntary bankruptcy petition under Chapter 11.  *See Defendants' Opposition*, at 5

On August 3, 2001, Plaintiffs filed a Motion for Partial Summary Judgment in Travis County Court against the non-bankrupt CCR member defendants for breach of the settlement agreement   *See Summary Judgment Motion*   Defendants did not respond to the motion.  Instead, on August 27, 2001, two days before the scheduled hearing on the summary judgment motion and 165 days after being served with Plaintiffs' fifth amended petition, Defendants removed the case to this Court  *See*

-2-

*Notice of Removal, Plaintiffs Motion to Remand,* Ex. 5 ("Notice of Hearing"). The Notice of Removal only pertained to the claims and causes of actions raised in the summary judgment motion—in other words, the breach of contract action against the non-bankrupt CCR defendants for failure to pay the settlement claim – not to the pending personal injury claims. *See Notice of Removal,* at 1. On September 26, 2001, Plaintiffs filed a Motion to Remand or, in the Alternative, Motion to Abstain with this Court. On October 4, 2001, the Judicial Panel on Multidistrict Litigation conditionally transferred this case to the United States District Court for the Eastern District of Pennsylvania. *See Defendants' Opposition,* Ex. 1.

## Analysis

I.    **Motion to Remand**

A.    **Timeliness**

Plaintiff seeks to remand this case to the Travis County state court on the grounds that removal was not timely. A defendant has thirty days after receipt of the plaintiff's pleading that gives rise to the grounds for removal to remove the case to federal court. *See* 28 U.S.C. § 1446(b). Defendants removed the case on August 27, 2001, 165 days after they were served with the fifth amended complaint adding the breach of contract claim. Defendants contend the removal was based on the bankruptcy statute, 28 U.S.C. § 1452, which is governed by Bankruptcy Rule 9027, which allows 90 days to remove a pending case in state court after the order for relief in a case under the Bankruptcy Code. *See Defendants' Opposition,* at 7; Fed. R. Bank. Pro. 9027(a)(2). Plaintiffs respond that the removal was not even timely under Rule 9027, because the breach of contract claim arose *after* Armstrong filed for bankruptcy. Under Rule 9027(a)(3)(A) applies, if the bankruptcy case is already pending when a plaintiff files a cause of action in state court, the defendant must

remove the case within 30 days of receiving the pleading   See Fed. R. Bank. Pro  9027(a)(3)(A).

Thus, Plaintiffs argue, Defendants should have removed the case within 30 days of receiving the fifth

amended petition, and they cannot prolong the removal deadline each time a different defendant files

for bankruptcy.  This Court finds the removal was not timely, but the Court will discuss the merits

of the removal as if it were.

B.   "Related to" Jurisdiction

Plaintiffs contend this Court does not have subject matter jurisdiction over this case because

the case was improperly removed.  Under 28 U.S.C. § 1452(a), a party may remove a claim to the

federal district court for the district in which the case is pending if the district court has bankruptcy

jurisdiction over the case under 28 U.S.C. § 1334.  Section 1334 of Title 28 of the United States

Code gives district courts "original but not exclusive jurisdiction of all civil proceedings arising

under title 11 [the Bankruptcy Code], or arising in or related to cases under title 11."  Thus, the

determination of whether this Court has jurisdiction over this case involves an inquiry into whether

the case is "arising under title 11" or "arising in or related to cases under title 11."  In making this

determination, the Court keeps in mind that removal statutes are to be strictly construed, with any

doubts resolved against removal and in favor of remanding the case to the state court. See Shamrock

Oil & Gas Corp  v. Sheets, 313 U S  100, 108 (1941); Healy v. Ratta, 292 U.S. 263, 270 (1934).

Defendants contend removal is proper because the breach of contract claim against non-

bankrupt parties at issue in this case could affect the bankrupt parties who were original defendants

in the underlying tort claim, namely Armstrong and U.S. Gypsum  Specifically, Defendants argue

that if the Plaintiffs are successful in this suit, the Defendants will sue Armstrong and U.S Gypsum

for indemnification under an agreement among all CCR members and thereby become creditors of

-4-

the bankrupt parties. Thus, Defendants conclude, their attempt to seek indemnification from the bankrupt parties would impact the administration of the bankruptcy state and is thereby "related to" the title 11 bankruptcy case.

The Fifth Circuit has held a case is "related to" a bankruptcy case under title 11 "if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively), and which in any way impacts upon the handling of the bankrupt estate." *Matter of Majestic Energy Corp.*, 835 F.2d 87, 90 (5th Cir. 1988) (quoting *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d. Cir. 1984)) The potential impact of this case on the bankruptcy estates of Armstrong and U.S. Gypsum is at least one step removed, because none of the bankrupt defendants are involved in the breach of contract claim at issue here, and any impact on those parties or their bankruptcy estates requires the Defendants to file a separate lawsuit. Given these degrees of separation, the Court finds this case is certainly not "arising in" a case under title 11. 28 U.S.C. § 1334(b). However, given this case's potential impact, albeit removed, on bankrupt parties, the Court concludes this case is "related to" a proceeding under title 11, as required by 28 U.S.C. § 1334(b). *See Broyles v. U.S. Gypsum Co.*, - B.R. -, 2001 WL 1078178, at *2 (E.D. Tex. 2001) ("The Court finds this action is at least 'related to' the bankruptcy case because any result may have the effect of either reducing or enlarging the property of the bankruptcy estate."), *In re Celotex Corp.*, 124 F.3d 619, 626-27 (4th Cir. 1997) ("any recovery by [the plaintiff] against [the non-bankrupt defendant] would impact the handling and administration of [the debtor's] bankruptcy estate by changing the character of [the non-bankrupt defendant's] indemnification claim against [the debtor] from contingent and unliquidated to certain and liquidated.") Therefore, this Court has subject matter jurisdiction over this case under 28 U.S.C § 1334 (b).

## C.  Mandatory Abstention

Even though this Court has jurisdiction over this case under 28 U.S.C. § 1334(b), section

1334 requires the Court to abstain from exercising its jurisdiction in the following situations:

> Upon timely motion of a party in a proceeding based upon a State law claim or State law
> cause of action, related to a case under title 11 but not arising under title 11, with respect to
> which an action could not have been commenced in a court of the United States absent
> jurisdiction under this section, the district court shall abstain from hearing such proceeding
> if an action is commenced, and can be timely adjudicated, in a State forum of appropriate
> jurisdiction.

28 U.S.C. § 1334(c)(2).  Here, Plaintiffs timely filed a motion to abstain within 30 days of the filing

of the notice of removal.  This case involves a breach of contract claim under state law, related to

but not arising under a bankruptcy case, and the record does not reflect any source of federal

jurisdiction other than bankruptcy jurisdiction under 28 U.S.C. § 1334(b).  The case has been

pending in state court in Travis County for a number of years,[1] and there is nothing in the record to

indicate that the breach of contract claim cannot be timely adjudicated in that forum.  The only

visible pause in that litigation was the Defendants' attempt to remove the case to this Court when

a potentially dispositive summary judgment motion on this claim was pending in the state court and

presumably on the cusp of resolution.

Abstention is permissive, but not required, where the case involves a "core" proceeding under

bankruptcy law.  See In re Southmark, 163 F.3d 925, 929 (5th Cir. 1999).  Despite Defendants' best

efforts to construe this case as a core proceeding under bankruptcy, the case law in the Fifth Circuit

---

[1] It is not clear from the record exactly how long this case has been pending in state court.
According to the Plaintiffs, it has been going on for six years. See Plaintiffs' Motion, at 7 n.2.

demonstrates otherwise. None of the Defendants in this case as removed has filed for bankruptcy [2] Therefore, any impact this case will have on the administration of any bankruptcy estate is tangential to the outcome in the case before the Court. *See WRT Creditors Liquidation Trust v. C.I.B.C Oppenheimer Corp.,* 75 F.Supp.2d 596, 606 (S.D.Tex. 1999) ("Core proceedings are matters or proceedings that 'are an integral part of the bankruptcy case,' including 'other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor . . . relationship.' 'Related-to' matters are those which, because they are peripheral to the concerns of the bankruptcy case and based on extrinsic sources of law, require mandatory abstention." (citations omitted)) Other district courts in the Fifth Circuit have abstained from exercising jurisdiction over cases involving non-bankrupt defendants like this case. *See Broyles v. U.S. Gypsum,* – B.R. –, 2001 WL 1078178 (E.D. Tex. 2001); *Luevano v. Dow Corning Corp.,* 183 B.R. 751 (W.D. Tex. 1995). This Court likewise finds abstention appropriate in this case.

Even if abstention were not mandatory under 28 U.S.C. § 1334(c)(2), this Court would abstain from exercising jurisdiction in this case under the discretionary abstention provision of 28 U.S.C. § 1334(c)(1), which allows a district court to abstain from hearing a case "related to" a bankruptcy proceeding "in the interest of justice, or in the interest of comity with State courts or respect for State law." 28 U.S.C. § 1334(c)(1). This case involves the application of state law, has

_____

[2] Defendants contend two defendants named in plaintiffs' fifth amended petition. Gasket Holdings, Inc. and T & N, filed for bankruptcy on October 1, 2001 *See Defendants' Opposition,* at 5. Earlier in that same pleading, however, Defendants state the only entities that were properly served with that petition and who removed the case to this Court were Amchem, CertainTeed Corporation, Dana Corporation, Inc., Pfizer, Inc., and Union Carbide Corporation. *See id.* at 2 n.1 Additionally, Plaintiffs contend there are no bankrupt defendants remaining in this case. *See Plaintiffs' Reply,* at 3 Thus, as far as the Court can tell from the record, the only parties in the case before the Court are non-bankrupt parties If the state court finds, on remand, some bankrupt parties are somehow still included in the suit, it has the authority to sever them.

long been pending before the state court and was on the eve of possible resolution when the Defendants removed it to this Court. Out of fairness to the Plaintiffs and in the interest of comity with state courts, this Court exercises its discretion to abstain from hearing this case, as other courts have done.[3] *See Broyles v. U.S. Gypsum*, — B.R. —, 2001 WL 1078178, at *5-*6 (E.D. Tex. 2001).

## II.  Motion to Stay

Because this Court abstains from exercising jurisdiction over this case, it will not stay the proceedings pending the MDL transfer, but instead will remand the case to state court, which is the proper place for the case to be heard.

In accordance with the foregoing:

IT IS ORDERED that Defendants' Motion to Stay the Case Pending MDL Transfer [#10] is DENIED;

IT IS FURTHER ORDERED that Plaintiffs' Motion to Remand [#7] on the grounds of timeliness of removal is GRANTED;

IT IS FINALLY ORDERED, in the alternative, that Plaintiffs' Motion to Abstain [#7] is GRANTED, and the remand is ordered on that basis.

SIGNED this the ___*1st*___ day of November 2001.

SAM SPARKS
UNITED STATES DISTRICT JUDGE

---

[3] In fact, in one of the few cases the Defendants rely upon to demonstrate the inappropriateness of mandatory abstention, the district court chose to abstain from exercising its jurisdiction on equitable grounds. *See Defendants' Opposition*, Ex. 4 (*In re Kelley & Ferraro*).

-8-

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF TEXAS
 2                    CORPUS CHRISTI DIVISION
 3    SALLIE KENNAMER,        )    CASE NO. C-01-477
      Individually and as    )
 4    Personal Representative )
      of the Heirs and Estate )
 5    of COULTER KENNAMER,    )
      Deceased; JESSIE ESTRADA )
 6    and MARTHA ROBLES;      )
      WILLIE HARPER and ERMA  )
 7    HARPER; and CHARLES     )
      RAMSEY,                 )
 8                            )
           Plaintiffs,        )
 9                            )
      v.                      )
10                            )
      ABLE SUPPLY COMPANY,    )
11    ET AL.,                 )
                              )
12         Defendants.        )
                              )
13
      ------------------------------------------------------------
14
      IN RE:                  )    CASE NO. 01-01578
15    FEDERAL-MOGUL GLOBAL,   )    CHAPTER 11
      INC.                    )    (Pending in the United
16         Debtor.            )    States Bankruptcy Court
                              )    District of Delaware)
17
18
19
20
21
22
23
24
25
```

Page 2

```
 1        IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF TEXAS
 2              CORPUS CHRISTI DIVISION
 3   BILLY ARNOLD and SYBIL  )  CASE NO C-01-478
     ARNOLD, RICHARD BOYLE   )
 4   and BARBARA BOYLE,      )
     ROBERT McCULLOUGH and   )
 5   ANNETTE McCULLOUGH,     )
                             )
 6      Plaintiffs,          )
                             )
 7   v.                      )
                             )
 8   ACandS, INC             )
                             )
 9      Defendants           )
                             )
10   -----------------------------------------
11   IN RE:          )  CASE NO. 01-01578
12   FEDERAL-MOGUL GLOBAL,  )  CHAPTER 11
     INC.           )  (Pending in the United
13      Debtor.     )   States Bankruptcy Court
                    )   District of Delaware)
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1        IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF TEXAS
 2              CORPUS CHRISTI DIVISION
 3   HARRY SNOW and BETH SNOW,)  CASE NO. C-01-480
     MAURICE GOUPILL; and    )
 4   WILLIAM PICKERING and   )
     ELIZABETH PICKERING,    )
 5                           )
        Plaintiffs,          )
 6                           )
 7   v.                      )
                             )
     ACandS, INC.,           )
 8                           )
        Defendants.          )
 9                           )
10   -----------------------------------------
11   IN RE:          )  CASE NO 01-01578
     FEDERAL-MOGUL GLOBAL,  )  CHAPTER 11
12   INC.           )  (Pending in the United
        Debtor.     )   States Bankruptcy Court
13                  )   District of Delaware)
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1        IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF TEXAS
 2              CORPUS CHRISTI DIVISION
 3   CHARLES PORTER and ROSE )  CASE NO. C-01-479
     PORTER; DOUGLAS FREEMAN )
 4   and CAROL GASH,         )
     Individually and as     )
 5   Personal Representative )
     of the Heirs and Estate )
 6   of WILBERT GASH,        )
     Deceased,               )
 7                           )
        Plaintiffs,          )
 8                           )
     v.                      )
 9                           )
     ACandS, INC.,           )
10                           )
        Defendants.          )
11                           )
12   -----------------------------------------
     IN RE:          )  CASE NO. 01-01578
13   FEDERAL-MOGUL GLOBAL,  )  CHAPTER 11
14   INC.           )  (Pending in the United
        Debtor.     )   States Bankruptcy Court
15                  )   District of Delaware)
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1        IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF TEXAS
 2              CORPUS CHRISTI DIVISION
 3   JOHN STERLING and PEGGY  )  CASE NO. C-01-481
     STERLING; CHARLES HORNUNG)
 4   and NERY DIAZ,          )
                             )
 5      Plaintiffs,          )
                             )
 6   v.                      )
                             )
 7   ACandS, INC.,           )
                             )
 8      Defendants.          )
                             )
 9   
10   -----------------------------------------
     IN RE:          )  CASE NO. 01-01578
11   FEDERAL-MOGUL GLOBAL,  )  CHAPTER 11
     INC.           )  (Pending in the United
12      Debtor.     )   States Bankruptcy Court
                    )   District of Delaware)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

2 (Pages 2 to 5)

HEARING

**Page 6**

```
 1        IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF TEXAS
 2              CORPUS CHRISTI DIVISION
 3   JOAN WEBB, Individually )  CASE NO. C-01-482
     and Representative of the)
 4   Heirs and Estate of     )
     JAMES L. WEBB, Deceased; )
 5   PHILLIP FREDERICK and    )
     JOYCE FREDERICK,         )
 6   FLORENCE HOWARD,         )
     Individually and as      )
 7   Personal Representative   )
     of the Heirs and Estate   )
 8   of PRESLEY HOWARD,        )
     Deceased; WALTER          )
 9   MERRILL, DANIEL PODOLNY  )
     and VIRGINIA PODOLNY,    )
10                             )
          Plaintiffs,          )
11                             )
     v.                        )
12                             )
     ACandS, INC.,             )
13                             )
          Defendants           )
14   and as                    )
15   ----------------------------------------
16   IN RE:        )  CASE NO. 01-01578
     FEDERAL-MOGUL GLOBAL,  )  CHAPTER 11
17   INC.         )  (Pending in the United
          Debtor.  )   States Bankruptcy Court
18               )   District of Delaware)
19
20
21
22
23
24
25
```

**Page 8**

```
 1        IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF TEXAS
 2              CORPUS CHRISTI DIVISION
 3   CHARLES ARMSTRONG and  )  CASE NO. C-01-484
     BRENDA ARMSTRONG,      )
 4                           )
          Plaintiffs,        )
 5                           )
     v                       )
 6                           )
     ABLE SUPPLY COMPANY,    )
 7   ET AL.                  )
                             )
 8        Defendants         )
                             )
 9
     ------------------------------------------
10
     IN RE:         )  CASE NO. 01-01578
11   FEDERAL-MOGUL GLOBAL,  )  CHAPTER 11
     INC.          )  (Pending in the United
12        Debtor.   )   States Bankruptcy Court
                     )   District of Delaware)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 7**

```
 1        IN THE UNITED STATES DISTRICT COURT
 2        FOR THE SOUTHERN DISTRICT OF TEXAS
          CORPUS CHRISTI DIVISION
 3   ELIZABETH JACKSON,  )  CASE NO C-01-483
     Individually and as  )
 4   Personal Representative )
     of the Heirs and Estate )
 5   of JAMES JACKSON,    )
     Deceased, MARILYN    )
 6   PAWSON, Individually and )
     as Personal           )
 7   Representative of the )
     Heirs and Estate of   )
 8   FLOYD DAWSON, Deceased, )
     VIOLA WOOD, Individually )
 9   and as Personal        )
     Representative of the  )
10   Heirs and Estate of    )
     NATHAN WOOD, Deceased, )
11   and VIOLA WOOD,        )
12        Plaintiffs,        )
13   v                       )
14   ACandS, INC.,           )
15        Defendants         )
16
     ------------------------------------------
17
     IN RE          )  CASE NO 01-01578
18   FEDERAL-MOGUL GLOBAL,  )  CHAPTER 11
     INC           )  (Pending in the United
19        Debtor    )   States Bankruptcy Court
                     )   District of Delaware)
20
21
22
23
24
25
```

**Page 9**

```
 1        IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF TEXAS
 2              CORPUS CHRISTI DIVISION
 3   RICHARD BURDO and    )  CASE NO. C-01-485
     VIOLET BURDO, RICHARD  )
 4   BANDEN and JANICE BANDEN,)
     ROBERT BRENNAN and SALLY )
 5   BRENNAN; THOMAS and RUTH )
     GEMKOW,               )
 6                          )
          Plaintiffs,       )
 7                          )
     v                      )
 8                          )
     ACandS, INC.,          )
 9                          )
          Defendants.       )
10                          )
11   ------------------------------------------
12   IN RE:         )  CASE NO. 01-01578
     FEDERAL-MOGUL GLOBAL,  )  CHAPTER 11
13   INC.          )  (Pending in the United
          Debtor    )   States Bankruptcy Court
14               )   District of Delaware)
15
16        HEARING ON DEFENDANT GARLOCK, INC.'S
17        MOTION TO TRANSFER VENUE
18        AND PLAINTIFFS' MOTION FOR REMAND
19
20
21
22
23
24
25
```

3 (Pages 6 to 9)

HEARING

1           P R O C E E D I N G S
2       THE COURT: Would you call the case.
3       FEMALE VOICE: Number is C-01-477 to C-01-485,
4    Sallie Kennamer, et al. versus Able Supply Company,
5    et al. Would you please state appearances.
6       MR. SIEGEL: Charles Siegel for Waters & Kraus
7    in Dallas.
8       MR. SIMON: Henry Simon from Simon Warner &
9    Doby in Fort Worth.
10      MR. SIEGEL: Michelle Norton from my firm and
11   Juan Mejia from -- or for the plaintiffs.
12      THE COURT: So that's the plaintiff's table?
13      MR. SIEGEL: Yes.
14      THE COURT: Okay.
15      MR. JORDAN: Shelby Jordan, Mitchell Chaney
16   from Brownsville. Melissa Ferrell from Austin, and we
17   represent the defendants Garlock.
18      THE COURT: You're responsible for that
19   brilliantly-crafted removal motion?
20      MR. JORDAN: Your Honor, I'll take credit on
21   that motion.
22      THE COURT: Okay.
23      MR. JORDAN: But I'm responsible for what
24   happened today, put it that way.
25      THE COURT: All right. There were no

1    pleadings in there. Somebody hadn't read the rules,
2    but --
3       MR. JORDAN: There were no pleadings?
4       THE COURT: No. There were a bunch of
5    Interrogatories. One pleading, no answers. All live
6    pleadings are supposed to be there.
7       MR. JORDAN: Yeah, I know I shouldn't take
8    credit.
9       THE COURT: I didn't know if you wanted to
10   take credit or not.
11      MR. JORDAN: Well, Your Honor, let me -- let
12   me say, I thought we had -- we do know the rules. And I
13   thought we had got all live pleadings, all orders, all
14   discovery through its required --
15      THE COURT: Of course, the big problem in six
16   out of nine of these is that the -- the debtor is not
17   mentioned anywhere in those pleadings. So I was going
18   to remand them all. And the plaintiff filed a motion
19   saying there were debtors -- were parties.
20      MR. JORDAN: Well, Your Honor, there's an
21   attachment that lists all the parties and names the
22   debtor. The debtor has to be hold up in the motion, I
23   believe, before this court, and they are named with
24   counsel and the --
25      THE COURT: Except for the -- except for the

1    in re: debtor, the Federal, whatever, Mogul, whatever,
2    is nowhere in those parties in six of the nine.
3       MR. JORDAN: Well, in the in re: Mogul, which
4    we try to -- what I try to explain in the responsive
5    pleading that we're preparing, that's mandated by the
6    Delaware Court that --
7       THE COURT: You mean that that will be filed
8    at any moment?
9       MR. JORDAN: Well, we just -- I think it's
10   this morning that we're going -- that we're responding
11   to.
12      THE COURT: Okay.
13      MR. JORDAN: And the in -- the in re:
14   Federal-Mogul is the consolidated case, and that's the
15   mandatory citing. You can't --
16      THE COURT: Is anybody suing that defendant
17   except for you as a -- for an indemnity claim -- an
18   indemnity claim?
19      MR. JORDAN: Yes, I believe there's a large
20   number of parties back --
21      THE COURT: For other than the indemnity?
22      MR. JORDAN: Well, the plaintiff's suing, of
23   course, for damages and then the --
24      THE COURT: Well, the plaintiff has
25   dismissed -- has nonsuited you in some of those cases.

1    Though you didn't provide me with that information, it
2    actually was in one of -- one or two of the cases.
3       MR. JORDAN: I believe we found one that there
4    was a nonsuit of -- of a -- of the debtor in that case.
5       THE COURT: For plaintiffs, are you suing
6    this -- this --
7       MR. SIEGEL: No, Your Honor, we're not. We
8    have no claims against the debtor. We were in the
9    process of nonsuit -- nonsuiting all of the
10   Federal-Mogul entities in all of the state court suits.
11      Unbeknownst to us, some of these removals
12   occurred before we could get the nonsuits on file. In
13   those cases, we're asking for a summary severance of the
14   claim against the debtor and dismissal. We have no
15   claims against that debtor or anybody in that --
16      THE COURT: Okay. So you're telling me today
17   you have no claims anywhere -- see, I wouldn't know
18   because I don't have live pleadings in a lot of these
19   cases. So you're -- you're telling me that you have no
20   claims against this bankrupt debtor?
21      MR. SIEGEL: In the state court, there may be
22   as of the moment of removal in some of the --
23      THE COURT: Okay. But at this moment you're
24   telling me no?
25      MR. SIEGEL: That's correct.

HEARING

---

Page 14

1  THE COURT: Okay.
2  MR. SIEGEL: Your Honor, I should also add one
3  other thing. In the cases where the nonsuit had not
4  been effected prior to the moment of removal, we realize
5  technically the debtor is still in the case in federal
6  court. We called up the debtor's counsel. We said, we
7  want to let you out, sever you. He has no opposition,
8  and that's reflected in our motion for severance.
9  MR. JORDAN: Your Honor, I'd like to step back
10 and explain to the Court where this is coming down.
11 First of all, counsel had asked that we announce to the
12 court that this -- that we -- that we continue this for
13 several days to allow the parties to join all the
14 pleadings and -- and get it properly before you because
15 there's a number of --
16 THE COURT: Well, you-all are the ones who
17 wanted the emergency hearing, and everybody's here.
18 MR. SIEGEL: And we chartered a jet to fly
19 down here, Your Honor. We're here.
20 MR. JORDAN: Counsel asked me to attempt to
21 get this set, and asked me if I would announce today
22 defendant is here.
23 THE COURT: I set it. I set it at --
24 MR. JORDAN: No, and --
25 THE COURT: Didn't I set it three days ago?

---

Page 15

1  MR. JORDAN: Well, let me -- let me step back
2  a little further. Last Thursday you said that we fax to
3  counsel. I called Thursday, you got the fax receipt.
4  Yesterday evening he called me and said he'd never seen
5  this before, didn't know it was set, would I agree to
6  continue.
7  And I said, well, we're talking several days.
8  Of course, I would if you really hadn't gotten it, but
9  here's the receipt. It apparently got to his fax
10 machine, but didn't get to his desk. But I wasn't going
11 to question him on that issue. If he tells me that's
12 the truth, I -- I believe that.
13 THE COURT: No continuance. So go ahead.
14 MR. JORDAN: All right. Let me -- let me, if
15 I can, address the Court -- and, I guess, Your Honor, if
16 I can first address the --
17 THE COURT: All right. So I'm going to -- I'm
18 going to address his motion to nonsuit -- to dismiss --
19 MR. JORDAN: His motion is to sever.
20 MR. SIEGEL: It's a motion to sever -- for
21 severance. We would like to sever out the claims
22 against the debtor. I'm happy to convert it today to a
23 motion for dismissal.
24 THE COURT: Well, I'm not sure procedurally if
25 I can do that at this moment.

---

Page 16

1  MR. SIEGEL: Right.
2  THE COURT: So your -- your motion before me
3  now is a motion to sever?
4  MR. SIEGEL: Right. So --
5  THE COURT: Let debtor out and send that on up
6  to Delaware?
7  MR. SIEGEL: And that's exactly been done in
8  the previous 30 asbestos bankruptcies, that's right.
9  MR. JORDAN: Your Honor, if I can -- if I can
10 sit and actually address where -- how we got here and
11 why, what counsel's suggesting we do is an issue
12 that's -- that I believe is reserved to the home
13 district court, federal district court in Delaware. Not
14 the bankruptcy court in Delaware, but the federal
15 district court in Delaware.
16 What is occurring in these cases --
17 THE COURT: Actually, I've done this many
18 times before.
19 MR. JORDAN: I'm sorry, Judge?
20 THE COURT: I've done this before, severed
21 out -- sent out the bankruptcy part to the bankruptcy
22 court.
23 MR. JORDAN: Well, the --
24 THE COURT: All claims against that debtor, I
25 sent out to the bankruptcy court, which is mandatory

---

Page 17

1  actually.
2  MR. JORDAN: Well, actually the case involved
3  the debtor. At this point I -- my impression is that a
4  severance after post petition, after the debtor in the
5  case is controlled by the stay, and that the stay has to
6  be lifted before a court can sever out a party that has
7  claims crossed extending by and against the debtor
8  because they had joint claims.
9  Now, but my hunch in this case is as follows,
10 and let me just explain, if I can, in constant what's
11 occurring in this case is that is -- that motivated this
12 removal. Number one, if we hadn't removed promptly and
13 moved prompt for hearings, there would have been a
14 nonsuit filed against all the -- all the bankruptcy
15 debtors. And here's what's occurred.
16 THE COURT: So what's wrong with that?
17 MR. JORDAN: Well, that's -- let me explain
18 that. And here's -- here's what's wrong. In using an
19 example, just this year in Delaware, a W. R. Grace case
20 and various cases have been filed. What is occurring is
21 this, is that plaintiffs -- assuming there are, say,
22 300,000 claims that are pending nationwide, which is
23 about accurate for most of these particular claims.
24 When a plaintiff -- when a debtor files
25 bankruptcy, then without moving to modify the stay,

---

5 (Pages 14 to 17)

HEARING

1   without -- without any action qualifies for the
2   bankruptcy courts, the plaintiffs send out these mass
3   notices of nonsuit and file their claims in the
4   bankruptcy court.  The result of that is that you have,
5   under 157(B)(5) and 28 USC 1411, a mandatory jury trial
6   on that proof of claim that goes to the Delaware
7   district court.
8       So the Delaware district court now has a jury
9   trial that has to be conducted.  That's the only way to
10  liquidate a personal injury wrongful death claim,
11  300,000 of us.  The state court has the original 300,000
12  jury trials that we had to begin with, without hope of
13  ever being able to determine whether or not that they
14  want those cases severed, whether or not they want to
15  have now 600,000 jury trials.  Now, that's just the
16  first half.
17      When -- when W. R. Grace filed, that
18  happened.  When Gypsum filed, and when the most recent
19  was the -- was the Mogul filing with Garlock, what is
20  now occurring is three of those occurred this year
21  with codefendants in our lawsuit.  So that you have 300
22  jury trials at federal level.  You now have 300 jury
23  trials for the next Chapter 11 that was filed.
24      You had 300,000 jury trials in the -- in the
25  gestalts where you've severed and send them up.  Those

1   as a jury trial.
2       And most -- but the most important aspect of
3   this -- and going back to the policy 157(B)(5), the
4   purpose of that is to stop what is occurring in this
5   particular case.  The purpose of 157(B)(5) is so that
6   there is a single district court who has to try the
7   300,000 Federal-Mogul cases, 300,000 cases in the
8   other -- in the other bankruptcies.  And I can look at
9   this process and decide whether they should be continued
10  to be divided up.  And -- and that's -- that's what --
11  that's what our brief addresses in -- in the context of
12  15075.
13      What -- what I believe that -- that section
14  says is that -- and because we had to remove the
15  division district, there is no -- there are no rules
16  that implement 157.  So you have to come to division
17  district where you are, notwithstanding the fact that
18  157 says only the district court can decide where the
19  case -- where that case is tried.
20      If you were to sever, for instance, you would
21  be and -- and sent up to them, you would not be sending
22  the case to the trial here.  You would be sending the
23  case for that court to decide where that debtor's case
24  would be tried.  Sometimes they're sent to MDL.
25  Sometimes they're actually sent back to state court.

1   are jury trials that have to be liquidated under Code 11
2   by a jury.  You will send up 300,000 other cases, not in
3   this court, but -- but the global, that is the problem.
4   And you still have the same 300,000 jury trials that
5   existed in Texas.
6       Each one of those are -- are trials.  We've
7   now either doubled, tripled, or quadrupled the same set
8   of facts, the same plaintiff's injury, all so that the
9   plaintiffs can continue this --
10      THE COURT:  Okay.  Wait a minute.  Let me just
11  ask you about your claim.  What your clients have is a
12  claim for indemnification?
13      MR. JORDAN:  Or a contribution.
14      THE COURT:  A contribution?
15      MR. JORDAN:  Yes.
16      THE COURT:  And that's not a jury trial, is
17  it?
18      MR. JORDAN:  Well, it -- it is a jury trial,
19  as far as we know.  There's no law on that yet.  The
20  issue is this, our claim cannot be liquidated unless
21  there is a wrongful death trial.  I mean, that's what
22  our case is.  So the -- so in the whole, says that a --
23  that a wrongful death personal injury case is not a jury
24  trial.  I don't know how you would say what we're going
25  to do is liquidate your claim without it being advised

1   And that doesn't happen often, but -- but it does.  And
2   they're -- but they're dealt with in the bankruptcy
3   process but never liquidated in the bankruptcy process.
4       THE COURT:  Would it make a difference if they
5   dismissed with prejudice, the plaintiffs?
6       MR. JORDAN:  If they dismiss the debtor with
7   prejudice?
8       THE COURT:  Yes.
9       MR. JORDAN:  I don't think that -- that would
10  not dismiss our counterclaims or our cross claims, I
11  should say.  It would not dismiss cross claims because
12  we still have a right to contribution.  And what is
13  happened --
14      THE COURT:  I understand that.  But if -- but
15  what you're -- what you're laying out as a scenario,
16  when the -- the plaintiff is filing all over,
17  everywhere, and goes forward in Delaware and goes
18  forward here, and then I think I would agree with you as
19  not -- as not tenable.
20      But if the -- if the plaintiff is
21  dismissing -- is telling you he's dismissing with
22  prejudice --
23      MR. JORDAN: :  Oh, I understand.
24      THE COURT:  -- then that leaves your -- your
25  cross claims or your claims for indemnification, which

HEARING

1 are viewed by some as not quite the same as another type
2 of action. In fact, may even be -- in one of the cases
3 that I looked at, might even be not quite for education
4 and might even be suitable for remand, which I wouldn't
5 necessarily agree with it. But it's just somebody's
6 decided that.
7     MR. JORDAN: Well, I miss -- I miss -- I
8 misunderstood you when you said, a dismiss with
9 prejudice. I guess to dismiss a debtor with prejudice,
10 and my concern -- or our problem that we are trying
11 multiple cases and can't have a party in because we
12 would be dismissing with prejudice, the case would still
13 be alive for our contribution claims, but they're not
14 going to do that. They are -- what they're doing -- and
15 I think counsel will tell you, they're not going to
16 dismiss with prejudice.
17     THE COURT: Okay. Tell me what you -- then
18 why don't you be real specific. What are you claiming
19 that --
20     MR. SIEGEL: Your Honor, right now on the
21 record, we agree to dismiss with prejudice. All --
22     THE COURT: But, see, that would -- for some
23 reason, I thought that was what it was.
24     MR. SIEGEL: Against Federal-Mogul, a --
25     THE COURT: Because I think you did that in

1 one of those cases. Wasn't there -- didn't you send me
2 a docket that said dismissal with prejudice?
3     MR. SIEGEL: It -- it certainly should be
4 done, and on the record, I hereby do it.
5     MR. JORDAN: And my understanding, counsel,
6 that's -- that dismissal with prejudice means you don't
7 file claims at all in the --
8     MR. SIEGEL: We will not file in the
9 bankruptcy proceeding.
10     THE COURT: See, that -- that takes care of
11 one of your big concerns, I would think.
12     MR. JORDAN: Well, it does in the sense
13 that --
14     THE COURT: Because I would agree with you, if
15 that was going to happen, they should -- everything
16 should go ahead and go.
17     On the other hand, if that's not what's
18 happening, if there's a dismissal with prejudice --
19 would you want to visit with your counsel?
20     MR. CHANEY: Your Honor, I'm Mitchell Chaney.
21 And I just know that, historically, what -- what has
22 happened is when there is a bankruptcy filed by one of
23 our codefendants, as Mr. Jordan says, these plaintiff --
24 what happens historically -- and I think there are a lot
25 more asbestos lawyers here than -- who have done it for

1 a much longer time than I have -- the plaintiffs by and
2 large run and file proofs of claims in the bankruptcy.
3 And Johns-Manville, the --
4     THE COURT: So that -- so what you're saying
5 is that a dismissal with prejudice doesn't necessarily
6 keep the proof of claims from occurring?
7     MR. CHANEY: Oh, I think historically it never
8 has. If, Your Honor --
9     THE COURT: Okay. Let's -- let's -- let's
10 see if we can go there then. Would that -- would that
11 be --
12     MR. CHANEY: That is --
13     THE COURT: They're shaking their heads, no,
14 they're not going to do that.
15     MR. CHANEY: They're saying, Your Honor --
16     MR. SIEGEL: Your Honor, if there's some legal
17 bar against our recovering any money, whether in a
18 lawsuit or a bankruptcy court, from an entity, then we
19 can't file a proof of claim. And to erase any doubt on
20 this floor, I hereby state on the record we will not
21 file proofs of claim to Federal-Mogul.
22     MR. CHANEY: To get out of the problem that
23 they're in now, they're willing to say we forego the
24 right on these cases to file proofs of claim because we
25 have to have this immediate problem solved. But when

1 the nine cases that aren't in front of Your Honor,
2 because we've done this in other cases --
3     THE COURT: You're -- you're talking about
4 300,000 cases out there, but all I've got before me are
5 nine cases.
6     MR. CHANEY: I appreciate that.
7     THE COURT: I don't have an MDL. If it were
8 removed over here and sent to an MDL, I would be
9 treating it different as -- differently as well.
10     MR. CHANEY: What -- what we're faced with,
11 Your Honor, is that one -- is one of the other things
12 that is addressed in this -- in our motion and the reply
13 that we were going to file to what got filed today by
14 the plaintiffs, was what they do -- now, let me just
15 tell you about the awkward handcuff situation I am in in
16 the state court.
17     I have -- and the reason that this bankruptcy
18 is so important to my client, the -- the movant here and
19 the defendant who have moved, is we manufacture
20 gaskets. One of the main subsidiaries of Federal-Mogul,
21 one was called Gasket Holdings, and the other is
22 Flexitallic. In virtually every one of the nine cases,
23 Flexitallic gaskets are ID'd as a gasket that the
24 plaintiff works with or worked with along with Garlock.
25     What happens in the state court, now that

HEARING

1 Flexitallic is in bankruptcy, is the plaintiffs get up
2 and argue to the state court judge that since there is a
3 bankrupt defendant, I can't try to show that the
4 plaintiff was exposed to that -- that
5 asbestos-containing product, although on the one hand
6 they want to tell the jury, and do very often, every
7 exposure counts, every exposure is causative. And in
8 the --
9       THE COURT: Like you're wearing those little
10 X-ray things; is that what you're saying?
11      MR. CHANEY: Yeah, that's the way they portray
12 it. But then they ask the judge in the state court
13 case, don't let Mr. Chaney talk about Flexitallic, even
14 though the plaintiffs themselves ID Flexitallic as a
15 product they were exposed to. So my -- my ability to
16 try to get some -- some distribution of the fault,
17 should there be any, is completely now taken away.
18 Where if under 157 --
19      THE COURT: How does that happen? How could
20 that -- how -- how does that position work?
21      MR. CHANEY: I have their -- their motions in
22 limine from many, many cases where they try to get the
23 judge to say I can't talk about the exposure --
24      THE COURT: About a third-party liability
25 that's not before them?

1      MR. CHANEY: That's what they say. And I have
2 the motions in limine that I can show you, Your Honor,
3 that we just were getting ready to go to pick a jury in
4 Brownsville in a case. And they get up and they tell
5 the judge, I can't talk about any of these exposures.
6 Well, this is one way we're --
7      THE COURT: Now, I don't know about the
8 technicalities of exposures, but I -- I thought you
9 could always bring up a third party.
10      MR. CHANEY: You can in -- except in these, in
11 my opponent's eyes, once the bankruptcy is filed, I
12 can't mention it. And -- and I have their motion in
13 limine where they -- where they say that.
14      THE COURT: I can see not mentioning that the
15 person is bankrupt.
16      MR. CHANEY: Well, they --
17      THE COURT: You ought to be able to lay it off
18 on somebody.
19      MR. CHANEY: They --
20      MR. SIEGEL: No, that's not that we would be
21 entitled to argue that Flexitallic or any other entity
22 is the sole cause of --
23      MR. CHANEY: That's all they --
24      MR. SIEGEL: -- of the disease. They're --
25 what they're asking you to do is amend the Texas Civil

1 Practice and Remedies Code. We have no claim now that I
2 have nonsuited with prejudice Federal-Mogul or any of
3 its subsidiaries. We have no claim against that entity,
4 either a lawsuit or in bankruptcy court.
5       We can't recover any money from them, and
6 therefore they can't recover contribution from them,
7 because the contribution or indemnity claim, unless it's
8 contractual, which these aren't, are completely
9 derivative of the plaintiffs' direct claim against
10 Federal-Mogul. We don't have any claim any longer, and
11 therefore they don't. And the complaint that he's
12 making is a complaint about what the Texas Civil
13 Practice and Remedies Code says about allocation of
14 fault among -- among different tort cases.
15      MR. CHANEY: Your Honor, that's a
16 misrepresentation of what the Civil Practice and
17 Remedies Code says. I would suggest that -- that to --
18 to, Your Honor, that what it says is there are -- there
19 is a practice by which I can name parties that I think
20 are responsible third parties and ask for a line --
21      THE COURT: A finding?
22      MR. CHANEY: Yes, by the jury. -- did this
23 party contribute. And to the extent that I, as one of
24 the counsel for a defendant, can give the liability to
25 other parties under the scheme of the Civil Practice and

1 Remedies Code, I may not have to share with -- with the
2 other parties a disproportionate amount.
3       If my percentage or my client's percentage is
4 more than 15 percent, then I -- they can recover all of
5 the damages under the Civil Practice and Remedies Code
6 against anyone who is more than 15 percent responsible.
7 What they want -- what we want is for our ability to
8 have our cross action heard in one trial with -- with
9 all of the other persons or parties that have
10 contributed to cause the disease allegedly of the
11 plaintiff. And in every case that was removed to your
12 court, Judge, the plaintiff said, I worked with
13 Flexitallic or I worked with Gasket Holding products,
14 and they caused my disease.
15      And we -- that's all we want to be able to
16 portray to one jury one time. And if the -- if the
17 bankruptcy -- or the U. S. District Court judge in the
18 home district decides it needs to be in Corpus or it
19 needs to be wherever, that's fine. But we'll -- we'll
20 have just one time when that can happen.
21      And that's all we're saying is this is a very
22 inefficient -- and I understand the Court's offer to my
23 opponent about, well, we just nonsuit with prejudice,
24 which is easy to do in nine cases to get back to state
25 court, but that's not what has historically happened.

Page 30

1 And -- and that doesn't take care of my cross action, my
2 ability to portray what has happened to the jury.
3     THE COURT: What is your -- how did -- what's
4 the -- what's the basis of your cross action?
5     MR. CHANEY: If they -- the plaintiffs have
6 said they were exposed to this bankrupt defendant's
7 products, and that was, in fact, a cause of the
8 plaintiff's disease.
9     THE COURT: And it doesn't have to be the sole
10 cause is what you're saying?
11     MR. CHANEY: That's what they say. I say that
12 it does not. But they say that the only way I could get
13 a line for Gasket Holdings is if I prove to the jury
14 that it was the sole cause. And, of course, the state
15 of the science wouldn't allow anyone to do that unless
16 the plaintiff said that's all I worked around, and they
17 never do. They say, I worked around all these
18 products.
19     So, I mean, they -- they're -- they put a
20 scientific impossibility for me to prove that it's the
21 sole cause when they say in their own pleadings it's
22 everything. Therefore, I can't talk about some of the
23 things it really was. And it's just that, you know, in
24 my experience, Your Honor, a completely unworkable and
25 unfair situation. And we've been here as defendant

Page 31

1 after defendant has fallen and now, you know, the -- the
2 realistic historic story is not portrayed to the jury --
3     THE COURT: Well, what discovery has your
4 client done against the -- against the debtor?
5     MR. CHANEY: We've been in many --
6     THE COURT: What -- what discovery? Have you
7 taken their depositions?
8     MR. CHANEY: There have been many, many
9 depositions taken.
10     THE COURT: Have you taken their depositions?
11     MR. CHANEY: In these cases?
12     THE COURT: Yes.
13     MR. CHANEY: In these nine? I don't believe
14 the -- I could be wrong, Your Honor. I have a sheet
15 that shows all the discovery. I don't know if actual
16 representatives of Flexitallic or Gasket Holdings
17 company were taken in any of these cases because what
18 happens usually, Judge, is everybody -- because this
19 litigation has been going on for a long time, every one
20 has everybody's depositions ad nauseam.
21     There's no more that could really be
22 discovered against Garlock or Flexitallic or 3M because
23 they've all been given so many times. You don't just go
24 in and redo all the depos. Everybody really knows what
25 the testimony is. So there will be ID. For example,

Page 32

1 Judge, in these cases there are standing orders for
2 discovery in the various counties, and the plaintiffs
3 have to show what products they ID, either by work
4 history sheet --
5     THE COURT: If one of these companies file
6 bankruptcy in Corpus Christi, one of these defendants --
7     MR. CHANEY: Yes, ma'am.
8     THE COURT: -- all of the -- you're saying
9 that all of the asbestos cases or all these cases would
10 come to the Corpus Christi district court?
11     MR. CHANEY: For a determination of where they
12 would ultimately be tried, it's my understanding of the
13 rule Mr. Jordan is talking to. Now, you're kind of back
14 in -- in his area of expertise. But that's what I
15 understand that rule says. So that there can be the
16 efficient and expeditious handling of claims where there
17 is a bankrupt defendant.
18     And it may be, Your Honor, I don't know what I
19 would propose, that the U. S. District court in
20 Delaware, with the input of the bankruptcy judge, and
21 you know certainly better than I do what kind of
22 interaction there is, may decide it's in the best
23 interest of everyone to sever or have a few trials or to
24 do something to liquidate the case.
25     My understanding also, the bankruptcy code --

Page 33

1 and Mr. Jordan can answer this better, Your Honor -- is
2 that if we don't liquidate our cross action, that we
3 lose it in -- in terms of when the bankruptcy plan or
4 this debtor is confirmed. So if there's a -- and the
5 only way we can liquidate it is by going to trial. So
6 to see if -- and then, you know, they will oppose us
7 putting this debtor on the blank because they'll say
8 it's a bankrupt debtor.
9     So we -- we stand a chance of losing
10 state-wide our ability to go and liquidate our cross
11 actions because we don't know when the plan of the
12 debtor will be confirmed. And if a cross action isn't
13 liquidated by the time the plaintiffs confirm, we don't
14 get anything back from them.
15     So my understanding of the rule that
16 Mr. Jordan has cited is that that's why it's more well
17 suited for the home district judge to decide these venue
18 remand considerations. And that's all we're asking for,
19 Judge. And I'll step away and let Mr. Jordan take
20 over.
21     MR. JORDAN: Your Honor, I --
22     THE COURT: Well, let me -- let me ask the
23 plaintiff to address just those recent arguments.
24     MR. SIEGEL: Yes, Your Honor. They don't have
25 any claim against Flexitallic anymore, Gasket Holdings.

Page 34

1  I've nonsuited those claims with prejudice. We can't
2  recover any money against Flexitallic. I'm calling it
3  Flexitallic, not the whole name. Therefore, Flexitallic
4  won't ever -- therefore, Garlock won't ever pay or
5  overpay for anything that Flexitallic really owed us
6  because Flexitallic now is completely immune from any
7  claim against us.
8       I want the Court to understand that these are
9  nine asbestos cases that were pending in Nueces County.
10 In at least one of them, a man is dying of
11 mesothelioma. His case has already been continued
12 twice. It's now set for trial again the first part of
13 next year. What they're asking you for is -- and
14 listening to Mr. Jordan and Mr. Chaney, I was thinking
15 that all of that argument is really the province of the
16 law reviews. It's the province of congressional
17 testimony. It is completely barred by the precedent
18 cited in our motion for remand.
19      Think about what they're asking you for.
20 They're asking you to totally ignore the delirium
21 (phonetic) jurisdictional deficiency here and transfer
22 this -- all of this to Delaware, which would buy them
23 many months of time. And Mr. Sterling, by the way, the
24 man who's dying of mesothelioma, will be a dead man.
25 They're asking you to send this case to Delaware;

Page 35

1  Delaware. The Delaware district court is governed by
2  the third circuit -- by the law of the third circuit.
3       The leading case that we cite in our motion
4  for remand is Pacor, Inc. versus Higgins, decided by the
5  third circuit in exactly this circumstance, a claim by
6  the plaintiff against a bankrupt asbestos defendant
7  Johns-Manville and several nonbankrupt defendants. And
8  the third circuit held the claim by the plaintiff
9  against the -- against the nonbankrupt companies and the
10 nonbankrupt companies' claims for -- against
11 Johns-Manville for contribution, which existed.
12      As of today, the claims against Flexitallic
13 don't even exist anymore. But the claims against
14 Johns-Manville, by goes the claim and of the
15 contribution defendant, did not constitute related-to
16 claims, such as to be within the district court's
17 bankruptcy jurisdiction. That is exactly the law that
18 will govern the district of Delaware in this case. Why
19 they are asking you to transfer this to Delaware so that
20 the Delaware court can enter a ruling, which is a
21 foregone conclusion --
22      THE COURT: Which is not related?
23      MR. SIEGEL: -- which is not related, is
24 beyond me.
25      I think the court should also know, because we

Page 36

1  heard a lot about the concern for 300,000 asbestos
2  claims, centralization is a constant theme you hear
3  in -- you've seen in their motion. Guess what? Only
4  asbestos claims represented by my firm Waters & Kraus
5  have been removed to federal court. Nine here in Corpus
6  Christi; many in Galveston; many in El Paso.
7       In the last ten days, my firm has had about 80
8  asbestos cases removed to federal court. We are
9  struggling at my firm to take this as some sort of
10 perverse compliment to our practice. But, frankly, it
11 has turned our firm upside down, hence -- and I
12 apologize for this -- the box of pleadings delivered to
13 the federal court today, such that it had to be screened
14 by security. But virtually every case in our office was
15 removed over the last ten days, and we have been
16 scrambling to file motions for remand in all of the
17 district courts around Texas.
18      Our firm probably represents fewer than five
19 percent of the asbestos plaintiffs in the state, and
20 certainly fewer than one percent of the asbestos
21 plaintiffs in the country. But for some reason, only my
22 firm's cases were removed to federal court; thus, I'm a
23 little bit dubious of the concern about centralization
24 here. In any event, as I said, all of that is for the
25 law reviews; all of that is a complaint, well taken or

Page 37

1  not, about the way the Texas statutory allocation of
2  fault among tortfeasors operates in personal injury
3  trials.
4       And it's really a complaint about federal
5  bankruptcy law, which is very clear on this issue and
6  which says that inchoate claims for contribution and
7  indemnity, even assuming they exist, are not related to
8  the bankruptcy, such that there is bankruptcy
9  jurisdiction. And that is certainly true of the
10 plaintiffs direct claim against the nonbankrupt
11 codefendants. That was the case -- that was the ruling
12 of the third circuit in the Johns-Manville bankruptcy.
13 That was followed very shortly by the fifth circuit in a
14 case holding that the -- the benefits of the automatic
15 stay do not apply to the nonbankrupt codefendants.
16      When Johns-Manville went bankrupt, all the --
17 all of its codefendants said, hey, we need the stay to
18 apply the claims against us too because of various
19 equities, various complaints they made about how unfair
20 it would -- it would be to defend asbestos without
21 Johns-Manville in the courtroom. That's -- that's the
22 Wentworth case that we cite in our brief.
23      The fifth circuit told them no. The -- the
24 bankruptcy stay applies to Johns-Manville, but it does
25 not apply to the claims against non-debtor codefendants,

10 (Pages 34 to 37)

HEARING

## Page 38

1   and that has always been the law. Again, we have
2   plaintiffs; we have some widows; we have in one case a
3   woman suffering from asbestosis; we have some people
4   whose cases were set for trial, some not; we have
5   Mr. Sterling who is dying of mesothelioma, and his case
6   has already been continued twice. There is
7   absolutely --
8           THE COURT: Is there some agreement that
9   discovery then between the defendants and other cases is
10  usable in your case?
11          MR. SIEGEL: As a general matter --
12          THE COURT: Had anybody asked for that
13  agreement?
14          MR. SIEGEL: As a general matter, depositions
15  taken among -- by different parties in asbestos
16  litigation does -- it is somewhat usable in ongoing --
17  in ongoing asbestos trials. That's certainly true, and
18  Mr. Chaney is right about that. However, Your Honor,
19  inquire about whether they've ever taken any discovery
20  against Federal-Mogul, because apparently that's the
21  most important thing they have in this case is their
22  cross claim against Federal-Mogul and Flexitallic.
23          We called up the chief counsel of Flexitallic,
24  and we said we're going to dismiss you. Do you have any
25  problem with that? No. By the way, has Garlock ever

## Page 39

1   taken any discovery against you? No. Has Garlock ever
2   sent you an interrogatory? No. Has Garlock ever
3   demanded formally or informally one cent in contribution
4   from you in the 250,000 asbestos cases you've resolved?
5   No. Have you ever paid Garlock one cent in
6   contribution? No. Has Garlock's claim for contribution
7   against you ever even entered your mind until now? No.
8           That is an exhibit to our -- we tried to take
9   his deposition last week. That was quashed or objected
10  to by Mr. Chaney. We've noticed it again for Friday,
11  but we recounted all of that information in an affidavit
12  by our lawyer Jeffrey Simon who spoke to him.
13          THE COURT: Do you know that to be untrue,
14  those representations?
15          MR. CHANEY: They did give me a notice for 24
16  hours to take a telephonic deposition of --
17          THE COURT: No, no. Misrepresentations about
18  your -- the status of your discovery against this
19  third-party debtor?
20          MR. CHANEY: We have, Your Honor, to my -- I
21  have not handled Garlock litigation nationwide, and
22  this --
23          THE COURT: So you can't say it's not true or
24  true?
25          MR. CHANEY: I can't say that we have never

## Page 40

1   attempted to get any enforcement or cross action. What
2   I can say is the cases I've handled, Your Honor, is what
3   has happened historically when I first started to do
4   some work for Garlock, the -- the settlement value was
5   $2,500 or $5,000 for somebody with a cancer like
6   Mr. Sterling.
7           Now, because all of these other -- and so, you
8   know, practically, Your Honor, you wouldn't chase a
9   codefendant down when you could resolve a case for 2,500
10  or $5,000. As a result of all of the bankruptcies of
11  all of the --
12          THE COURT: So that wouldn't be an unusual
13  situation then if that were true?
14          MR. CHANEY: If that were true?
15          THE COURT: The plaintiffs' representations of
16  the state of your discovery against the third-party
17  debtor?
18          MR. CHANEY: If -- if we had never chased them
19  down for --
20          THE COURT: Right.
21          MR. CHANEY: -- reimbursement of the $5,000?
22  I -- I presume that is true, Your Honor, historically.
23  But what the point I was leading up to, Judge, is this
24  has all changed. Now, the people who manufactured the
25  vast majority of the asbestos-containing products are

## Page 41

1   all in -- or not all. But a huge number of them, as the
2   Court well knows, are in bankruptcy.
3           THE COURT: I don't know this.
4           MR. CHANEY: Well, that is the truth, and I --
5           THE COURT: Just assume I don't know
6   anything.
7           MR. CHANEY: Okay. The truth is --
8           THE COURT: That's probably much closer to the
9   mark.
10          MR. CHANEY: John -- well, I'm not far behind
11  you, Your Honor, because I've not been involved in this
12  docket like -- like Mr. Siegel has. But Johns-Manville
13  was the largest manufacturer; went bankrupt years ago.
14  OCF, the --
15          THE COURT: So what happened to all those
16  claims against that defendant?
17          MR. CHANEY: Well, I'm sure that if you ask
18  him, his clients filed proofs of claim in the vast
19  majority of them.
20          THE COURT: Did yours?
21          MR. CHANEY: I don't think my -- my client
22  Garlock ever filed a proof of claim because what was
23  happening was we weren't a target. We were a
24  peripheral, tertiary, low-on-the-food-chain defendant.
25  And now the demands have gone from 5,000 to 600,000.

11 (Pages 38 to 41)

Page 42

1  The truth is, you know, at some point in time, we're all
2  going to be in --
3  THE COURT: When did that happen?
4  MR. CHANEY: That happened probably about in
5  the last three to five years -- the last two to three
6  years where the -- the focus --
7  THE COURT: Okay. So what companies have
8  gone -- what other -- what other codefendants have gone
9  bankrupt in that three- to five-year period?
10  MR. CHANEY: Oh, I don't know that I could
11  even list them. All these people would have a much
12  better idea than I, but --
13  THE COURT: Well, did you file proofs of claim
14  in any of those?
15  MR. CHANEY: I don't think we filed proofs of
16  claim in any of those. I'm sure the plaintiffs did, but
17  I don't think we did.
18  THE COURT: Okay. But you filed none?
19  MR. CHANEY: I filed --
20  THE COURT: And you had -- you had indemnity
21  claims in those cases too?
22  MR. CHANEY: But -- but, Your Honor, what
23  happened --
24  THE COURT: Did you have indemnity claims in
25  those?

Page 43

1  MR. CHANEY: Yes. But once we settle, Your
2  Honor, under Texas law, our indemnity claims are
3  extinguished because we become a settling tortfeasor.
4  So at some point in time, the economics of all this have
5  changed to where, against a company like Gasket Holdings
6  or Flexitallic, it has now become important to pursue
7  the cross actions to have them heard in one location.
8  The economics have changed of -- of this whole docket,
9  drastically, drastically.
10  MR. SIEGEL: They should petition the
11  legislature then, Your Honor, if the situation has
12  changed or a change in the bankruptcy codes will allow
13  this to occur.
14  MR. JORDAN: If I may say, let me just report
15  to the court, there is over 150 Chapter 11's in Delaware
16  this year alone in asbestos-related companies. The
17  economics have absolutely and critically changed.
18  Congress already enacted 157(B)(5) in anticipation of
19  centralizing these types of proceedings.
20  In what Mr. Chaney is telling you, we were
21  preparing, in fact, the response that we were going to
22  file. It had a chart that included not just the
23  proliferation of litigation, that's the first time I've
24  heard today they're dismissing without prejudice or with
25  prejudice because we got copies of dismissals on all

Page 44

1  without prejudice.
2  This is the first time I've ever heard they
3  would be willing to do that in these eight cases.
4  But -- but what our advisement will show you is that in
5  1991, these cases settled for $500. In the year 2000,
6  the demand for 600,000, and it's only because someone
7  who was, as Garlock, a small company --
8  THE COURT: Are you telling me because the
9  defense pool has gotten smaller?
10  MR. JORDAN: We've become targets all of a
11  sudden. There's nobody else to pay. In fact, they say
12  that to you. There's no -- these other people are in
13  bankruptcy. You're going to have to pony-up because
14  there's nobody left. And that's what's happened.
15  And -- and 157(B)(5) was used in the
16  Dow Corning case to bring every single contribution
17  claim to the home district court, every shareholder
18  claim to the home district court. And even that case
19  was -- was not the -- it wasn't the type of case that is
20  similar to what's occurring down in Delaware. And what
21  is happening is the filing in the bankruptcy --
22  THE COURT: Do any of -- any of those cases
23  that you're talking about where the plaintiff has said,
24  I am -- I am not -- I'm dismissing with prejudice
25  against the debtor?

Page 45

1  MR. JORDAN: None -- none of those cases that
2  I'm aware of has that -- has that ever occurred. In
3  fact, I haven't told the court that -- that surely I
4  would have the opportunity to respond to that by going
5  back and looking at some of the cases and being sure
6  that --
7  THE COURT: I guess what I'm saying is that it
8  does seem to be a significant difference from --
9  MR. JORDAN: I think -- I think --
10  THE COURT: When -- when certainly I can see,
11  like I told you before, if they weren't doing that and
12  they were thinking about suing, again, the bankruptcy
13  court, just that defendant, everything should go
14  together. And I understand that. I think this appears
15  to be a different capuvich (phonetic), and especially
16  when you're just -- when all you have left are indemnity
17  claims against -- between the codefendants.
18  And I understand that that's a problem because
19  the pool is shrinking. That's not a problem that I
20  think I need to deal with. That's a problem that the
21  shrinking -- the shrinking pool specialists need to
22  tackle. I mean, I can't deal with that, but I can look
23  at the plaintiffs form and the -- and the defendants
24  that are left.
25  And -- and I'm not sure that your

12 (Pages 42 to 45)

Page 46

1  indemnification claim is cognizable at this point
2  because it's not ripe. Yet, whether I should even be
3  looking at it as a -- as a claim at this point and
4  then -- and what he says does make good sense. If you
5  want to address that and tell me I don't have any sense
6  either, which is fine.
7      MR. JORDAN: I wouldn't do that.
8      THE COURT: No, my husband does; so don't
9  worry about it. He doesn't really. I'm just kidding.
10      If you -- if the plaintiff gives up their
11  claim against your codefendant, then your claim for
12  indemnification certainly has to shrink, if not
13  disappear.
14      MR. CHANEY: I -- respectfully, Your Honor, I
15  would disagree with that because under Texas law, the
16  plaintiffs doesn't need to bring a claim for me to have
17  a valid contribution claim against any defendant.
18      THE COURT: Well, I understand against an
19  insurance carrier, but I think if some -- if they
20  haven't had the same liability you do to the plaintiff
21  before you get indemnification from them on a claim,
22  that's right against you.
23      MR. CHANEY: That's only for contractual
24  indemnity. Under common law indemnity, within 30 days
25  Your Honor, of my being brought in as a defendant, I can

Page 47

1  bring in any third party I want who I think shares my
2  liability. Now, in this case what happened is they sued
3  us, and so while the case was pending, I found a cross
4  action against them for contribution.
5      It's not extinguished by his saying, we'll
6  never sue you again, because I could still in a court
7  say, you know, Mr. Sterling worked only with Flexitallic
8  gaskets, not with Garlock gaskets. To the extent you
9  think, jury, that is a dangerous product, it's because
10  he worked with both gaskets, and his dismissing doesn't
11  affect my cross action or my ability to pursue any
12  defendant.
13      MR. SIEGEL: It does, Your Honor.
14      MR. CHANEY: It does not.
15      MR. SIEGEL: He said I can bring a cross claim
16  against anyone who shares my liability. That was his
17  word. Since we don't have -- no longer have any
18  claim --
19      THE COURT: I think I've got it.
20      MR. SIMON: Your Honor, could I -- could I
21  speak briefly just on a bankruptcy issue on one thing?
22      THE COURT: Are you the plaintiff bankruptcy
23  person?
24      MR. SIMON: Yes, ma'am.
25      THE COURT: Okay. Let me -- let him finish,

Page 48

1  and then I want to hear from you.
2      MR. SIMON: Thank you.
3      THE COURT: Because you've been standing in
4  line there for a while.
5      MR. SIMON: I have, Your Honor.
6      MR. CHANEY: I -- I feel very strongly that
7  what Mr. Siegel says about my ability to maintain a
8  cross action for contribution once his client says I'm
9  not going to go after that defendant anymore, and -- and
10  just take a simple auto product case.
11      Okay. They -- they sue auto manufacturer,
12  whatever the car was they say didn't work. It caught on
13  fire, as a result of a drunk driver hitting the
14  plaintiff's car.
15      THE COURT: Okay. Plaintiff sues you, the car
16  person.
17      MR. CHANEY: Right.
18      THE COURT: You sue the driver.
19      MR. CHANEY: I sue the drunk driver of the
20  other car.
21      THE COURT: You sue the drunk driver, but
22  that's different as well because in a -- in a case
23  between the plaintiff and you, you're only responsible
24  for what the part that your defective product caused.
25  You're not responsible for the -- for what the drunk

Page 49

1  driver did.
2      MR. CHANEY: But the only way I can show what
3  part I'm responsible for is to have the jury answer what
4  part the drunk driver is responsible for. Otherwise, if
5  there's just two blanks, X motor company and the
6  deceased re: that was --
7      THE COURT: But you're talking about
8  contributory negligence. Isn't -- is that what you're
9  saying?
10      MR. CHANEY: No, ma'am.
11      THE COURT: This is contributory negligence?
12      MR. CHANEY: No, Your Honor. I'm saying,
13  assume I'm in a car, and I'm rear-ended by a drunk
14  driver, and my -- my widow sues the car company.
15      THE COURT: Well, you don't need to be worried
16  about it at all.
17      MR. CHANEY: Right. That would -- then would
18  be moot.
19      THE COURT: I'm sorry.
20      MR. CHANEY: Then -- then what happens is
21  my -- my estate, my family, they sue the car company.
22  The car company will bring in the drunk driver saying,
23  you know, it wasn't our car. It was the drunk driver.
24      The family of the deceased can't just get up
25  and say, well, you know what, we're not going to sue the

HEARING

---

Page 50

1 drunk driver, and now all that goes to the jury is my
2 estate versus the car company. The car company has the
3 right to maintain, independent of the plaintiff's
4 allegations, a cause of action for contribution or
5 indemnity, if the jury were to find that the fault was
6 the sole cause of the drunk driver, that third party.
7      THE COURT: Well, see, that's just what he's
8 saying. He's saying you still have the right to say --
9 to put that person on the jury charge as the sole
10 cause.
11      MR. CHANEY: Judge, I got a transcript from a
12 hearing that I could show you and their motion in limine
13 in every case where they say I can't do that.
14      THE COURT: I thought he just stood up and
15 said you can always point to them as sole cause.
16      MR. CHANEY: Well, I have a lot of problems
17 with sometimes what somebody says here versus --
18      THE COURT: Is that -- did you say that?
19      MR. SIEGEL: I did, Your Honor. And,
20 undoubtedly, counsel will get the transcript from this
21 hearing and use it against us in every --
22      THE COURT: Did you not stand up and say you
23 have no objection to them using this debtor person as --
24 as sole cause --
25      MR. SIEGEL: Absolutely.

---

Page 51

1      THE COURT: -- as long as nobody mentions that
2 they're in bankrupt?
3      MR. SIEGEL: That's right. They can -- they
4 can say they're in bankruptcy.
5      MR. CHANEY: But he'll tell the judge, Your
6 Honor, they can't say it's the sole cause because
7 everything causes it. It all causes it.
8      THE COURT: No. Wait; wait.
9      MR. SIEGEL: I'm binding myself right now.
10      MR. CHANEY: But he'll say, but Chaney can
11 never prove it's the sole cause because --
12      THE COURT: That's not my problem.
13      MR. CHANEY: I understand that.
14      THE COURT: I mean, that's just the Texas
15 law.
16      MR. CHANEY: All I'm trying --
17      THE COURT: To get him on the -- to get him on
18 the list for contributory negligence, they have to be in
19 line for being sole cause. Is that right?
20      MR. CHANEY: No. No, Your Honor.
21      THE COURT: That's what he's saying.
22      MR. CHANEY: And he's incorrect.
23      THE COURT: I thought you just said that.
24      MR. CHANEY: No. What I'm saying is all I
25 have to do to get them on a line --

---

Page 52

1      THE COURT: Can we -- can we read this back?
2      MR. CHANEY: Well, maybe I'm --
3      THE COURT: Maybe we better play this back.
4      MR. CHANEY: I may be confused. And if I am,
5 I -- I apologize. The difference is he's saying sole
6 cause, and I'm saying --
7      THE COURT: So did you.
8      MR. CHANEY: I'm saying a cause. Then I
9 misspoke, and I apologize, Your Honor.
10      In my -- in my example, all I would have to
11 say is for indemnity, it was the sole cause because,
12 otherwise, I wouldn't be entitled to indemnity. But for
13 contribution, the drunk driver was a cause, and that's
14 what I would say in any case, even though the plaintiffs
15 didn't bring direct action against the third party
16 because what he's trying to convince you of is once the
17 plaintiffs say, we don't want to sue that defendant, my
18 right to maintain a cross action is gone.
19      And I will be happy to provide the court with
20 some briefing to show that under Texas law, that is not
21 the case. He's trying to tell you that all the
22 plaintiff has to do is say, hey, I'm not going to sue
23 this defendant anymore, and a codefendant can't continue
24 to maintain a cross action. And I'm saying that that is
25 not the law in Texas, and I would be happy to find --

---

Page 53

1      THE COURT: Have you sued -- have you sued --
2 I misunderstood your suit. You have sued these
3 codefendants. In fact, you've sued all codefendants?
4      MR. CHANEY: Yes. Yes, Your Honor.
5      THE COURT: For contributory?
6      MR. CHANEY: No, for --
7      THE COURT: Contribution?
8      MR. CHANEY: For contribution and indemnity,
9 yes, Your Honor. In fact, almost every defendant has
10 sued almost every defendant in the context of the
11 asbestos cases. Some of the standing orders, for
12 example, the Nueces County --
13      THE COURT: Wait a minute. If you get for
14 contribution is this, if you are sued, okay, and you're
15 just the only defendant left --
16      MR. CHANEY: Right.
17      THE COURT: And they're going to sue you as
18 the sole cause or a cause?
19      MR. CHANEY: Yes, Your Honor.
20      THE COURT: You -- that's the only two ways
21 you can be sued; right, sole cause or a contributing
22 cause?
23      MR. CHANEY: They're -- in this case they're
24 saying we manufactured a product that was defective, and
25 that was the producing cause is what they say in

---

14 (Pages 50 to 53)

HEARING

**Page 54**

1  products, yes.
2       THE COURT: The producing cause?
3       MR. CHANEY: Yes. And for negligence, it
4  would be proximate cause, but it's in essence the same
5  thing.
6       THE COURT: Well, isn't there a difference in
7  the contributions between a producing cause and a
8  negligence proximate cause?
9       MR. CHANEY: There's not really a difference
10  in my ability to share the responsibility with the third
11  party, but the proof that the plaintiffs have to put on
12  to a product manufacturer for a defective product is
13  producing cause, which is defined just a little bit
14  different in the pattern jury charge than proximate
15  cause.
16       THE COURT: Okay. I guess I want to talk
17  about -- you're suing them for both producing and -- and
18  negligence?
19       MR. SIEGEL: That's right, Your Honor. Yes.
20       THE COURT: Okay. In -- in a producing cause,
21  if the jury finds that you're a producing cause and
22  awards $10 in damages, how would you ever get
23  indemnification from the other -- from the codefendant?
24       MR. CHANEY: Well, what I would typically do
25  is I would have the codefendant as a blank on the list

**Page 55**

1  of persons with whom the -- or among whom the jury can
2  apportion the cause.
3       THE COURT: But you can have 100 producing
4  causes. In a -- in a products liability, do you have to
5  do apportion, like ten percent, this one, five percent,
6  that one?
7       MR. CHANEY: Yes, you do.
8       THE COURT: Is that -- is that right?
9       MR. SIEGEL: Yes.
10       THE COURT: Okay.
11       MR. CHANEY: In fact, when you have mixed
12  products in negligence, you still apportion the same way
13  among everyone who may have contributed to cause the
14  injury or accident.
15       THE COURT: And this person would not be --
16  this debtor would not be on the jury charge?
17       MR. SIEGEL: There's a separate provision of
18  the Texas Civil Practice and Remedies Code that keeps --
19  that does allow, in some situations, bankruptcies to
20  come along if they settle with the plaintiffs or -- or
21  that's the position to be taken by defendant.
22  Otherwise, if it's just a bankrupt entity, that -- that
23  entity can't come on forms to begin with. But
24  certainly, when there can't be any possible
25  responsibility for contribution because there's no

**Page 56**

1  longer a viable contribution worry, they don't belong
2  there.
3       And, Your Honor, I really -- I asked my
4  associate to go look for a case. Apparently, she
5  couldn't find it or she could not get to the library.
6  The case is C&H Nationwide versus Thompson in the recent
7  Supreme Court of Texas case from the mid '90s, and
8  it's -- I'm sorry I don't have the cite for you. But it
9  says, almost verbatim, a -- a defendant or an entity
10  cannot be liable to a defendant if he is also not liable
11  to the plaintiff.
12       That is the simple bedrock law is that is what
13  contribution and indemnity is. If there is no longer a
14  viable claim against Flexitallic for any of these
15  debtors, then there is no longer a proof of claim. And
16  Your Honor's suspicions were right, I think. All of a
17  sudden, these -- these proofs of claim are so important,
18  or these contributions claims are so important, yet they
19  never once even filed a proof of claim in any bankruptcy
20  in history for contribution.
21       MR. CHANEY: Your Honor, I would be happy to
22  provide the case law that would show that I can maintain
23  a cause of action against a third-party defendant
24  irrespective -- I don't know about the case he's talking
25  about. If there is an absolute defense by a third-party

**Page 57**

1  defendant, like statute of limitations, that may have
2  some -- something in -- that may have an effect on my
3  ability to maintain them as a third-party defendant.
4  And I can easily find case law, Your Honor,
5  that says just because the plaintiff says I'm not going
6  to sue this defendant does not affect my right as a
7  defendant to bring in and maintain a claim for
8  contribution against that third-party defendant.
9       MR. SIEGEL: It's not that we're not going to
10  sue them. It's that we can no longer recover against
11  them. If we just had never named Flexitallic and had
12  never sued them or dismissed them or nonsuited them,
13  then, yes, he would have a third-party claim against
14  them.
15       MR. CHANEY: Well, did I --
16       MR. SIEGEL: But now, by virtue of what I've
17  said, there is no rightful recovery on our part against
18  the debtor. Therefore, there is no contribution claim
19  against the debtor.
20       MR. CHANEY: I -- I guess I'm confused as to
21  what he's saying. Even though he's dismissed them, I
22  still can -- I don't have it in front of me, Your
23  Honor. But I can provide the court with -- with case
24  law that would say, I'm still able to maintain a cause
25  of action to try to get some fault apportioned to them

15 (Pages 54 to 57)

HEARING

Page 58

1   because the -- one of the determinations that is
2   extraordinarily important, Your Honor, is whether or not
3   my client is jointly and severally liable.
4        So you want to get anyone who has contributed
5   to the -- to cause the disease on the jury form so that
6   the jury can determine if that entity did, in fact,
7   contribute to or cause the disease. And in every one of
8   these cases, one of the debtors had been identified by
9   the plaintiffs themselves as having manufactured
10  products who caused his or her disease.
11       In the case law about my being able to
12  maintain the cause of action, Your Honor, I'd be happy
13  to provide you if -- if I have a day or so. But I know
14  you want to talk to the bankruptcy lawyer some more.
15  I -- I'd be happy to answer any other questions you
16  have.
17       THE COURT: Thank you.
18       MR. CHANEY: All right.
19       MR. SIMON: Good afternoon, Your Honor. I'm
20  Henry Simon. I'm a bankruptcy lawyer. I don't know how
21  to improve the Texas practice system, but it seems to me
22  this -- the issues that we're dealing with today deal
23  with bankruptcy.
24       THE COURT: Bankruptcy only.
25       MR. SIMON: And the questions are these:

Page 59

1   Should the court, as Mr. Jordan has said, without
2   hearing, without consideration, without laying
3   considerations or equities, simply send this case a --
4   as we say in your brief, to send this case to Delaware.
5   And the answer to that, obviously, is no. It might be
6   comforting to Mr. Jordan or others, certainly to some of
7   these defendants who gain benefit of that, but the truth
8   is that the statutes which pertain to remand, which call
9   upon the court to examine the jurisdiction first,
10  actually makes sense.
11       It makes sense. And every now and then when
12  you have to go back and read them all together, you
13  recognize that they make sense. The court examines its
14  jurisdiction first, as our brief indicates the supreme
15  court has said, and I don't think it's controversial
16  but --
17       THE COURT: That sounds familiar.
18       MR. SIMON: Yeah. And these are jurisdiction
19  issues. The first question is whether or not this is
20  core or noncore. Now, that wasn't part of the law for a
21  long time. There is always a habit of bankruptcy
22  lawyers to say too much and give too much history, but,
23  just briefly, when the bankruptcy code came in, there
24  was this thought in the bankruptcy court one could do
25  anything. One could get divorced; one could file any

Page 60

1   kind of case. And then came Marathon, and then came
2   limitations on the jurisdiction of the bankruptcy
3   court.
4        And then came these various concepts about
5   what the bankruptcy court could do and should do and
6   could not do and should not do. And along with that
7   came with issue of whether or not a particular piece of
8   litigation was core or noncore. This is noncore.
9   Everybody agrees it's noncore. Well, if it's noncore,
10  then what jurisdiction is it? The first thing the court
11  considers is whether or not it is related. Is this
12  related jurisdiction?
13       Under 157C1 what is related jurisdiction?
14  Actually, the courts are split. The statute says they
15  can have a material effect, even though it doesn't use
16  the word material. Some courts say, you got to show me
17  it really makes a difference. That's what I think
18  related means. And other courts say, well --
19       THE COURT: You're saying I don't have it yet
20  anyway.
21       MR. SIMON: You don't have it. There's no
22  related jurisdiction here. This is a contribution
23  claim. It's not entitled to a jury trial. I don't know
24  what the affect is of the Texas jury charge and whatever
25  activity, but no one's giving up any claim.

Page 61

1        What happens is people who have a contribution
2   claim, if they had it filed as a proof of claim to
3   bankruptcy, bankruptcy intervenes over a lot of this.
4   It's inconvenient to a lot of people. It's -- it's a
5   discomfort, but it's been the law since the 18th
6   Century.
7        THE COURT: But you love it.
8        MR. SIMON: Well, I have -- I have to make a
9   living some way, Judge. And I'm not very mechanical
10  so -- yes, I do.
11       So the question at first instance is what did
12  they really have? Well, they don't have an indemnity
13  claim. They claim to have a contribution claim because,
14  I guess, if they had an indemnity claim, the plaintiff
15  wouldn't have had any exposure to their products at all
16  or whatever.
17       But they claim to have a contribution claim,
18  and here's -- here's a good deal of law on that. The
19  FDIC versus Sexton, .42, federal rules 55, simply says
20  you don't get a jury trial, and this isn't to delay the
21  jurisdiction. And -- and there are lots and lots of
22  cases.
23       But the issue Defendant Jordan raises, which I
24  think is unique -- Mr. Jordan says two things that are
25  unique. He says, first of all, you shouldn't even think

16 (Pages 58 to 61)

## Page 62

1  about these things. You're not thinking about these;
2  just send them to Delaware. And the reason that you're
3  just to send them to Delaware is this had a lot of
4  parts. There's going to be 300,000 jury cases.
5       THE COURT: But in case I wanted him to put a
6  little order there showing me how another judge has done
7  the same thing.
8       MR. SIMON: I beg your pardon?
9       THE COURT: Did you see their exhibits?
10      MR. SIMON: I did not, Your Honor.
11      THE COURT: You didn't show them your
12  exhibits -- those exhibits, did you?
13      MR. JORDAN: Your Honor, there's a lot of
14  exhibits I haven't seen. You can't imagine the
15  hurricane we've been undergoing in the last --
16      THE COURT: Well, you don't think I've seen
17  the same hurricane?
18      MR. JORDAN: Yes, you've seen it. Yes, you
19  have.
20      MR. SIMON: But, Your Honor, the point is
21  there won't be 300,000 jury cases that are -- that are
22  laid out to the Delaware court against the debtor in
23  bankruptcy. That's why people file bankruptcies. They
24  file bankruptcies, and they file a case on them. And
25  they say to the bankruptcy judge, don't put us through

## Page 63

1  all these jury cases. We don't have the money. We're
2  tired of paying these lawyers. Don't give anybody
3  relief from the automatic stay. And, of course, without
4  relief from the automatic stay, you can't go forward;
5  can't go forward anyway.
6       And what they say is we're going to work this
7  out in the claims process. These cases don't get
8  tracked to juries. And Johns-Manville, Babcock &
9  Wilcox, Owens-Corning, they get worked out in the claims
10  process. A certain amount of the debtors' assets are
11  put in what we call the defense program. The assets get
12  put in a pool, and you let everybody who complained to
13  be in that pool fight among themselves for the assets.
14      The unsecured creditors submitting in these
15  major cases has belaboring work to make a determination
16  as to how much of the pool goes to people who have
17  coughs, pleural thickening; how much goes to people who
18  have cancer, or how much goes to living mesotheliomas,
19  and how much goes to dead mesotheliomas, and so forth.
20  Sometimes the process goes through, and sometimes it
21  doesn't. But it doesn't go to jury trial. So just take
22  that off. That's not what happens. It does not go to
23  jury trials now.
24      THE COURT: You're saying it can't or it
25  doesn't?

## Page 64

1       MR. SIMON: The bankruptcy judge is faced with
2  the fact that the entire purpose of putting this case in
3  bankruptcy is to stop the litigation against this
4  defendant. And congress has said not only that you can
5  do that, but we're going to help you. The congress
6  passed 11-USC-524-G, which gives you the channeling
7  injunction if you give up sufficiency of your assets.
8  If you meet the test, then you put it in the pool, that
9  which the congress has said to be sufficient to relieve
10  you of asbestos liabilities.
11      That's what all these cases are all about.
12  That's what they're trying to get to. The statute
13  didn't exist at the time of Johns-Manville. The
14  Johns-Manville, although it was carefully negotiated,
15  stayed on with that form because they couldn't channel
16  it off. They can now, and that's where these bankruptcy
17  cases go. So they do not -- repeat, do not go to
18  multiple jury trials in that courtroom.
19      So that's just -- that horror doesn't exist.
20  Now, that's fine. Now, let's see where we really are.
21  We're really in the United States Federal Court in
22  Corpus Christi. This case has been removed here. There
23  isn't very much, if any, related jurisdiction. Maybe
24  they have a contribution claim. They've never raised
25  one. Raised is not the right word. They've never

## Page 65

1  pursued it. They've never recovered on it. But if they
2  do, they will file a claim in the bankruptcy. So they
3  haven't lost their contribution claim.
4       Now, is it as effective as being able to try
5  it through a jury? I don't know. But lots of things
6  have circumvented by the bankruptcy process. The
7  congress has provided a remedy for all of these folks
8  concerned. They may not like the remedy. Most of the
9  contractual creditors, as well as the noncontractual
10  creditors and debtors, don't like what happens to them
11  in bankruptcy. But that's the system, so to speak.
12      The court also considers mandatory
13  abstention. If there is no other jurisdiction, other
14  than that afforded by 28-USC-1340 -- 1334, if, in fact,
15  there is a pending state court case, and there is, if it
16  can be timely adjudicated, and it can, and if there are
17  not otherwise inequities, the Court should have a
18  saying.
19      Permissive jurisdiction picks it up if you
20  don't meet 100 percent of every test for mandatory
21  extension. And permissive abstention really covers
22  what's fair to these parties. You know, is it fair to
23  jerk them up to Delaware and they'll spend months up
24  there in a process where no one understands why they've
25  been sent there? Of course not.

17 (Pages 62 to 65)

Page 66

1      And, finally, to make it clearer what congress
2  intended, they came back with a special bankruptcy
3  remand provision, which is 1452. It simply says, this
4  court can remand for any equitable reason, and that
5  there is no appeal from a remand for any equitable
6  reason. So that's what we're really talking about.
7      Mr. Jordan would believe or would have us
8  believe that it should just be sent to Delaware for no
9  rhyme or reason and -- and months later, Delaware court
10 will do something with it maybe.
11     THE COURT: Well, he's good, though?
12     MR. SIMON: Yes, he is. It's a very nice
13 argument, you know. But for the argument regarding
14 transfer, I wouldn't be here. So I guess I'm glad that
15 we have this. But, I mean, this is a run-of-the-mill
16 personal injury case in which a defendant took
17 bankruptcy. It happens every day, all over.
18     The argument regarding mandatory transfer is
19 unique in my experience. It's not unique that there is
20 a consideration given to whether you consider
21 jurisdiction first. You not only have the two supreme
22 court cases, but you have the Oklahoma case, and
23 that's -- and it's the case in which he says, yes, you
24 must consider jurisdiction first. Transfer follows
25 jurisdiction.

Page 67

1      If there is jurisdiction, if there is federal
2  court jurisdiction, then you can consider whether or not
3  to transfer. But you certainly can't do it before
4  that. But you do not engraft, that is you don't take
5  1412, which talks about interest of justice and forum
6  non-conveniens and match up 1412 with this
7  28-USC-157(B)(5) and say, aha, we've matched these two
8  up, and they don't really say what I think they say.
9  But think how nice it would be, Judge, if you just
10 transferred every one of these cases to Delaware. Well,
11 it's a good argument. It's an interesting argument, but
12 it's wrong.
13     You could amend the statute and then leave it
14 to congress to really consider at a point sending
15 absolutely everything to the bankruptcy court. But they
16 thought they were right, and they decided to let the
17 decision, as to whether or not to assert or maintain and
18 continue federal court jurisdiction, remain at the local
19 level with the local United States district court who
20 understands this case far better than any Delaware court
21 ever would, to go down the liberty and find out whether
22 it related to the jurisdiction since it's noncore,
23 whether they say mandatorily or permissively, and most
24 of all, whether to remand on equitable grounds. It just
25 seems to me that's what --

Page 68

1      THE COURT: Well, can I sever and remand?
2      MR. SIMON: Oh, sure. Absolutely.
3      Plaintiff sever -- or can sever and remand?
4  Certainly. Certainly the debtor defendant is not going
5  to complain at being severed and there being a dismissal
6  and a dismissal with prejudice. I mean, of course, they
7  can't complain.
8      THE COURT: They are.
9      MR. SIMON: No. I know they're complaining,
10 not the debtor defendant.
11     THE COURT: Oh.
12     MR. SIMON: They're attempting to arguing.
13 This is -- you see, they're trying to say, well, the
14 automatic stay prohibits you -- prohibits you from doing
15 that. It's -- it's already every day, and it's usually
16 wrong. You can't claim the automatic stay if you're not
17 a debtor. Nondebtors can't claim the automatic stay.
18 They can't come in and say, aha, you can't dismiss
19 against this debtor. The debtor can claim. The debtor
20 is the only party that --
21     THE COURT: The automatic stay is only for the
22 benefit of the debtor.
23     MR. SIMON: Absolutely. 352 is absolutely
24 explicit. Only the debtor can claim. The debtors waive
25 it. The debtor cannot claim it, which is a little less

Page 69

1  than waiver, and both courts will accept it. Or on
2  motion and hearing, the court can grant relief. But
3  nobody else can say, aha, there's a debtor, and he can't
4  do this because the debtor has the -- has the right in
5  automatic stay.
6      So at the end of the day, Judge Burris said,
7  and some of the other cases said, when you get through
8  one of these complicated assertions, in a strange way
9  there is -- there's less here than meets the eye. This
10 is a personal injury case. There's -- there's a
11 defendant in bankruptcy; get a lawyer.
12     I would be happy to answer any question I can
13 answer.
14     THE COURT: Mr. Jordan.
15     MR. JORDAN: Your Honor, I have to issue with
16 practically every summary we will all -- it was just
17 announced to you. And I -- and I really want to start
18 from the beginning. I need to get a copy of their
19 response this morning, and I could have it by five
20 o'clock, our response, to give you the case law that
21 says that what they're telling you is not case law.
22     Let me start with the first thing related to
23 jurisdiction. Clearly, it's related to jurisdiction.
24 If this certain in re: Wood, it says that anything,
25 they could have a conceivable --

HEARING

Page 70

1    THE COURT: You can move on to the next one.
2    MR. JORDAN: The second is what this Court can
3  do under 157(B)(5). What is this Court permitted to do
4  by way of handling where the -- where this is tried.
5  The district court shall order the personal injury
6  toward the wrongful death claims. It doesn't say those
7  asserted against the debtor. It could include
8  contribution claims. You'd have to have your personal
9  injury law in that trial, shall we arrive in the
10  district court in which the bankruptcy case is pending
11  or the district court in the district in which the claim
12  arose, as determined by the district court in which the
13  bankruptcy case is pending.
14    And now all the arguments that you've heard;
15  for instance, what counsel told you is, oh, none of
16  these proofs of claims that they've always filed until
17  their announcement this morning that they're not going
18  to file them. All these claims never go to jury trial
19  28-USC-1411 specifically says that jury trial is
20  reserved. In every single claim that is a jury trial is
21  reserved so that they --
22    THE COURT: I was reading between the lines on
23  that one and figured that out.
24    MR. JORDAN: Let me move --
25    THE COURT: Just because it doesn't happen,

Page 71

1  doesn't mean it can't.
2    MR. JORDAN: We'll move to the next thing.
3  Counsel told you you can abstain. You have plenty of
4  jurisdiction to abstain. Anything you do to determine
5  where the case is to be tried in -- I respectfully
6  submit, is in --
7    THE COURT: If this helps your arguments,
8  these are the only two options that I foresee at this
9  time: Send everything Delaware, sever, and send the
10  remaining claims against the debtor to Delaware, and
11  remand the other -- the other claims. Those are the
12  only two options, which don't really touch on abstention
13  and some other -- and some other things.
14    MR. JORDAN: And do exactly what -- there is a
15  certain option that they offer today as to nonsuit, and
16  then do something. And I'm not sure what that would
17  leave the court, but let me suggest this.
18    THE COURT: Nonsuit.
19    MR. JORDAN: Well, I believe they said they
20  were going to nonsuit or dismiss with prejudice. I call
21  it nonsuit.
22    THE COURT: No, I'll put that in an order that
23  that's been -- that that has occurred and that
24  representation is binding.
25    MR. JORDAN: And here's the concern I have.

Page 72

1  First of all, Judge, 175, it restricts court to which --
2  in home to determine where any of these claims should be
3  tried. And -- and you were -- several things announced
4  you today, as if you were the home court, and of course
5  you wouldn't know what's happening in Delaware. What is
6  happening with the bankruptcy case, I don't know that.
7  I mean, I'm going to make an argument, I don't know
8  that.
9    THE COURT: I understand that. I understand
10  that.
11    MR. JORDAN: And 157 is used to send all cases
12  to a single forum to --
13    THE COURT: All cases involving the debtor.
14  But I can certainly carve out the debtor portion of this
15  case and send it to Delaware. I've done it in the past.
16    MR. JORDAN: Well, and I --
17    THE COURT: And nobody's ever complained.
18    MR. JORDAN: Well, and I guess that's the next
19  focus that I'd like the court to consider. We told you
20  why we're here, and that is because plans have changed.
21  Yes, we're -- but -- but because it is changed, Garlock
22  is not one of the big players.
23    Garlock is now -- now in the category of
24  midsize players who will themselves be totally bankrupt
25  in the next couple of years, if this continues. If what

Page 73

1  is -- if what is allowed happens, the plaintiffs can
2  carve off each segment and retry and retry and retry the
3  same thing over and over again. Then the defendants are
4  actually worn out.
5    And -- and, for instance, the suggestion to
6  you that you can abstain -- and this is one of the
7  reasons I would make this suggestion to the court. What
8  I -- what I think the court needs to rule on on the
9  transfer motion is a matter of law is whether we
10  convince you by case law, by facts that are not
11  disputed. I want the opportunity to respond to the
12  brief they filed today because I need to tell the court,
13  I don't believe it's accurate. And -- and let me give
14  you just a very brief example, they had asked you to
15  have said.
16    157(B)(4) says, noncore proceedings under
17  157(B)(2)(B) 20 USC, shall not be subject to mandatory
18  abstention. And you have to go read over what those
19  are, and those are any claims that deal with continued
20  or unliquidated personal injury or wrongful death tort
21  claims. That's what each codefendant has in respect to
22  its right to contribution. You can't -- there is no
23  mandatory abstention.
24    So I need the opportunity to put before the
25  court as a matter of law, I'm -- I am comfortable

HEARING

1 standing on my briefs because I think the law is --
2 because this is a matter of -- because it's a matter of
3 law for you to -- for you to consider. But I -- and
4 I -- and I truly need the opportunity to respond to
5 things that were suggested that -- that this court has
6 the jurisdiction to set the -- because what they're
7 asking you to do is --
8     THE COURT: So you don't have a nonsuit with
9 prejudice. They dismissed with prejudice.
10     MR. JORDAN: We still have a counterclaim
11 simply --
12     THE COURT: You don't have -- you don't have
13 an indemnification claim. You only have a contribution
14 claim.
15     MR. JORDAN: I think that's right.
16     THE COURT: Is that what you're saying?
17     MR. JORDAN: Yes, we have it, but we -- and I
18 say it this way, how -- I don't know how the court would
19 accomplish this type of severance. Each codefendant has
20 a claim against the other, but I'm going to take one
21 unit and put it over here. And that severed claim is
22 going to have one plaintiff and how many codefendants?
23 I mean certainly you wouldn't try to contribute twice.
24 And so --
25     THE COURT: Am I right in assuming that none

1 of the other defendants -- none of the other defendants
2 joined in your -- in your removal over here?
3     MR. JORDAN: I think -- well, you're right.
4 None did because the statute doesn't require a joinder
5 in these matters, and so none of --
6     THE COURT: But I've not heard from -- I've
7 not heard from any of the other defendants. See, I -- I
8 don't have any of their pleadings because you didn't
9 include any in the live pleadings.
10     MR. JORDAN: I don't -- that doesn't make
11 sense. I hope the Court --
12     THE COURT: It doesn't make even the
13 remotest --
14     MR. JORDAN: I hope that you just didn't get
15 all the file.
16     THE COURT: Oh, no.
17     MR. JORDAN: Because I -- we labored to hours
18 in the night to get these done right. And I -- I just
19 don't understand that you wouldn't have --
20     THE COURT: I don't have any answers from any
21 of the -- I have one answer in all of these in there
22 from your client. I don't have any answers or cross
23 actions from any of the defendants. So I have to assume
24 from that, since you are standing on your briefs and
25 your record, that there are no other cross claims by any

1 other defendants against this -- this defendant.
2     So we're only talking about yours and holding
3 out the litigation because that was your obligation to
4 do an appropriate notice of removal, which I think is
5 probably the worst one I've seen, but who am I to say.
6     MR. JORDAN: Well, and, you know, I'll stand
7 here and take that. I do. That's what happens. I -- I
8 apologize.
9     THE COURT: It's bad.
10     MR. JORDAN: That's not our standard work
11 file --
12     THE COURT: The file's right here. Look
13 through it.
14     MR. JORDAN: Yeah, I will. I will have my
15 staff explain what happened too. I don't understand
16 this. So I -- I just have to tell you, we believe
17 without ever --
18     THE COURT: So I'm assuming from that, and --
19 and I'm certainly in a position to assume from that,
20 that no other codefendant has a claim against this
21 debtor. You're the only one, and I cannot imagine
22 holding that litigation with how many defendants are
23 there?
24     MR. CHANEY: There are varying numbers of
25 defendants left in the nine cases, Your Honor.

1     THE COURT: It looks like about 100 or so.
2     MR. CHANEY: No, no. It's usually 20, 25.
3     MR. JORDAN: Yeah, 25 or 30.
4     THE COURT: I'm just going to end up with the
5 service list. It just seemed to go on and on and on.
6 And I had to read through it several times to look for
7 this debtor. And six of them, the debtor wasn't even
8 mentioned.
9     MR. CHANEY: So did we.
10     THE COURT: No debtor in six of the cases
11 whatsoever; no mention of this debtor in six of the
12 cases that were remanded -- removed. Three only had an
13 indemnification claim by your client. So there is no
14 motion to supplement the record. So I'm not going to
15 let you supplement the record on that issue. That's the
16 way it is. It is the way it is at this moment, the
17 removal. So I will let you supplement it on -- are you
18 going to respond to the motion to remand?
19     MR. JORDAN: Yes, I saw it this morning and --
20     THE COURT: You may respond. How much time do
21 you need? I mean, this is your emergency motion. So I
22 said immediately.
23     MR. CHANEY: Your Honor, yes, and I -- I
24 didn't want -- I didn't ask earlier for a continuance.
25 I showed up because the other side asked me to.

20 (Pages 74 to 77)

Page 78

1 THE COURT: I understand that.
2 MR. CHANEY: So if I can make a response to
3 the pleadings they filed today on my motion by tomorrow
4 morning at 9:00 o'clock, 9:30, and to the motion to
5 remand by, say, Thursday morning.
6 THE COURT: All right.
7 MR. CHANEY: Now, and on the remand, Your
8 Honor, that is -- I'd like to have the opportunity to
9 urge the Court to allow an additional hearing if you're
10 going to actually move to a remand after the other steps
11 are taken. This is --
12 THE COURT: Well, this is the hearing. This
13 is the hearing. If you have evidence, put it on.
14 MR. CHANEY: Well, I didn't know it was a
15 hearing on the remand. I mean, I didn't -- I didn't
16 know it was filed until this morning.
17 THE COURT: Well, it's almost automatic, if
18 you're going to file a motion -- a mandatory motion to
19 transfer, we're going to be hearing about a remand.
20 Whether it's sua sponte -- this is whether it's
21 sua sponte, which I actually had signed this morning and
22 not entered six remands in the nine cases
23 because of the very extremely-poor removal notices.
24 And I have to bring that up once again because
25 I sua sponte was going to remand six of them and was

Page 79

1 almost going to remand all nine of them sua sponte. But
2 I figured I'd let you talk because I may see them back
3 again for another defendant or somebody else because
4 it -- because of the 90-day rule. But, I mean, that's
5 what I'm telling you is that -- is that it's not -- it
6 shouldn't be a surprise that we're going to take up a
7 remand because, well, we just didn't have a hearing
8 today.
9 MR. CHANEY: Because I anticipate it, it's
10 just that I -- that we didn't -- I didn't have the
11 pleadings even as of today. We called last Friday and
12 we called up last Thursday expecting to hear something,
13 and I just haven't heard from counsel at all, except to
14 continue. That's the point I'm making is counsel called
15 me --
16 THE COURT: Oh, he called the case manager and
17 I said not -- tell him no continuance.
18 MR. CHANEY: So if the court would add me for
19 Thursday morning on the -- on the remand --
20 THE COURT: But what evidence did you want
21 to -- what further evidence do you need on that?
22 MR. CHANEY: Well, I haven't studied their
23 motion. So I just want to be sure if what they raise
24 simply is a matter of law.
25 THE COURT: Well, I have.

Page 80

1 MR. CHANEY: Okay. Well, if they've since
2 raised issues as a matter of law, then I can -- then I
3 can -- then I doubt seriously we'll have any evidence.
4 And if we have any evidence, it will probably be simply
5 by affidavit, and that can be done by Thursday.
6 THE COURT: The only thing I'd like to hear is
7 that if you have -- there's an affidavit on file from
8 the plaintiff about the lack of any action by your
9 client against this debtor: discovery, claims,
10 demands. And if that is untrue, any part thereof, I
11 would like to see that in an affidavit.
12 MR. CHANEY: All right. And we'll -- we'll
13 respond to that, Your Honor. I think what the affidavit
14 referred to is the historical conditions that the
15 industry was in, and I -- and I have -- I don't have if
16 that's accurate or not accurate.
17 MR. CHANEY: Well, your co-counsel there told
18 me, and according to the plaintiff, he misrepresented.
19 He told me there had been numerous amounts of discovery,
20 and that it was customary. He didn't exactly say, but
21 it was on this point. But that it was customary to use
22 this discovery in all of the cases, some 800 cases or
23 800,000, or however many there are.
24 And, in fact, plaintiff's counsel, and I
25 called this debtor's counsel and said, have you ever

Page 81

1 done -- has this defendant ever done any discovery or
2 made any claim on -- for indemnification at all, any
3 demand, any Interrogatories, any depositions, and was
4 told, no, that it never occurred.
5 MR. CHANEY: Your Honor, I will go through
6 these cases and -- and furnish any affidavit in response
7 to that.
8 THE COURT: Is that all what you told me?
9 MR. SIEGEL: That's what our affidavit says.
10 Mr. Simon from our office -- not this Simon, but
11 actually his son Jeffrey Simon, spoke to the chief
12 national counsel for the debtor. And Mr. Simon recounts
13 in his affidavit exactly what was said.
14 THE COURT: And I understand and I am going to
15 take this representation, unless I am told otherwise,
16 that the debtor does not object to being dismissed
17 without prejudice -- with prejudice?
18 MR. SIEGEL: That's right.
19 THE COURT: And the debtor does not object to
20 the plaintiffs' statement that they will not file any
21 proof of claims in the debtors' bankruptcy in Delaware.
22 MR. SIEGEL: That's right. And I say that in
23 certificate of conference on the motion for severance,
24 and that is exactly the case.
25 MR. CHANEY: Your Honor, can I mention one

21 (Pages 78 to 81)

HEARING

1  thing? I want to make sure that my statement to you
2  that you understood or that I've -- I've made sure that
3  I clearly --
4      THE COURT: It was a broad statement.
5      MR. CHANEY: All I'm saying about the
6  discovery is you had asked me, did we take discovery
7  against, for example, Gasket Holdings, and because they
8  are one of the debtors and although it's, you know,
9  Federal-Mogul, it's all their subsidiaries also.
10     THE COURT: Right.
11     MR. CHANEY: So -- and what I meant by the
12 fact that we've probably been in thousands of cases, and
13 in many of those cases, representatives or experts of
14 these debtors have been taken. So -- and it's common in
15 this docket for those to be used in various trials. So
16 I -- we have not taken any discovery in these nine cases
17 against these defendants, but we have a lot of discovery
18 against those defendants that we have accumulated from
19 other cases.
20     So it wouldn't be necessary for me to go take
21 a deposition of a corporate representative of Gasket
22 Holdings because it's probably been taken several dozens
23 of times. And that's the same for all the defendants.
24 That's what I --
25     THE COURT: That's what I actually heard had

1  never happened.
2      MR. SIEGEL: No. Your Honor, it -- it's
3  certainly true that, for instance, in the -- in the
4  years of asbestos litigation, plaintiffs frequently may
5  have taken the deposition of a Flexitallic corporate
6  representative. Defendants don't typically notice each
7  other's deposition. In fact, I can't even think of an
8  instance that that's ever occurred. And I'm certain
9  that it hasn't ever occurred between Garlock and
10 Flexitallic, or they would know it.
11     But it's certainly true that when we put on
12 our cases against Flexitallic in the years where they
13 weren't bankrupt, we're allowed to use depositions that
14 may have been taken in another case. That -- that's
15 all. What I think the point -- what we were trying to
16 demonstrate through our phone call to the debtor's
17 counsel is that they don't take -- they never take and
18 do not take these contribution claims seriously because
19 they've never crossed -- they've never once, for
20 instance, paid a judgment to a plaintiff and then gone
21 after money from Flexitallic.
22     Or they've never -- they've never rounded up
23 all the plaintiffs in a class action and said, we paid
24 these 100,000 people 100 billion dollars, and we're
25 suing you for half of it. That -- that kind of thing

1  has never happened. I think we have to recover
2  contributions that were --
3      MR. CHANEY: I think, with that correction, I
4  agree. But there's plenty of discovery out there that I
5  have access to from Flexitallic and Gasket Holdings.
6  And we've not probably taken their depositions, but it
7  would be superfluous for us to do that because we
8  probably have 50 depos from various of their experts or
9  representatives. We haven't pursued the claims like
10 Mr. Siegel has, but I didn't want the court to think
11 that there's never been any discovery conducted as to
12 Flexitallic. That's happened before.
13     And one other point, Your Honor, and I
14 apologize for the -- I apologize if these removals
15 didn't have all the pleadings in it. We tried to make
16 sure and do that, but I don't know. I think the Nueces
17 County standing order says -- and this is an effort that
18 occurs in various jurisdictions where the district
19 clerk, I think after a while, decides either I'm putting
20 a gun to my head, or we need some different rules
21 because there is a flurry of cross actions.
22     You know, we've probably taken a good chunk of
23 Brazil in filing this paper. And what happens is that
24 the judges in certain of these venues, the Valley is
25 one; Nueces County is one, said every defendant has a

1  cross action against every other defendant without
2  filing it. You are drowning our clerks in paperwork.
3  Don't file it --
4      THE COURT: But then it leads to docket
5  entry.
6      MR. CHANEY: It's in a separate standing order
7  for asbestos cases only. Nevertheless --
8      THE COURT: But wouldn't you have included
9  that in --
10     MR. CHANEY: I'm -- I'm not suggesting that it
11 perhaps shouldn't have been included. But all of these
12 defendants, if you -- if they were to speak up, would
13 say they have cross actions, either that they filed or
14 by virtue of the standing order, are filing against
15 these debtors.
16     MR. SIEGEL: Actually, Your Honor, the
17 standing orders in Nueces County do not apply to Waters
18 & Kraus cases. They apply to Baron & Budd cases. And
19 that's another sort of peculiar fact that we can't
20 understand here. Baron & Budd has many more cases than
21 we do. They're governed by standing orders, but for
22 some reason, those cases weren't removed.
23     THE COURT: Why is that?
24     MR. CHANEY: Because we've got virtually in
25 the -- almost all of the plaintiffs' attorneys in the

22 (Pages 82 to 85)

HEARING

Page 86

1    State of Texas, we have either arrangements or some type
2    of agreements with, Your Honor. This is the only --
3        THE COURT: What do you mean?
4        MR. CHANEY: I mean we -- we settle virtually
5    every case that we have.
6        THE COURT: Oh, settle every case?
7        MR. CHANEY: With virtually every case that we
8    have, for example, with the firm that he just mentioned.
9        THE COURT: You settled every case but this --
10   this law firm's case?
11       MR. CHANEY: Well, I can't say every, Judge,
12   truthfully because I only -- I only handled South
13   Texas. But the vast majority of all of the asbestos
14   litigation in Texas, as to my client, it settled either
15   by virtue of a standing settlement agreement or some
16   type of a global arrangement or some type of
17   understanding.
18       We don't need -- we don't need the type of
19   consolidation that we're asking for where we have cases
20   with firms that we have long-term standing orders and --
21   I mean settlement --
22       THE COURT: Well, how long term was it, if
23   they're still on the docket?
24       MR. CHANEY: Maybe I'm confused, Your Honor.
25       MR. SIEGEL: With all due respect, Your Honor,

Page 87

1    are we being punished by means of the federal removal
2    statute for getting -- for not settling our --
3        THE COURT: No. No. Are these -- I
4    understood these cases are still on the docket, the
5    state court docket. And you're saying they've been
6    settled?
7        MR. CHANEY: No, no. I didn't mean to imply
8    that they're still on the docket. If they've been
9    settled, they're not on the docket.
10       THE COURT: Okay.
11       MR. CHANEY: But we have an agreement. For
12   example, he mentioned our --
13       THE COURT: So every case that this -- the
14   jury and this other debtor is in, no matter the law firm
15   representing the plaintiff, has been removed to federal
16   court, if it's still there -- if it's still on the
17   docket?
18       MR. CHANEY: Every case that -- well, every
19   case that I'm in -- and there are more than -- I'm not
20   the only lawyer who represents Garlock in the State of
21   Texas, to make sure that you understand.
22       THE COURT: But you do in South Texas?
23       MR. CHANEY: Yes. In every case that I am in
24   with Mr. Siegel's firm, I believe every case has been
25   removed to federal court.

Page 88

1        THE COURT: Well, I'm asking what about other
2    cases? Are there any nonremoved cases that are still
3    pending?
4        MR. CHANEY: Yes, there are, Your Honor.
5        THE COURT: Where your client and the debtor
6    is in on --
7        MR. CHANEY: Well, I don't know about my
8    client and the debtor. Now, what has happened --
9        THE COURT: Are you in other cases with the
10   debtor in South Texas?
11       MR. CHANEY: I don't believe we are anymore
12   because what happened is once we removed the case, they
13   ran out virtually the very next day and nonsuited the
14   debtor in every case.
15       MR. SIEGEL: That was not our firm. It wasn't
16   our firm.
17       MR. CHANEY: Oh, well, I don't -- I don't know
18   how many cases.
19       THE COURT: I'm asking about --
20       MR. CHANEY: But the honest truth is, I don't
21   know the answer to that, Your Honor, but I would be
22   willing to -- you know, within the time period of the --
23   the response to the motion of remand.
24       THE COURT: Well, is it possible that you just
25   removed this law firm's cases?

Page 89

1        MR. CHANEY: We did. Yes, that is what we
2    did, Your Honor.
3        THE COURT: Well, why -- why not the other
4    cases?
5        MR. CHANEY: Because what I was trying to tell
6    you -- what I was trying to tell the Court is, see,
7    the -- most of the cases, they're filed. There is
8    discovery done, and the -- the way this docket is run,
9    once there is a certain amount of ID information
10   developed and a certain amount of information that shows
11   the status of the disease, then there are agreements
12   with the majority of the plaintiffs' firms in Texas and
13   my client where the cases are settled. Those cases are
14   then settled, and they're taken off the docket.
15       THE COURT: The cases that are still on the
16   docket in South Texas, they are not this law firm's
17   cases?
18       MR. CHANEY: Yes, Your Honor.
19       THE COURT: Were they not -- they were not
20   removed because?
21       MR. CHANEY: Because we have understandings or
22   agreements with those other firms.
23       THE COURT: So they're all settled. There's
24   no nonsettled cases, other than these law Firms' cases?
25       MR. CHANEY: Well, when you say settled, this

23 (Pages 86 to 89)

HEARING

1  is -- I had -- I had some problems understanding this in
2  the asbestos docket when I got in it also. The case
3  will be filed usually. The plaintiffs then develop some
4  evidence about my client was exposed to your product,
5  and here's the medical record that shows he has this
6  disease.
7        At that point in time, what happens is in
8  the -- in the majority of the cases, there's an
9  agreement that results in that case being settled at
10  that time. So they're not very -- very often they're
11  not settled pre lawsuit. They're filed. There is some
12  rudimentary discovery that has taken place, and then
13  they are settled.
14        THE COURT: Okay. So you're implying that
15  it's settled. Every case has not been removed in South
16  Texas.
17        MR. CHANEY: Well, or there's an -- or in the
18  majority of cases, there is an agreement in place that
19  will result in those cases being settled eventually.
20        THE COURT: What do you mean?
21        MR. CHANEY: Is what I was just trying to
22  explain.
23        THE COURT: What -- what kind of agreement?
24        MR. CHANEY: An agreement or understanding
25  between the law firm, whoever we might be talking about,

1  mean, the others think they're -- if they're in the
2  file, I have one that will settle in the -- in the back
3  that you originally -- that we've been traditionally
4  doing. These -- these different cases are no longer
5  traditional cases. They don't settle. They haven't
6  settled. And the demands have become astronomical.
7        And I, again -- and I, again, apologize. I
8  don't know what happened to this file, why you would not
9  have as complete a file as the others did. I don't
10  understand that, and I'm -- I assume, if my staff should
11  explain that, what they got out of the clerk's office,
12  you got it. You should have exactly what it is. I
13  don't know what -- what went wrong, but I'll find out.
14        THE COURT: And in some of them I have the
15  most bizarre documents; nothing relevant really. I have
16  the plaintiff's original petition and -- and your
17  client's answers and cross action. Those are the only
18  pleadings in any of the cases -- any of the nine cases.
19  I have bunches of Interrogatories, which you never file
20  in federal court. Some miscellaneous, other documents,
21  extremely peculiar. And, of course, again, there's --
22  six of the cases there's no mention of the debtor at
23  all.
24        MR. CHANEY: And I -- you have to look at the
25  attachments to see. You know, I -- I can't imagine the

1  and -- and my client.
2        MALE VOICE: Your Honor, it includes an
3  informal --
4        THE COURT: You mean an informal kind of a
5  settlement, that's not settled?
6        MR. CHANEY: Or there might be -- I don't
7  know, but there very well may be a written document that
8  existed. I really don't get involved in that because I
9  do mainly the trial work. But some of them may be
10  informal. Some of them may be formal.
11        MALE VOICE: And, Your Honor, up until -- up
12  until this year, that was the standard practice that
13  you would -- you would take your X-rays, your reads;
14  your experts would fit into a matrix some place.
15  Everyone on the plaintiff's side knew where --
16        THE COURT: When is the 90 -- when is the 90
17  days up for this?
18        MR. CHANEY: For another seven days or so.
19        THE COURT: Okay.
20        MR. CHANEY: I mean, there's time -- let me
21  also say that one of the reasons that we picked this --
22  these -- these are the reasons --
23        THE COURT: Well, why is the emergency on this
24  one and not on the others?
25        MR. CHANEY: Because we think we'll settle. I

1  debtor's name isn't on the attached as a -- I don't
2  know. I can't explain it. I'm going to find out how
3  that could happen.
4        THE COURT: Pull out 478, for instance.
5        MR. SIEGEL: I think the reason --
6        THE COURT: You got 478? Ms. Garza, you're
7  the clerk, 478. Would you give that to the marshal,
8  please?
9        MALE VOICE: Yes, I'm sorry.
10        MR. CHANEY: Your Honor, I -- if I can
11  enlighten the Court, what I -- what I see -- where I
12  see --
13        THE COURT: Do you see that?
14        MR. CHANEY: Well, the debtor's name, if
15  you'll notice, the first half lists every -- according
16  to the rules, lists every counsel, the defendant, the
17  addresses, the phone number, the fax number. And if you
18  go down one, if you would not know -- and what I don't
19  see -- and I don't know --
20        THE COURT: How could I possibly know?
21        MR. CHANEY: How could you possibly know the
22  Gasket Holding Company is a defendant, and that we were
23  not committed to put Gasket Holdings in the headings
24  because Delaware --
25        THE COURT: And where would it be in any

24 (Pages 90 to 93)

HEARING

Page 94

1  petition that you filed?
2      MR. CHANEY: You mean any pleadings filed?
3      THE COURT: Any pleadings.
4      MR. CHANEY: Well, it should have been
5  disclosed in bold letters to show you that that is the
6  debtor by which we are claiming --
7      THE COURT: Well, it wasn't.
8      MR. CHANEY: Can I see your -- well, you --
9  you are supposed to have all live pleadings naming all
10 parties.
11     THE COURT: And, of course, they're not
12 there.
13     MR. CHANEY: Okay. Well, here's United Gas --
14 Turner & Newell. That's the one of the debtors that are
15 named. Although, we don't -- it doesn't say that on
16 the --
17     THE COURT: For all the defendants, how on
18 earth could I possibly know from the state of those
19 pleadings that you sent over?
20     MR. CHANEY: You could not figure that out,
21 and I -- I mean, I have to agree with that. I wanted
22 to -- I wanted to show the court what we thought we did
23 what we were supposed to, but you could not figure that
24 out without a -- without some sort of --
25     THE COURT: Even your cross action doesn't

Page 95

1  name them.
2      MR. CHANEY: Well, again, I --
3      THE COURT: It's not even in the style of the
4  pleadings.
5      MR. CHANEY: And I thought this was a county
6  in which cross actions did not have to be filed or
7  they're being filed.
8      MR. JORDAN: There is a cross action on file,
9  Your Honor, in all of --
10     THE COURT: Well, how would I know that?
11     MR. JORDAN: Well, I'm not saying that -- I
12 didn't prepare -- I'm not trying to distance myself
13 here, but I didn't prepare the rules on these cases.
14 You -- the cross action should have been enclosed. It
15 should have been part of the --
16     THE COURT: Well, it is. It's part of your
17 answer. It's a -- it's a state court answer that's got
18 an answer and a cross action. It just says all
19 defendants.
20     MR. CHANEY: You said Case Number 38. Which
21 one --
22     THE COURT: 78 -- 478. I was just using this
23 as an example of the ones where I couldn't find hide nor
24 hair of Federal-Mogul Global.
25     MR. CHANEY: And the plaintiff's name, on the

Page 96

1  whole second page, Your Honor, I don't have it.
2      THE COURT: Arnold.
3      MR. CHANEY: Arnold.
4      THE COURT: And I have your answer that says,
5  motion to transfer venue; subject there to include as
6  your original answer, jury demand, and original cross
7  action, and it just says, we want to sue all
8  defendants.
9      MR. CHANEY: That is -- I mean that is the
10 state form filed with the cross action. I apologize if
11 it wasn't pointed out more or highlighted more for the
12 Court.
13     THE COURT: Well, how could you possibly
14 highlight it any more? It just says sue all
15 defendants. And in some of these, you see, the
16 plaintiff had already taken a nonsuit.
17     MR. CHANEY: I don't think the -- the
18 plaintiff in this case, the one that we're looking at,
19 the Arnold case, had taken a nonsuit against all of the
20 defendants that went in or all of the debtors that went
21 into bankruptcy. I show that on the little information
22 that I have in this notebook, and we -- I brought the
23 state court pleadings with me, that Flexitallic was
24 ID'd, that Gasket Holding was in the case.
25     THE COURT: Well, that -- that may be all

Page 97

1  wonderful. But as the gentleman pointed out, the first
2  thing I look to is jurisdiction, and I've got somebody
3  removing a case based on a debtor that's not a party
4  from the state to these pleadings. And that's why I was
5  sua sponte remanding them all.
6      MR. CHANEY: I understand what you're saying,
7  Judge, but Gasket Holdings was a defendant, and it is --
8  it's one of the debtors.
9      THE COURT: How would I know that?
10     MR. CHANEY: I'm not saying -- Your Honor, I'm
11 not defending the state of the papers that came
12 forward. I'm just telling the court that that's the
13 state it's reading. And if it wasn't clear to Your --
14 to, Your Honor, I understand that, and I apologize.
15     MALE VOICE: Your Honor, I recall being
16 attached to the order that consolidated Federal-Mogul
17 because the heading, it contained the header, it
18 attached the order that included all the defendants, all
19 the actual filed members under the consolidated numbers,
20 which made the T&N and the Gasket Holdings.
21     MR. CHANEY: Your Honor, in Brownsville, if I
22 might add, the plaintiff did file a motion to remand.
23 And in that case, they said the debtor was not a party,
24 and we attached the Brownsville's case, the -- the
25 automatic stay order and the filing from the bankruptcy

25 (Pages 94 to 97)

Page 98

1  court that clearly shows that although the Federal-Mogul
2  Gasket Holdings company, Flexitallic, all of the other
3  subsidiaries are parties also or debtors in that
4  bankruptcy. If that pleading was not attached in these
5  removals, it should have been. And I apologize for
6  that.
7        THE COURT: There's really nothing relevant in
8  these pleadings, but -- and, in fact, a good number of
9  these nine cases had the citation issued to -- the three
10  cases that were -- that actually had a mention of
11  Federal-Mogul didn't even have a -- serve a citation on
12  them.
13        MR. CHANEY: Federal-Mogul may not have in
14  several of those cases been sued, but in every one of
15  the cases, the -- a subsidiary was or I guess until
16  today, may announce the dismissal with prejudice was a
17  party at the time of the removal.
18        THE COURT: All right. Anything else?
19        MR. CHANEY: Your Honor, I requested the --
20  the time to file responses, and if that would be
21  permitted by court?
22        THE COURT: Any objection?
23        MR. SIEGEL: No, Your Honor. I -- I just want
24  to make sure I understand what is coming when.
25        THE COURT: By Thursday morning they'll

Page 99

1  respond to your motion to remand. That is just one
2  defendant.
3        MR. SIEGEL: I feel like we've stated our
4  arguments and don't necessarily need to. And I agree --
5  and I don't -- and I guess we'll -- we'll waive the
6  right to file one. We would like, Your Honor, to rule
7  expeditiously. Needless to say, I have taken exception
8  to the notions that alone and with all plaintiffs,
9  asbestos firms, that we're being used because we don't
10  enter in a group settlement.
11        THE COURT: We didn't get a straight answer on
12  that one, did we? I'm just not clear at all because he
13  says -- you know, he says he comes in at trial time. So
14  I'm not sure, you know, what state or the others that
15  well.
16        MR. CHANEY: I'm trying to give a straight
17  answer -- and I apologize, Your Honor. We have -- in
18  the majority of the cases, we have an agreement or
19  understanding with our counterparts with the firms like
20  Mr. Siegel's about the value of the cases. The -- the
21  demands that we have received within the last year from
22  this firm are compared to the other cases.
23        And -- and many of the -- many of those
24  lawyers are very fine lawyers with a lot of experience
25  in this litigation. Comparatively, the demands are

Page 100

1  exorbitant. And so we have in place agreements for
2  reasonable settlements with the vast majority of the
3  firms that do this kind of work on the plaintiffs' side
4  and have had for some number of years, Judge.
5        MR. SIEGEL: Well, is that the reason
6  you're --
7        THE COURT: Do you have enforceable agreements
8  with all -- in all the other cases?
9        MR. CHANEY: Some -- some of them are
10  enforceable.
11        THE COURT: Some are not?
12        MR. CHANEY: Some of them just are -- are
13  understandings where we've never had problems. We've
14  never had difficulties.
15        THE COURT: Well, what if this firm
16  substitutes in and --
17        MR. CHANEY: What firm substitutes in?
18        MR. SIEGEL: Your Honor, they can try cases
19  against us if they don't like our demands.
20        MR. CHANEY: We have tried very -- we've tried
21  many against them, and most of them have resulted in --
22        THE COURT: Okay. We're done. Thank you all
23  very much. Thank you very -- anybody else want to say
24  anything that's here on the case?
25        Thank you all very much for your appearances.

Page 101

1  You're excused.
2        (Proceedings were concluded.)

26 (Pages 98 to 101)

HEARING

Page 102

1    STATE OF TEXAS    )
2    COUNTY OF DALLAS   )
3
4         I, Dana A. Taylor, Certified Shorthand
5    Reporter in and for the State of Texas, certify that the
6    foregoing recorded hearing was transcribed by me and
7    that the hearing is a true record to the best of my
8    ability.
9         I further certify that I am neither counsel
10   for nor related to any party in this cause and am not
11   financially interested in its outcome.
12        Given under my hand this the _____ day of
13   November, 2001.
14
15
16
17   _____
     Dana A. Taylor, CSR #6048
     CSR Expiration: 12/31/02
18   Henjum Goucher Reporting Services, P.C.
     2501 Oak Lawn Avenue
19   Suite 435
     Dallas, Texas 75219
20   (888) 656-DEPO
21
22
23
24
25

27 (Page 102)

Case 1:01-cv-00180   Document 25   Filed in TXSD on 11/20/2001   Page 84 of 100



N O T E S   T O   C O N S O L I D A T E D   F I N A N C I A L   S T A T E M E N

Choose... ▼



## NOTE T | COMMITMENTS AND CONTINGENCIES

GENERAL

There are pending or threatened against BFGoodrich or its subsidiaries various claims, lawsuit
administrative proceedings, all arising from the ordinary course of business with respect to
commercial, product liability, asbestos and environmental matters, which seek remedies or
damages. BFGoodrich believes that any liability that may finally be determined with respect to
commercial and non-asbestos product liability claims should not have a material effect on the
Company's consolidated financial position or results of operations. From time to time, the Com
is also involved in legal proceedings as a plaintiff involving contract, patent protection,
environmental and other matters. Gain contingencies, if any, are recognized when they are re

At December 31, 2000, approximately 17 percent of the Company's labor force was covered b
collective bargaining agreements. Approximately 3 percent of the labor force is covered by col
bargaining agreements that will expire during 2001.


ENVIRONMENTAL

The Company and its subsidiaries are generators of both hazardous wastes and non-hazardou:
wastes, the treatment, storage, transportation and disposal of which are subject to various lav
governmental regulations. Although past operations were in substantial compliance with the tl
applicable regulations, the Company has been designated as a potentially responsible party ("
by the U.S. Environmental Protection Agency ("EPA"), or similar state agencies, in connection
several sites.

The Company initiates corrective and/or preventive environmental projects of its own to ensur
and lawful activities at its current operations. It also conducts a compliance and management
systems audit program. The Company believes that compliance with current governmental
regulations will not have a material adverse effect on its capital expenditures, earnings or
competitive position.

The Company's environmental engineers and consultants review and monitor environmental is
at past and existing operating sites, as well as off-site disposal sites at which the Company ha
been identified as a PRP. This process includes investigation and remedial selection and
implementation, as well as negotiations with other PRPs and governmental agencies.

At December 31, 2000 and 1999, the Company had recorded in Accrued Expenses and in Othe
Non-Current Liabilities a total of $119.9 million and $128.5 million, respectively, to cover futui
environmental expenditures. These amounts are recorded on an undiscounted basis.

The Company believes that its reserves are adequate based on currently available information
Management believes that it is reasonably possible that additional costs may be incurred beyo
amounts accrued as a result of new information. However, the amounts, if any, cannot be esti
and management believes that they would not be material to the Company's financial conditio
could be material to the Company's results of operations in a given period.


ASBESTOS

*Garlock Inc. and the Anchor Packing Company* As of December 31, 2000 and 1999, these two
subsidiaries of the Company were among a number of defendants (typically 15 to 40) in action
filed in various states by plaintiffs alleging injury or death as a result of exposure to asbestos I

Settlements are generally made on a group basis with payments made to individual claimants
a period of one to four years. The Company recorded charges to operations amounting to
approximately $8.0 million in each of 2000, 1999 and 1998 related to payments not covered b
insurance



In accordance with the Company's internal procedures for the processing of asbestos product liability actions and due to the proximity to trial or settlement, certain outstanding actions aga Garlock and Anchor have progressed to a stage where the Company can reasonably estimate t cost to dispose of these actions. These actions are classified as actions in advanced stages and included in the table as such below. Garlock and Anchor are also defendants in other asbestos related lawsuits or claims involving maritime workers, medical monitoring claimants, co-defen and property damage claimants. Based on its past experience, the Company believes that these categories of claims will not involve any material liability and are not included in the table below

With respect to outstanding actions against Garlock and Anchor that are in preliminary proceed stages, as well as any actions that may be filed in the future, the Company lacks sufficient information upon which judgments can be made as to the validity or ultimate disposition of su actions, thereby making it difficult to estimate with reasonable certainty what, if any, potentia liability or costs may be incurred by the Company. However, the Company believes that Garlo Anchor are in a favorable position compared to many other defendants because, among other things, the asbestos fibers in the asbestos-containing products sold by Garlock and Anchor we encapsulated. Subsidiaries of the Company discontinued distributing encapsulated asbestos-b products in the United States during 2000.

Anchor is an inactive and insolvent subsidiary of the Company. The insurance coverage availal it is fully committed. Anchor continues to pay settlement amounts covered by its insurance an not committing to settle any further actions. Considering the foregoing, as well as the experie the Company's subsidiaries and other defendants in asbestos litigation, the likely sharing of judgments among multiple responsible defendants, recent bankruptcies of other defendants, legislative efforts and given the substantial amount of insurance coverage that Garlock expect be available from its solvent carriers to cover the majority of its exposure, the Company belie that pending and reasonably anticipated future actions against Garlock and Anchor are not lik have a material adverse effect on the Company's financial condition, but could be material to t Company's results of operations in a given period.

Although the insurance coverage which Garlock has available to it is substantial (slightly in ex of $1.0 billion as of December 31, 2000), it should be noted that insurance coverage for asbes claims is not available to cover exposures initially occurring on and after July 1, 1984. Garlock Anchor continue to be named as defendants in new actions, some of which allege initial expos after July 1, 1984. However, these cases are not significant and the Company regularly rejects for settlement.

The Company has recorded an accrual for liabilities related to Garlock and Anchor asbestos-re matters that are deemed probable and can be reasonably estimated (settled actions and actio advanced stages of processing), and has separately recorded an asset equal to the amount of liabilities that is expected to be recovered by insurance. In addition, the Company has recorde receivable for that portion of payments previously made for Garlock and Anchor asbestos prod liability actions and related litigation costs that is recoverable from its insurance carriers. A tal provided below depicting quantitatively the items discussed above.

|  | 2000 | 1999 | 199 |
|---|---|---|---|
| (number of cases) |  |  |  |
| New actions filed during the year | 36,200 | 30,200 | 34,40 |
| Actions in advanced stages at year-end | 5,800 | 8,300 | 4,70 |
| Open actions at year-end | 96,300 | 96,000 | 101,40 |
| (dollars in millions) |  |  |  |
| Estimated liability for settled actions and actions in advanced stages of processing | $ 231.3 | $ 163.1 | $ 112. |
| Estimated amounts recoverable from insurance | $ 285.7 | $ 183.6 | $ 128. |
| Payments | $ 119.7 | $ 84.5 | $ 53. |
| Insurance recoveries | 83.3 | 65.2 | 54. |
| Net Cash Flow | $ (36.4) | $ (19.3) | $ 1. |

The Company paid $36.4 million and $19.3 million for the defense and disposition of Garlock a Anchor asbestos-related claims, net of amounts received from insurance carriers, during 2000 1999, respectively. The amount of spending in 2000 was consistent with the Company's expec that spending throughout 2000 would be higher than in 1999.

The Company believes the increased number of new actions in 2000 represents the acceleratio claims from future periods rather than an increase in the total number of asbestos-related clai expected. This acceleration can be mostly attributed to bankruptcies of other asbestos defend and proposed legislation currently being discussed in Congress

Case 1:01-cv-00180   Document 25   Filed in TXSD on 11/20/2001   Page 86 of 100

The acceleration of the claims also may have the impact of accelerating the associated settlement payments. Arrangements with Garlock's insurance carriers, however, potentially limit the amount that can be received in any one year. Thus, to ensure as close a matching as possible between payments made on behalf of Garlock and recoveries received from insurance, various options are currently being pursued.

These options include negotiations with plaintiffs' counsel regarding the possibility of deferring payments as well as with its insurance carriers regarding accelerating payments to the Company.

OTHER

The Company and certain of its subsidiaries (excluding Garlock and Anchor) have also been named as defendants in various actions by plaintiffs alleging injury or death as a result of exposure to asbestos fibers. These actions relate to previously owned businesses. The number of claims to date has not been significant and the Company has substantial insurance coverage available to it. Based on the above, the Company believes that these pending and reasonably anticipated future actions are not likely to have a materially adverse effect on the Company's financial condition or results of operations.

The Company is also a defendant in other asbestos-related lawsuits or claims involving maritime workers, medical monitoring claimants, co-defendants and property damage claimants. Based on past experience, the Company believes that these categories of claims are not likely to have a materially adverse effect on the Company's financial condition or results of operations.



Case 1:01-cv-00180  Document 25  Filed in TXSD on 11/20/2001  Page 87 of 100

shows that 18 percent, or 994, of 5,590 adults who had chest X-rays have scarring in the lining of their lungs, which is most closely associated with asbestos exposure.

### National Average

The results are much higher than the national average of between 0.2 percent and 23 percent of similar lung abnormalities among people not exposed to asbestos, the agency reports.

The findings for the testing, conducted between July and November 2000, follow preliminary results released Feb. 22 that showed that as many as 30 percent of the Libby residents have signs of an asbestos-related pulmonary disease. In the initial study, the agency reported that 627 of 1,078 people who were medically screened showed pulmonary distress and tested positive for a possible asbestos-related illness.

The report says physicians found scarring on the chest wall on X-rays of 30 percent of adults tested, but only 1 to 5 percent have identifiable changes such as scarring of the lung tissue and 1 to 6 percent have moderate to severe reductions in their ability to breathe.

In addition to the scarring percentages of Grace and non-Grace workers, the new results show that the longer test subjects lived in Libby, the higher the risk of lung problems. Among the people with scarring, 493 had lived 35 or more years in Libby, 224 had been there 23 to 34 years, 133 lived there for between 15 and 22 years and 141 were there less than 14 years.

### Obesity / Smoking

The report also links clinically obese people with a higher rate of scarring and says 503 people with lung scarring were ex-smokers, 174 currently smoke and 316 never smoked. Age is also reported to be a factor, and the researchers fear that with the latency of the disease, more young people will develop scarring and pulmonary distress. Of those tested, 510 people with lung scarring were between ages 45 and 64, 381 were older than 65, 103 were between ages 18 and 44 and 16 were between ages 18 and 35.

Montana Gov. Judy Martz said the finding were "disturbing" and reported that she is work-

ing with EPA Administrator Christie Whitman to find a solution to Libby's asbestos problem — a solution that may involve putting the defunct mine on the Superfund National Priorities List for long-term remediation.

"These numbers are a profound reminder of the human health tribulations that many past and present residents face. We will look at the full detailed report and respond accordingly," Martz said. ■

---

## MDL Actions Dismissed Due To 6 Bankruptcy Filings

PHILADELPHIA — Asbestos cases pending in the MDL 875 docket against six asbestos-related companies have been dismissed, according to recent orders issued in the U.S. District Court for the Eastern District of Pennsylvania (In re: Asbestos Products Liability Litigation [No. VI], No. MDL 875, E.D. Pa.)

---

## Looking for a document?

## Look No Further!

Visit www.mealeysonline.com

and have your document delivered directly to your computer.

Or call 1-800-MEALEYS for more i...



EXHIBIT
E

U.S. District Judge Charles R. Weiner, overseer of the MDL 875 docket, dismissed pending actions from six asbestos companies that had been transferred to the MDL from various federal courts

On Sept. 12, Judge Weiner dismissed 14 cases against Armstrong Cork & Seal Co. and 253 cases against GAF Corp. On Oct. 1, Judge Weiner dismissed 19 cases against United States Mineral Co., 21 cases against U.S. Gypsum Co., 79 cases against U.S Mineral Wool Corp. and 7,244 cases against U.S. Mineral Products Co.

In dismissing the cases, Judge Weiner tolled the applicable statute of limitations and entitled plaintiffs to request reinstatement from the MDL at a later date. ■

# Del. Judge Sets Omnibus Hearing Dates For Grace

WILMINGTON, Del — U S. Bankruptcy Judge Joseph J. Farnan Jr on Oct 5 set a schedule for two omnibus hearings in the bankruptcy proceedings of W.R Grace and Co (In re  W R Grace & Co. et al., No 01-1139-JJF, D Del Bkcy.)

Judge Farnan, issuing the order in the U.S Bankruptcy Court for the District of Delaware, scheduled the hearings for 2 p.m Nov  5 and 9.30 a.m. Jan. 3, 2002  Both meetings will be in Courtroom No. 2A on the second floor of the Boggs Federal Building here ■

# Del. Judge Issues Order Permitting Securities Trading For USG Group

WILMINGTON, Del — Granting a motion by the Official Committee of Unsecured Creditors in USG Corp.'s Chapter 11 bankruptcy case, a Delaware bankruptcy judge recently issued an order authorizing securities trading upon establishment of an "ethical wall" (In re  USG

(**Order available.**   Document #48-011030-012R.)

U.S. Judge Randall Newsome of the U.S. Bankruptcy Court for the District of Delaware on Oct. 22 issued an order permitting present and future committee members to trade in the USG Group's securities and applicant financial institutions that are or might become creditors of the USG Group to also trade. Both trading allowances, according to the order, are applicable only upon the establishment and implementation of ethical walls or moral trading guidelines.

In response to the committee's Aug. 28, 2001, motion to trade securities in the USG Group, Judge Newsome's order outlines the limitation of trading and stipulates that the order does not apply to the trading of trade claims and that committee members are prohibited from purchasing and selling bankruptcy claims. The order also specifies that the procedures of the ethical wall that will govern the trading must be employed by a Securities Trading Entity. Under that entity, all committee-related personnel must execute a letter acknowledging that they may receive restricted information, the order says

According to the order, the trading entity must also ensure that committee-related personnel will not share restricted information with anyone else trading, will keep the information in files that are inaccessible to other employees and will review themselves and the ethical procedures that are in place ■

# Delaware Bankruptcy Judge Extends Removal Period For USG Corp.

WILMINGTON, Del — Delaware Bankruptcy Judge Randall Newsome on Oct 14 granted a motion to USG Corp. to extend the time for which USG may file notices of removal from any pending litigation against USG or its

.

| MDL Reporter |
|---|

**CHAPTER 11**

**Pittsburgh Corning et al.**

## Judge dismisses six defendants that have declared voluntary bankruptcy, tolling statute of limitations

Judge Weiner dismissed from the MDL 875 proceedings on June 14 six defendants that have filed Chapter 11 petitions.

Dismissed were Pittsburgh Corning Corp., W.R. Grace & Co.-Conn., Armstrong World Industries, Asbestospray Corp., Spraycraft Corp., Rock Wool Manufacturing.

The order tolls applicable statutes of limitations, allowing plaintiffs to request reinstatement from the court if circumstances warrant.

• • •

**REMAND**

**Vanderbilt
Mitchell**

See P. 14 for order.

## Judge Weiner approves 10 separate cases for remand; suggests Alaska court resolve motions in two cases

Judge Weiner asked the Judicial Panel on Multidistrict Litigation on June 22 to approve remand of two cases to the District of Alaska. The cases were among 10 cases approved for remand. **(See following articles.)**

The judge suggested remand of the cases of Vanderbilt and of Mitchell. As usual, punitive damages were severed and retained by the court.

Judge Weiner recommended that the federal court in Indiana resolve all outstanding motions and take whatever action may be deemed proper.

• • •

**REMAND**

**Schaffer**

## Judge suggests remand to Oregon, says all outstanding motions should be resolved by federal court there

Judge Weiner approved on June 22 suggestion of remand of the case of Schaffer to the District of Oregon.

As usual, punitive damages were severed and retained by the court.

The suggestion of remand says outstanding motions should be resolved by the federal court in Oregon.

• • •

**REMAND**

**Barber**

See P. 16 for order.

## Judge suggests remand of case to Colorado

Judge Weiner asked the Judicial Panel on Multidistrict Litigation on June 22 to approve remand of the case of Murray to the federal court for the District of Colorado.

DONALD BEEZHOLD

1         IN THE UNTIED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF TEXAS
2            BROWNSVILLE DIVISION
3
   DEBRA KULAW, Individually and  *
4  As Personal Representative ofthe*
   Heirs and Estate of        *
5  LeVAUGHN DARNOLD,        *
                         *CASE NO.
6                     *B-01-CV-178
               Plaintiffs,  *
7                        *
     -against-           *
8                        *
   ACandS, Inc., et al.       *
9            Defendants.  *
10  *********************************************
             ORAL DEPOSITION OF
11            PAUL J. HANLY, JR.
             NOVEMBER 02, 2001
12  *********************************************
13
          DEPOSITION OF PAUL J. HANLY, JR.,
14
   taken on behalf of the Plaintiff, at 415.
15
   Madison Avenue, New York, New York 10017,
16
   commencing at 1:01 p.m., the 2nd day of
17
   November, 2001, before Danielle Grant,
18
   Notary Public in and for the State of
19
   New York.
20
21
22
23
24
25

HENJUM GOUCHER REPORTING SERVICES, L.P.        1-888-656-3376

DONALD BEEZHOLD

## Page 2

1                A P P E A R A N C E S
2  FOR THE PLAINTIFFS
3      DAVID C GREENSTONE, Esq., of Counsel
       WATERS & KRAUS, LLP
       3219 McKinney Avenue
4      Suite 3000
       Dallas, Texas 75204
5      214-357-6244
6
   FOR THE DEFENDANTS CAPCO AND ASARCO
7      CHRISTOPER P. DePHILLIPS, Esq., of Counsel
       PORZIO, BROMBERG & NEWMAN, P.C
8      100 Southgate Parkway
       Morristown, New Jersey 07962-1997
9      973-538-4006
10
   FOR THE DEFENDANTS GARLOCK
11     BERNARD L. LEVINTHAL, Esq., of Counsel
       GOLDFEIN & HOSMER
12     1600 Market Street
       Philadelphia, Pennsylvania 19103-7288
13     215-979-8200
14
   FOR THE DEFENDANTS GARLOCK:
15     MICHAEL H. REED, Esq., of Counsel
       PEPPER & HAMILTON, LLP
16     3000 Two Logan Square
       Philadelphia, Pennsylvania 19103-2799
17     215-981-4000
18 FOR THE DEFENDANTS AMERICAN STANDARD:
19     ROBERT BROOKS-RIGOLOSI, Esq., of Counsel
       ROSS & HARDIES
20     65 East 55th Street
       New York, New York 10022
       212-418-0689
21
22
23
24
25

## Page 3

1  APPEARANCES. .CONTINUED
2
3  FOR THE DEFENDANTS BORG-WARNER CORPS: BROWN &
   ROOT, INDIVIDUAL & AS SUCCESSOR IN INTEREST TO
4  HARBISON WALKER, DRESSER INDIVIDUAL & AS SUCCESSOR
   IN INTEREST TO WORTHINGTON INC., and WORTHINGTON
5  CORP
       ELIZABETH L. PHIFER, Esq., of Counsel
6      GODWIN, WHITE, GRUBER, ESQS
       901 Main Street, Suite 2500
7      Dallas, Texas 75202-3727
       214-939-4826
8
9  FOR THE DEFENDANTS AMETEK, INC.
       COLIN M. CHERICO, Esq., of Counsel
10     BAKER BOTTS, LLP
       599 Lexington Avenue
11     New York, New York 10022-6030
       212-705-7050
12
   FOR THE DEFENDANTS COMBUSTION ENGINEERING
13     JOHN CESARO, Esq., of Counsel
       PICILLO & CARUSO
14     371 Franklin Avenue
       Nutley, New Jersey 07110
15     973-667-8100
16
   FOR THE WITNESS
17     JAYNE CONROY, Esq., of Counsel
       COBLENCE & WARNER
18     415 Madison Avenue
       New York, New York 10017
19     212 593-8000
20
21
22
23
24
25

## Page 4

1                  INDEX
   WITNESS· PAUL J. HANLY, JR
2
   EXAMINATION BY               PAGE
3  BY MR. GREENSTONE                5
   BY MR. REED            14
4  BY MR. LEVINTHAL           19
5
          EXHIBITS
6
   NUMBER    DESCRIPTION        PAGE
7    1     Fourth Amended Notice    6
     2     Affidavit and Subpoena   7
8
     G1    Informational brief     14
9    G2    Affidavit of David M. Sherbin  16
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 5

1          PAUL J. HANLY, JR.,
2  having been first duly sworn, testified as
3  follows:
4          EXAMINATION
5  BY MR. GREENSTONE:
6      Q   Good morning, sir.
7      A   Good afternoon.
8      Q   I guess it is afternoon.
9          Would you state your full name for
10 the record?
11     A   Paul J. Hanly Jr.
12     Q   I have a few questions to ask you,
13 sir, but before we sort of get into the meat of it
14 can you tell us how you are currently employed and
15 your association with Federal-Mogul and Gasket
16 Holdings Inc.?
17     A   I am an attorney. I'm a partner of
18 this law firm, Coblence and Warner. I have been
19 national counsel T&N Flexitallic and Forodo since
20 1981, with approximately a two-year hiatus in the
21 early 1990s.
22         I have been national counsel to
23 Federal-Mogul Corporation and all of its
24 subsidiaries with asbestos liability since the
25 acquisition by Federal-Mogul Corporation since

2 (Pages 2 to 5)

DONALD BEECHOLD

Page 6

1  March of 1988 of T&N, Flexitallic and Forodo.
2      Q   What is the relationship of Gasket
3  Holdings, Inc. to these organizations?
4      A   Gasket Holdings Inc. is the current
5  name of a company that used to be known as
6  Flexitallic Gasket Company Inc., later known as
7  Flexitallic Inc., Gasket Holdings Inc., is a
8  wholly-owned subsidiary of Federal-Mogul
9  Corporation.
10     Q   I want to attach as Exhibit 1 to the
11 deposition Plaintiff's fourth amended notice of
12 intent to take oral deposition.
13         (Plaintiff's Fourth Amended Notice,
14     was marked as Plaintiff's Exhibit No. 1,
15     for identification, as of this date.)
16     Q   Sir, I believe you are also
17 appearing here pursuant to subpoena?
18     A   That's correct.
19     Q   I believe the subpoena is attached
20 to this affidavit here of a Mr. Jeffrey Simon who
21 works at my firm.
22         Are you familiar with Mr. Simon?
23     A   I have never met Mr. Simon but I
24 have spoken to him on the telephone.
25     Q   Okay. Great.

Page 7

1      A   This Exhibit 1 does not have the
2  subpoena attached to it.
3      Q   Okay. The subpoena we have, I'll
4  mark this as Exhibit 2, which is an affidavit of
5  Jeffrey Simon and it does have the subpoena
6  attached, as well as the First Notice of
7  Deposition we had given in this case.
8         (Affidavit and Subpoena, was
9     marked as Plaintiff's Exhibit No. 2, for
10    identification, as of this date.)
11     A   I have Exhibit 2 in front of me. I
12 have never seen this affidavit before. Would you
13 like me to read it?
14     Q   Absolutely. You can read it in its
15 entirety if you would like?
16     A   To myself?
17     Q   Yes.
18     A   I have read the affidavit which is
19 the first two pages of Exhibit 2.
20     Q   It's my understanding that that
21 affidavit was prepared by Mr. Jeffrey Simon after
22 a conversation with you on the telephone.
23         Do you remember having a
24 conversation with him on the telephone?
25     A   I do.

Page 8

1      Q   My first question would be: Is
2  there any item in the affidavit of Jeffrey Simon
3  that you take issue with or disagree with in any
4  manner?
5      A   No, except, first with respect to
6  paragraph number one it references that I have
7  served as national, chief national trial and
8  coordinating counsel in asbestos-related injury
9  and wrongful death claims for a number of
10 corporations, among those set forth in paragraph
11 one is Felpro Corporation. I have not prior to
12 October 1, 2001 served in that capacity for Felpro
13 Corporation. The remainder of paragraph one is
14 true however.
15         Paragraph six which reads "none of
16 the corporation that Mr. Hanly represents have
17 ever paid Garlock any money to either settlement
18 or judgment for any cross-claim claimed for
19 contribution or claimed for indemnity is true to
20 the best of my knowledge." So I take issue with
21 that paragraph only to the extent it doesn't
22 reflect that that statement is to the best of my
23 knowledge.
24         As far as I can tell there is
25 nothing else in the affidavit of Mr. Simon with

Page 9

1  which I disagree.
2         My Counsel has advised me, and I
3  agree Paragraph 9 which states "Garlock has never
4  conducted formal discovery against any of those
5  corporations represented by Mr. Hanly", et cetera,
6  that paragraph is true to the best of my
7  knowledge.
8      Q   Thank you, sir. For the purposes of
9  clarification and for making sure that there is a
10 clear record, I'm going to walk through these
11 quickly and if they are any issues that come up
12 paragraph by paragraph, besides the one you
13 mentioned let me know.
14         Paragraph number one or one here on
15 the affidavit says that "you, Mr. Hanly," have
16 served as chief national trial and coordinating
17 counsel in asbestos related injury and wrongful
18 death claims Federal-Mogul Corporation, Gasket
19 Holdings, Inc., Flexitallic Inc, T&N, PLC, T&N
20 Limited, Wagner Electric Corporation Ferodo
21 Corporation, and Felpro Corporation and related
22 companies since March of 1998." You indicated
23 that with respect to Felpro that has not been
24 since March of 1998?
25     A   That's correct.

3 (Pages 6 to 9)

DONALD BEECHOLD

Page 10

1    Q   Other than that how long have you
2  served as counsel for Felpro or what needs to be
3  corrected about that?
4    A   I actually have not been counsel for
5  Felpro in any capacity until October the 1st 2001,
6  at which time Federal-Mogul Corporation and all of
7  its United States subsidiaries filed for Chapter
8  11 protection.
9    Q   That's the only change that you
10 would have to Paragraph 1?
11   A   The only other change is a technical
12 one, it's Ferodo America Inc. is the name of that
13 corporation, not Ferodo Corporation.
14      MS. PHIFER: I object to the form of
15      the question.
16   Q   Paragraph 2, "Mr. Hanly has served
17 as trial counsel for T&N entities, Flexitallic
18 Inc., and Ferodo Corporation since 1981, has been
19 national trial and coordinating counsel for those
20 companies since 1985?
21   A   That's correct.
22   Q   Number 3, "No one alive has more
23 knowledge regarding the history and trial strategy
24 of asbestos injury and wrongful death cases of
25 those above-mentioned entities, than does

Page 11

1  Mr. Hanly?
2    A   Regrettably I think that's true.
3    Q   Number four, "During the time in
4  which Mr. Hanly has represented T&N, T&N has
5  resolved approximately 500,000 lawsuits involving
6  claims for asbestos-related personal injury and/or
7  wrongful death.  During that period of time
8  Garlock Inc. has been a co-defendant in several
9  hundreds thousand of those lawsuits?
10   A   I believe that to be true based on
11 my experience.
12   Q   Number five, "While Mr. Hanly has
13 represented Federal-Mogul corporation
14 Federal-Mogul Corporation has resolved
15 approximately 250,000 lawsuits filed in claims or
16 asbestos-related personal injury and/or wrongful
17 death, Garlock Inc. was a co-defendant in most of
18 those claims."
19   A   I believe that to be true.
20   Q   Number six, "None of the
21 corporations that Mr. Hanly represents have ever
22 paid Garlock any money through either settlement
23 or judgment for any cross-claim, claim for
24 contribution or claim for indemnity".
25   A   To the best of my recollection and

Page 12

1  knowledge that's true.
2    Q   Seven, "To your knowledge Garlock
3  has never demanded any payment or affirmatively
4  made any claim for payment as a cross-claim, claim
5  for contribution or claim for indemnity of any of
6  the corporations represented by Mr. Hanly".
7    A   I believe that to be true.
8    Q   Eight, "Garlock has does not and has
9  historically has not filed formal or affirmative
10 pleadings seeking cross-claim, contribution or
11 indemnity from any of the corporations represented
12 by Mr. Hanly, other than those cross-claims that
13 are deemed to have been filed by Garlock's having
14 answered a plaintiff's claim, as exists in certain
15 standing orders in Texas and similar orders of
16 certain courts in some other states.
17   A   I am not aware of any such pleadings
18 have been filed.
19   Q   Nine, "Garlock has never conducted
20 formal discovery against any of those corporations
21 represented by Mr. Hanly, including but not
22 limited to never having deposed a Federal-Mogul or
23 T&N witness?
24   A   I believe that to be true.
25   Q   Ten, "Garlock has never put before a

Page 13

1  jury a case against Federal-Mogul or T&N in any
2  case in which they remained with Garlock as trial
3  defendants".
4    A   To the best of my knowledge that's
5  true.
6    Q   Eleven, Federal-Mogul Corporation
7  and T&N and Gasket Holdings Inc. have been sued by
8  hundreds of clients represented by Water and
9  Krauss and in a professional context the interest
10 of Federal-Mogul Corporation and T&N and other
11 companies represented by Mr. Hanly are adverse to
12 those of the claimants represented by Waters and
13 Kraus."
14   A   That's true.
15   Q   Twelve, "You have not received any
16 guarantees or promises in exchange for your
17 testimony"; is that correct?
18   A   That's true.
19   Q   Number 13, "The practical effect of
20 Garlock having a cross-claim, a claim for
21 contribution or claim for indemnity in any case
22 against Federal-Mogul Corporation or T&N or any
23 related company, has been a non-event in the
24 resolution and litigation of hundreds of thousands
25 of claims over many years."

4 (Pages 10 to 13)

DONALD BEEZHOLD

Page 14

1    A   Certainly that's true from a
2  financial or strategic perspective.
3    Q   Sir, I believe those are all the
4  questions I have, I'll pass the witness.
5        MR. LEVINTHAL:  Just so it's clear
6    to start with Mr. Reed and I are going to
7    split the questions.
8  EXAMINATION BY
9  MR. REED:
10   Q   My name is Michael Reed, I'm partner
11 with Pepper Hamilton LLP in Philadelphia.  I'm
12 special bankruptcy counsel for Garlock Inc.
13       First, I would like to have marked
14 and let's call it G1, a document and ask Mr. Hanly
15 to look at it, take a few minutes to look at it.
16       (Informational Brief, was
17    marked as Exhibit No. G1, for
18    identification, as of this date.)
19   A   Yes, sir, I have looked at it.
20   Q   Can you identify G1?
21   A   Yes, sir, it's the Informational
22 Brief that the various Federal-Mogul debtors,
23 including T&N filed in the bankruptcy proceeding
24 commenced on October the 1st, 2001.
25   Q   Does your signature appear on G1?

Page 15

1    A   My signature does not appear on G1.
2    Q   Was G1 -- does your name appear
3  below a signature line which bares a signature by
4  an attorney at your firm on G1?
5    A   No, sir.  My name appears but not
6  below a signature line for my firm or me.
7    Q   All right, let's take another shot.
8        Did you participate in the
9  preparation of G1?
10   A   Yes, sir.
11   Q   Is it fair to say you are a
12 co-author of G1?
13   A   Yes, sir.
14   Q   To the best of your knowledge are
15 the contents of G1 truthful?
16   A   Yes, sir.
17   Q   Is there anything in G1 that you
18 believe to be incomplete within the confines of
19 what the subject of G1 -- strike that.
20       Why was G1 filed?
21   A   It is my understanding, and I
22 qualify this by stating that I am not a bankruptcy
23 lawyer in the sense in which that term is usually
24 employed.  It is my understanding that an
25 informational brief is often filed in a complex

Page 16

1  bankruptcy proceeding and I was asked to
2  participate in the creation of such a document.
3    Q   I would like to mark one other
4  document.  Let's call that G2.
5        (Affidavit of David M. Sherbin, was
6    marked as Exhibit No. G2, for
7    identification, as of this date.)
8    Q   Mr. Hanly, take a look at G2 and see
9  if you can identify it.
10   A   Yes, sir.  G2 is the affidavit of
11 David M. Sherbin, vice president and deputy
12 general counsel an secretary of Federal-Mogul
13 Corporation and support of various first day
14 motions filed in the Federal-Mogul bankruptcy
15 proceeding.
16   Q   G2 is a document that really
17 addresses a panoply of subject matters, isn't that
18 true, it addresses a number of different topics?
19   A   That's true.
20   Q   Is it true that one of the topics,
21 and I can't refer you to the precise page there is
22 a part of G2 that addresses the certain historical
23 matters that are also addressed in G1 concerning
24 the history of asbestos litigation with the
25 debtor?  And take your time to find it, I can't

Page 17

1  point you to the precise page?
2    A   I'm going to have to find it.
3    Q   Let me see if I can get the precise
4  page.  I apologize for that.
5        I would refer you to page eight,
6  Page 8 and 9, Pages 8 and 9.
7    A   Yes, sir, and your question.
8    Q   Pages 8 and 9 discuss the, well, did
9  you participate in or were you consulted in the
10 preparation the statements made on Pages 8 and 9?
11   A   I was not consulted concerning the
12 specific matters with respect to this affidavit.
13   Q   But, I would then ask you to briefly
14 read paragraphs 16, 17 and 18 on pages 8 and 9 if
15 you would.
16   A   Yes, sir, I have read those.
17   Q   Are those statements truthful to the
18 best of your knowledge?
19   A   To the best of my knowledge the
20 statements in paragraphs 16, 17 and 18 are true.
21   Q   Now, I would ask you the same
22 question about G2, do you know why it was filed?
23   A   No, not specifically, all that I,
24 all that I have been informed of it's typical and
25 supportive of folks in the bankruptcy area call

5 (Pages 14 to 17)

DONALD BEEZHOLD

Page 18

1  first day motions to file an affidavit from an
2  officer of the corporation.
3      Q   I only have a couple of more
4  questions.
5          Do the debtors have any agreement
6  with the parties who noticed this deposition that
7  relates to your appearance here or your testimony?
8      A   No, sir.
9      Q   You have already testified that you
10 had a phone conversation with Mr. Simon concerning
11 your testimony?
12     A   Yes, sir.
13     Q   Did Mr. Simon make any suggestions
14 to you about how you should testify?
15     A   No, sir.
16         MS. CONROY: It wasn't a
17     conversation about his testimony.
18         MR. REED: I'm not trying to
19     trick anybody. Thank you, that's all I
20     have.
21 EXAMINATION BY
22 MR. LEVINTHAL:
23     Q   My name is Bernie Leventhal not much
24 special about me. I recognize you from courtroom
25 past as a matter of fact over the years. I'm

Page 19

1  going to be very brief.
2          Mr. Simon's statement in paragraph 3
3  of the affidavit that sort of sets you out as the
4  keeper of the flame so to speak. I would assume
5  that you are in a position as to how the landscape
6  has changed over the years in the asbestos
7  litigation?
8      A   Regrettably I am.
9      Q   In fact, some of the companies, let
10 me ask you: The companies that are listed in
11 paragraph one of Mr. Simon's affidavit that you
12 have represented did any of those companies used
13 to be members Center for Claims Resolution?
14     A   Yes, sir.
15     Q   Which one?
16     A   Flexitallic or Gasket Holdings,
17 which is the same company. T&N, PLC are the same
18 company and Ferodo.
19     Q   And at some point that came out of
20 the CCR?
21     A   Yes, sir, at different points.
22     Q   And prior to being members for the
23 Center of Claims Resolution were any of them
24 members of the Wellington Facility?
25     A   Yes, sir, all three were.

Page 20

1      Q   Would it by a fair statement that
2  their purposes, the primary purpose in belonging
3  to that consortia was really to settle claims
4  filed by plaintiffs in the asbestos litigation?
5      A   That was certainly the intention
6  those three entities.
7      Q   In fact, as a general proposition
8  over the years was that, in fact, what that more
9  often than not accomplished?
10     A   Yes.
11     Q   Perhaps less than you would like.
12         Has it been your experience
13 representing these companies that in the most
14 recent times, last two years, three years, there
15 has been an increase in claims filed, cases filed
16 against these defendants?
17     A   Yes, sir.
18     Q   Has it likewise been your experience
19 that in this period of most recent couple of years
20 when more and more defendants are going into
21 bankruptcy, demands of settlement cases have
22 increased?
23     A   Absolutely.
24     Q   Would it be fair to say that in the
25 context of any single asbestos case plaintiffs

Page 21

1  were looking to your clients for larger shares so
2  the case itself could settle for the same basic
3  amount of money that it had always settled for?
4          MR. GREENSTONE: Objection.
5      A   Yes, sir.
6      Q   Was it your experience that the
7  effect on your clients was that Plaintiff's
8  counsel were looking to your clients for larger
9  so-called shares than they ever had been before?
10     A   I think that's the same question you
11 just asked.
12     Q   He objected to the form, I wanted to
13 rephrase it?
14     A   The answer is yes.
15     Q   Now, you have testified that with
16 respect to Paragraphs 8 and -- I'm sorry with
17 respect to Paragraphs 6 and 9 of Mr. Simon's'
18 affidavit you believe the statements to be true to
19 the best of your knowledge; isn't that correct?
20     A   Yes.
21     Q   Would you likewise say the same
22 thing with respect to Paragraphs 8 and 10 of
23 Mr. Simon's affidavit?
24     A   Yes, sir to the best of my knowledge
25 and recollection.

6 (Pages 18 to 21)

DONALD BEEZHOLD

**Page 22**

1    Q  And that would be because you never
2  represented Garlock so you can't say with
3  certainty what Garlock always did or never did or
4  anything like that?
5    A  No, I don't think that's the reason
6  that I qualify my answer.
7    Q  What is the reason you qualify your
8  answer?
9    A  The reason I qualify my answer is
10  that, as you know, your client and mine have been
11  defendants in hundreds of thousands of cases.
12  While I have had responsibility over many years
13  for essentially all of those cases, I cannot
14  recollect having read each and every pleading as I
15  sit here today. Therefore, it is possible that
16  there may have been from time to time affirmative
17  pleading of some sort up for another, by your
18  client asserting a cross-claim or contribution or
19  indemnity plan. I simply cannot recall that ever
20  having occurred.
21    Q  Okay, fair enough.
22      In paragraph eight, drawing your
23  attention to Paragraph 8, that states that Garlock
24  does not and historically has not filed formal or
25  affirmative pleadings seeking cross-claim

**Page 23**

1  contribution indemnity from any of the
2  corporations represented by Mr. Hanly. Other than
3  those cross claims that are deemed to have been
4  filed by Garlock's having filed an answer to
5  plaintiff's claim.
6    A  Yes, sir.
7    Q  Has it been your experience over the
8  years in various jurisdiction that the asbestos
9  litigation has had its own rules as opposed to
10  other types of litigation?
11    A  I certainly agree with that.
12    Q  I ask the record to reflect the ear
13  to ear grin on Mr. Hanly's face.
14      And has it likewise been your
15  experience in jurisdictions that "deem automatic
16  cross-claims" that there is no need or requirement
17  to file any formal pleading in addition to that to
18  preserve cross-claims of defendants?
19    A  I understand that to be a case in a
20  number of jurisdictions, yes, sir.
21    Q  And finally one last thing I guess
22  that reflects the change in landscape is that your
23  clients have never been in bankruptcy before, have
24  they?
25    A  That's true.

**Page 24**

1      MR. LEVINTHAL:  That's all I have.
2      MR. GREENSTONE:  Nothing further.
3
4  (The deposition concluded at 1:35 p.m.)
5

**Page 25**

1      CHANGES AND SIGNATURE
2  PAGE/LINE    CHANGE    REASON
3
4
5

HENJUM GOUCHER REPORTING SERVICES, L.P.

DONALD BEEZHOLD

Page 26

1    I, PAUL J. HANLY, JR., have read
the foregoing deposition and hereby affix my
2  signature that same is true and correct, except as
noted above
3
4
5
6       _____
      PAUL J. HANLY, JR.
7  THE STATE OF_____ )
   COUNTY OF_____ )
8     Before me,_____, on this
   day personally appeared PAUL J. HANLY, JR., know
9  to me (or proved to me under oath or through
   _____ (description of identity card or
10 other document) to be the person whose name is
   subscribed to the foregoing instrument and
11 acknowledged to me that they executed the same for
   the purposes and consideration therein expressed
12    Given under my hand and seal of office
   this_____day of_____,2001
13
14
15
16    _____
      NOTARY PUBLIC IN AND FOR
      THE STATE OF_____
17
18
19
20
21
22
23
24
25

Page 27

1      REPORTER'S CERTIFICATION
      DEPOSITION OF PAUL J. HANLY, JR.
2        NOVEMBER 11, 2001
3    I, DANIELLE GRANT, Shorthand Reporter in
   and for the State of New York, hereby certify to
4  the following.
      That the witness, PAUL J. HANLY, JR., was
5  duly sworn by the officer and that the transcript
   of the oral deposition is a true record of the
6  testimony given by the witness.
7      That the deposition transcript was
   submitted on NOVEMBER 2, 2001, to the witness or
8  to the attorney for the witness for examination,
   signature, and return to me.
9
      That the amount of time used by each
10 party at the deposition is as follows.
11    MR. GREENSTONE - -18 Minutes
      MR. REED - -      9 Minutes
12    MR. LEVINTHAL - -  3 Minutes
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 28

1    That pursuant to information given to the
deposition officer at the time said testimony was
2  taken, the following includes counsel for all
parties of record
3
4  DAVID GREENSTONE, Attorney For Plaintiffs
   ROBERT BROOKS-RIGOLOSI, Attorney for Defendant
5  CHRISTOPHER P. DePHILLIPS, Attorney for
Defendants
6  BERNARD L. LEVINTHAL, Attorney for Defendants
   MICHAEL H. REED, Attorney for Defendants
7  ELIZABETH L. PHIFER, Attorney for Defendants
   COLIN M. CHERICO, Attorney for Defendant
8  JOHN CESARO, Attorney for Defendants
   JAYNE CONROY, Attorney for Witness
9
   I further certify that I am neither
10 counsel for, related to, nor employed by any of
the parties or attorneys in the action in which
11 this proceeding was taken, and further that I am
not financially or otherwise interested in the
12 outcome of the action.
   Further certification requirements
13 pursuant to Rule 203 of TRCP will be certified to
after they have occured.
14
   Certified to by me this 2nd of November,
15 2001.
16
17
18
19    _____
      DANIELLE GRANT,
20    NOTARY PUBLIC IN AND FOR
      THE STATE OF NEW YORK
21
22
23
24
25

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

NOV 1 5 2001

CLERK U.S. DISTRICT COURT

By_____

DENNIS GILL, Individually and as ) 
Personal Representative of the Heirs and ) 
Estate of ROBERT GILL, Deceased, ) 
ET AL., ) 
                     ) 
       Plaintiffs, ) 
                     ) 
VS. ) 
                     ) 
ACANDS, INC., ET AL., ) 
                     ) 
       Defendants. )

CIVIL ACTION NO.

3:01-CV-2110-G

ENTERED
NOV 16 2001
U.S.D.C.

## ORDER

Before the court are the following motions: (1) the motion of the plaintiffs,

Dennis Gill, individually and as personal representative of the heirs and estate of

Robert Gill, and Ann Smith, individually and as personal representative of the heirs

and estate of Stephen Smith (collectively, "the plaintiffs"), to sever all claims against

bankrupt defendants in this action, (2) the motion of the plaintiffs to remand this

case to the state court from which it was previously removed, and (3) the emergency

motion of defendant Garlock, Inc. to transfer this case pursuant to 28 U.S.C.

§ 157(b)(5). The motions are granted in part and denied in part.

Certified a true copy of an instrument
on file in my office on __11/16/01__
Clerk, U.S. District Court,
Northern District of Texas
By _____ Deputy

In *Arnold, et al. v. AC&S, Inc., et al.*, No. C:01-CV-478 (S.D. Tex. Nov. 9,

2001), the U.S. District Court for the Southern District of Texas, Corpus Christi

Division, Judge Janice Graham Jack presiding, severed all claims against the debtor in

that action, transferred those claims to the district court in Delaware, and remanded

the remainder of the claims to the state court in which they were originally filed.  The

reasoning of *Arnold* is unassailable, and this case is indistinguishable from it.  For the

reasons stated in *Arnold*, all claims in this action against debtors Federal Mogul

Corporation (sued individually and as successor in interest to T&N PLC, T&N Ltd.,

and/or T&N, Inc. and as successor in interest to Cooper Automotive Division of

Cooper Industries, Inc.); Wagner Electric Corporation and Abex Corporation f/k/a

American Brake Shoe Company and American Brake Shoe and Foundry Company

(successor-by-merger to the American Brake Shoe and Foundry Company f/k/a the

American Brake Block Corporation); and Gasket Holding, Inc. (sued individually and

as successor in interest to Flexitallic Gasket Company) are **SEVERED** and

**TRANSFERRED**, pursuant to 28 U.S.C. § 157(b)(5),* to the **United States**

**District Court for the District of Delaware**.  All remaining claims are

---

*        Garlock simultaneously removed seven cases to this court based on
alleged "related to" jurisdiction.  The bankruptcy referred to in this order (and in the
three remaining cases) is Case Number 01-10578, pending in the United States
Bankruptcy Court for the District of Delaware.

- 2 -

**REMANDED**, pursuant to 28 U.S.C. § 1447(c) and/or § 1452(b), to the **40th Judicial District Court of Ellis County, Texas**, where they were originally filed.

The clerk shall mail a certified copy of this order to the district clerk of Ellis County, Texas. 28 U.S.C. § 1447(c).

**SO ORDERED**.

November 15, 2001.

A. JOE FISH
United States District Judge

- 3 -